UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------- x
                               :

  UNITED STATES OF AMERICA        :
                               :

            - v. -            :             S2 22 CR 650 (JPO)
                               :

  MARTIN MIZRAHI,             :
    a/k/a "Marty Mizrahi,"      :
                               :
               Defendant.       :
                               :

---------------------------------------------------- X

 

## GOVERNMENT'S OPPOSITION
## TO DEFENDANT MARTIN MIZRAHI'S RULE 29 AND RULE 33 MOTIONS

 

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
50 Main Street, Suite 1100
White Plains, New York 10606

Benjamin Klein / Emily Deininger
Assistant United States Attorneys
- *Of Counsel* -

**Table of Contents**

PRELIMINARY STATEMENT ............................................................................. 1

BACKGROUND ................................................................................................. 1

APPLICABLE LAW ........................................................................................... 11

ARGUMENT .................................................................................................... 13

POINT I .......................................................................................................... 13

THE COURT SHOULD DENY MIZRAHI'S RULE 29 AND RULE 33 MOTIONS .............. 13

**A.**   **Substantial Evidence Supported the Jury's Guilty Verdicts on the Fraud-Related Counts** ........................................................... 13

    1.   Elements of the Offenses ............................................................. 13

    2.   Substantial Evidence Supported the Jury's Guilty Verdicts  as to Counts One, Two, Three, and Six ................................................. 15

**B.**   **Substantial Evidence Supported the Jury's Guilty Verdicts on the Money Laundering-Related Counts** ..................................... 18

    1.   Elements of the Offenses ............................................................. 19

    2.   Substantial Evidence Supported the Jury's Guilty Verdicts  as to Counts Four, Five, and Seven .................................................. 20

CONCLUSION ................................................................................................. 25

## PRELIMINARY STATEMENT

The Government respectfully submits this opposition to defendant Martin Mizrahi's motions for a judgment of acquittal, pursuant to Rule 29, and for a new trial, pursuant to Rule 33. *See* Dkt. 140. For the reasons below, the defendant's motions are meritless and should be denied.

## BACKGROUND

On December 19, 2023, Superseding Indictment S2 22 Cr. 650 (JPO) was filed charging Mizrahi with: (i) conspiracy to commit wire fraud and bank fraud; (ii) wire fraud; (iii) bank fraud; (iv) conspiracy to commit money laundering; (v) money laundering; (vi) aggravated identity theft, and (vii) conspiracy to operate an unlicensed money transmitting business.

Trial was held from February 14 to March 4, 2024. At trial, the Government proved beyond a reasonable doubt that, from in or about February 2021 to in or about June 2021, Mizrahi participated in the following schemes:

### A. Laundering Bulk Cash Narcotics Proceeds

Overwhelming evidence showed that, from in or about February to in or about May 2021, Mizrahi and multiple co-conspirators participated in a scheme to launder bulk cash narcotics proceeds by converting those proceeds into cryptocurrency.

Mizrahi's co-defendant, Joel Zubaid, testified at length about the scheme. *See* Tr. 133:17-639:17. Zubaid explained that he first became involved in laundering cash in 2020, though his acquaintance Sergio Knight. Tr. 141:12-19. Knight introduced Zubaid to an individual named Eduardo, who was moving $300,000 to $400,000 per day for a cartel. Tr. 141:18-142:7. Zubaid understood that the money was coming from selling drugs, and that it was being converted into Bitcoin to send back to the cartel. Tr. 142:8-13. Eduardo gave Zubaid cash, which Zubaid converted into Bitcoin for a fee. Tr. 142:23-144:18.

Mizrahi joined the scheme shortly after Zubaid's initial transactions with Eduardo.  In January 2021, Knight arranged for Zubaid and others to launder $316,000 in drug proceeds.  Tr. 144:19-149:12.  After taking a cut, the group deposited $291,580 into an account controlled by Andrew Demaio, a businessman based in Las Vegas.  *Id.*  Demaio failed to send the Bitcoin and began ignoring Zubaid's calls.  Tr. 149:13-18.  Fearing for their safety if they failed to transfer the funds as promised, Zubaid, Knight, and Salim Qadir went to Las Vegas to look for Demaio.  Tr. 149:20-150:3.  At a certain point, Zubaid contacted Mizrahi to help them collect the stolen money.  Tr. 150:3-11.  Zubaid, Knight, and Qadir met Mizrahi at his warehouse and explained that Demaio had stolen money they had received from a cartel.  Tr. 150:25-151:12.  Mizrahi agreed to help collect the cash for $50,000.  Tr. 156:1-5.  Mizrahi also told Zubaid that he could convert cash into Bitcoin for Zubaid himself.  Tr. 158:9-16.

Over the next several months, Zubaid regularly brought bulk cash narcotics proceeds to Mizrahi to convert into Bitcoin.  Zubaid typically got cash from Negra, another cartel associate he met through Knight.  Tr. 158:17-159:9.  Zubaid, at times with co-defendant David Goran, then usually drove the money from California to Las Vegas and gave it to Mizrahi.  Tr. 159:18-21.  At times, instead of bringing the cash directly to Mizrahi, Zubaid and others deposited the cash into various accounts and then wired it to Mizrahi's accounts.  Tr. 188:23-189-10.  Zubaid and Mizrahi discussed the source of the cash, including specifically that it had come from Negra and was derived from selling drugs.  Tr. 161:6-19.  In exchange for a fee, Mizrahi took the drug money from Zubaid and sent Bitcoin to various wallets supplied by Zubaid.  Tr. 161:20-25.  In total, over several months, Zubaid estimated that he sent Mizrahi more than $5 million in narcotics proceeds for conversion into Bitcoin.  Tr. 201:13-15.

Goran similarly testified about Mizrahi's role in the scheme.  Goran confirmed, consistent with Zubaid's testimony, that he accompanied Zubaid to pick up bulk cash narcotics proceeds, which he understood came from a Mexican cartel.  Tr. 1021:17-1022:10.  He and Zubaid then either took the money to Mizrahi in Las Vegas or deposited it into various accounts they controlled.  Tr. 1022:2-4.  Mizrahi, in turn, took the cash and converted it into cryptocurrency.  Tr. 1022:5-6.  Goran also testified that he heard discussions with Mizrahi about the fact that the cash Mizrahi was getting had come from cartels and that Zubaid was in debt to those cartels as a result of the Demaio theft.  Tr. 1050:22-1052:16.  Goran likewise confirmed that Mizrahi had agreed to collect the money stolen by Demaio.  Tr. 1033:19-1034:22.

The testimony of Zubaid and Goran was corroborated by multiple sources, including photographs of bulk cash taken in Mizrahi's home and recovered from Zubaid's iCloud account.  For example, Government Exhibit 226A showed the following pile of cash, taken on or about February 16, 2021, in Mizrahi's kitchen:



Similarly, Government Exhibit 237A showed the following pyramid of cash, with a picture of Mizrahi visible in the background, taken on April 11, 2021, in the same part of Mizrahi's home:



The Government also introduced scores of emails and other electronic communications between Zubaid and Mizrahi relating to the conversion of bulk cash into Bitcoin. This included numerous emails from Zubaid to Mizrahi about amounts of cash that he would deliver and Bitcoin wallets where Mizrahi should send the money. *See, e.g.*, GX 902 (April 9, 2021 email from Zubaid to Mizrahi about "200 k btc," including Bitcoin wallet); GX 169 (May 28, 2021 email from Zubaid to Mizrahi about "cash for BTC" attaching picture of money). It also included messages from Zubaid to Mizrahi sending screenshots of communications with Negra about the conversion of cash into Bitcoin, making clear that Mizrahi was aware of the source of the funds. *See, e.g.*, GX

4

197 (April 7, 2021 email attaching screenshot of communications with Negra, including a Bitcoin wallet); GX 198 (April 4, 2021 email from Zubaid to Mizrahi asking about "100k btc," explaining "Negra just texted me inquiring about it).

The extensive communications about converting cash into Bitcoin were also consistent with the financial records admitted into evidence. For example, the Government introduced bank records showing that, as Zubaid brought Mizrahi bulk cash, Mizrahi transferred millions of dollars out of his company LV Net to his personal account. *See* GX 702 (summarizing records showing that, from April 1, 2021 to June 21, 2021, Mizrahi sent $5,295,000 from LV Net to his personal account). Once he had the money in the banking system, Mizrahi transferred it on from his personal account to Coinbase, and then on from Coinbase to cryptocurrency wallets supplied by Zubaid. *Id.*; *see also* GX 703 (summarizing Coinbase records showing 29 transfers, totaling $3,855,704.30, from Mizrahi's Coinbase wallet to four cryptocurrency wallets associated with Negra).

The Government also introduced documentary evidence relating to Mizrahi's efforts to collect stolen cash for Zubaid. This included, for example, numerous emails from Zubaid to Mizrahi about Demaio. *See, e.g.*, GX 958 (email chain between Zubaid and Mizrahi regarding "Andrew's account info"); GX 973 (January 30, 2021 email from Zubaid asking Mizrahi to "check out" Demaio); GX 960 (February 3, 2021 email from Zubaid sending possible address for Demaio to Mizrahi). It also included a voicemail that Mizrahi sent to Zubaid demonstrating that he had reached out to Demaio's company. *See, e.g.*, GX 965 (February 23, 2021 email from Mizrahi to Zubaid attaching voicemail from Cashgrab). The Government similarly introduced emails relating to Mizrahi's efforts to collect roughly $500,000 stolen by another man named Anthony. *See, e.g.*, GX 160, GX 163. This evidence included, among other things, WhatsApp messages, in which

Mizrahi *admitted* that he had successfully collected $380,000 from Anthony.  *See* GX 1365. As part of this exchange, Zubaid noted that he had "protected" Mizrahi after Anthony had stolen this money because Anthony had "solicited in [Mizrahi's] home."  *Id.*  At trial, Zubaid testified about this exchange, explaining that he had protected Mizrahi by paying down the debt so that the cartel would not physically harm Mizrahi.  Tr. 308:1-18.

### B.  Laundering Fraud Proceeds

At trial, substantial evidence showed that Mizrahi also laundered the proceeds of a business email compromise fraud involving Brownsville Community Development Corporation.

It was uncontested at trial that millions of dollars were stolen from Brownsville as part of a business email compromise fraud.  Edmund Awuah, Brownsville's Chief Financial Officer, testified that his email had been compromised and used to fraudulently direct the company's bank, Carver Federal Savings Bank, to add "Dain Brooks" as someone with access to Brownsville's account, including the authority to send wire transfers.  Tr. 100:1-113:17.  Patrick Brennan, a Senior Vice President at Carver, testified that the fraudulently obtained "Dain Brooks" credentials were used to direct Carver to send millions of dollars in wire transfers from Brownsville's account to various third parties.  Tr. 62:17-80:3.  As a result of the fraud, approximately $3.5 million was stolen from Carver.

Zubaid testified about Mizrahi's role in laundering the money stolen from Brownsville.  As Zubaid explained, and reflected in numerous emails, shortly before the Brownsville fraud, he and Mizrahi were involved in another wire fraud scheme, during which Mizrahi was supposed to receive $10 million into his girlfriend's account.  Tr. 210:5-213:18.  Instead of getting the money, however, a series of fraudulent charges were run on the account.  *Id.*  Undeterred, Mizrahi wanted to continue doing business with Zubaid.  Tr. 213:20-22.  Shortly thereafter, an individual Zubaid

6

knew as Omar Lucas began sending wires from Brownsville to Zubaid's OB Marketing account, which Zubaid sent on, in part, to Mizrahi.  Tr. 213:23-216:15.  Zubaid and Mizrahi discussed the source of the money, including that it had been stolen and had to be moved fast or the wires could be reversed.  Tr. 214:1-12.  Mizrahi then converted the money into Bitcoin for a commission of approximately 7%.  Tr. 214:18-21.  Zubaid got a total of four wires from Lucas into the OB Marketing account.  Tr. 218:25-219:4.  After each wire came in, Zubaid transferred money to Mizrahi for conversion to Bitcoin.  Tr. 219:5-221:19.  At a certain point, however, the OB Marketing account was frozen by the bank.  *Id.*  Zubaid then sent Lucas wiring instructions for LV Net, so Lucas could send the wires directly to Mizrahi.  Tr. 221:20-222:11.  Zubaid said he did not know whether Lucas sent any further wires to Mizrahi's account.  Tr. 222:21-24.

Goran similarly testified about the scheme to launder the money stolen from Brownsville. Goran explained that Zubaid initially told him the wires were connected to real estate, but he understood that they were in fact fraudulent.  Tr. 1074:15-1076:3.  Goran knew that the source of the wires had previously sent money to Zubaid, which had been frozen for fraud.  Tr. 1076:15-1077:10.  Before the Brownsville wires came in, Goran was present for a meeting with Mizrahi at a strip mall, during which Goran saw that Mizrahi was extremely upset because an account Mizrahi had given to Zubaid had been connected to a fraud.  Tr. 1077:14-1078:13.  After the stolen wires from Brownsville came in, Goran, who had access to the OB Marketing account, sent a portion of the money on to LV Net for Mizrahi to convert into Bitcoin.  Tr. 1080:23-1082:20.  Goran also testified that he understood that Mizrahi was paid for his role in the scheme.  Tr. 1091:20-1092:3.

Once again, the Government introduced substantial documentary evidence corroborating the testimony of Zubaid and Goran.  For example, financial records show that, from May 12 to May 14, 2021, $690,000 was sent from OB Marketing to LV Net in four different wires.  *See* GX

702 at 6.  As this money was sent from OB Marketing to LV Net, Mizrahi sent Bitcoin transfers valued at approximately $683,000 from his Coinbase account to various cryptocurrency wallets supplied by Zubaid.  *Id.*  Similarly, WhatsApp messages showed that Zubaid communicated with Lucas about Mizrahi, including specific communications in which Lucas asked to "put Marty on the line."  GX 224A.  These messages similarly showed Zubaid sending Lucas wiring instructions for LV Net.  *See* GX 225A.  Finally, email communications show that, after the fraud was reported to Bank of America, Mizrahi lied to the bank about the purpose of the transfers, falsely claiming that these wires had been payment for legitimate LV Net services, saying:  "We sold OB Marketing & Research LV.Net Hosting services and they paid us for them."  GX 319.

## C.  Engaging in Credit Card Fraud

At trial, the Government also introduced overwhelming evidence showing Mizrahi's participation in a third scheme—a multi-million credit card fraud spanning from in or about April 2021 to in or about June 2021, as the money laundering schemes were ongoing.

Zubaid testified at length about the nature of the credit card fraud scheme and Mizrahi's role.  Zubaid learned about the scheme from Gazi Khan, who claimed to be able to preload credit cards with large sums of stolen money that could be accessed by charging the cards and entering a six-digit pre-authorization code.  Tr. 223:1-225:5.  Zubaid brought the scheme to Mizrahi who agreed to use LV Net to run the fraudulent charges for a percentage of the money.  Tr. 225:6-226:8.  At first, Mizrahi asked for 7%, but, over time, he began asking for larger sums as he was "taking all the risk."  Tr. 225:23-226:8.  Over the course of several weeks, Mizrahi, through LV Net, ran millions in fraudulent credit card charges on cards supplied to him by Zubaid via Khan.  Tr. 296:15-18.  Mizrahi never provided any goods or services in connection with these charges.  Tr. 231:20-22.  Instead, he, Zubaid, and Khan, were simply splitting the money.  Tr. 231:23-24.

Goran testified similarly about the scheme. Goran knew that Khan had initially proposed the scheme, and that the participants—including Khan, Zubaid, and Mizrahi—were simply splitting up the money without providing anything in return. Tr. 1101:2-1102:22. Goran was present at a meeting where Khan received a paper bag with cash as part of his proceeds from the scheme. Tr. 1102:23-1103:12. For his part, Goran signed various fraudulent invoices that could be sent to, among others, Mizrahi, which he understood could then be passed on to the credit card companies. Tr. 1104:25-1107:25. Goran was also present for discussions in which Mizrahi specifically discussed the scheme, including expressing his desire to wait four to six months before paying out other scheme participants such as Khan because he was worried that the fraudulent charges could be reversed by the credit card companies. Tr. 1108:6-1109:8.

Once again, substantial evidence supported the testimony of Zubaid and Goran. Emails showed Zubaid regularly sending Mizrahi pictures of credit cards, identification documents, and six-digit codes. *See, e.g.*, GX 995 (May 6, 2021 email from Zubaid to Mizrahi attaching Amex for Scott Walker); GX 1001 (May 8, 2021 email from Zubaid to Mizrahi attaching Mastercard and license for Yaser Hamada). Financial records showed that Mizrahi, though LV Net, charged tens or hundreds of thousands of dollars at a time to the cards supplied by Zubaid. *See* GX 705 at 48 (summarizing charges per cardholder). Emails also showed that, when charges were rejected or disputed, Mizrahi simply swapped out the cards for replacement cards supplied by Zubaid. *See, e.g.*, GX 1025 (May 18, 2021 email from Zubaid forwarding Mizrahi message "from Gazi" that they would do "replacement for any returns"); GX 1044 (May 18, 2021 email forwarding Mizrahi message "From Gazi" that the best "option" after chargebacks was "just change to fresh card new transactions and return the disputed funds"). Two of the named cardholders—Scott Walker and Michael Loflin—also testified at trial that they had never heard of Mizrahi or approved any of the

9

charges run by LV Net.   Tr. 714:7-725:18, 1389:4-1397:8.   Rather, the testimony of these cardholders showed that they were both victims of identity theft.   *Id.*

Numerous documents also showed Mizrahi's efforts to cover up the scheme.   After getting questions from credit card processors about the fraudulent charges, Mizrahi created a number of fake invoices to make those charges look legitimate.   *See, e.g.*, GX 1088 ($2.1 million invoice for "Hosting and servers" for Andrea Pinto Zubaid); GX 1088 ($24.6 million invoice for "Hosting and servers" for "Melton Tischler"); GX 1118 ($4.2 million invoice for "Hosting and servers" for Shahvand Aryana); GX 1110 ($6.8 million invoice for "Hosting and servers" for Edi Rivera).

Testimony from multiple witnesses further showed that the credit card charges were *not* part of LV.net's business operation; rather, Mizrahi effectively concealed these charges from everyone at LV.net except for the company's comptroller, who Mizrahi directed to run the charges and prepare the false invoices.   Sergey Pyatkov, LV Net's comptroller, testified that the charges were booked to the company's "loan to company stockholder" account, which was used for Mizrahi's personal transactions, and that he never saw any evidence that LV Net provided services in exchange for the charges. Tr. 864, 914, 917, 919, 920, 933.   Pyatkov further testified no one from LV Net was involved in running the credit card charges besides himself and Mizrahi.   Tr. 914:21-915:2.   During the defense case, Jeffery Peoples, LV Net's Chief Operating Officer, testified that he had no idea that LV Net was running millions in credit card charges in 2021, and that he first saw a $24.6 million invoice for Tischler—which would have multiples larger than any contract in LV Net's history—the day before he testified. Tr. 1464:23-1468:23. And Ronald Cook, LV Net's Chief Financial Officer, similarly testified that he was not aware in mid-2021 that LV Net had run about $8 million in credit card charges, that he was not involved in running those charges, and that he did not know anything about them.  Tr. 1554:8-25.

Financial records introduced by the Government at trial show that, in total, from April 29 to June 11, 2021, Mizrahi ran at least forty fraudulent credit card charges totaling $7,982,450.  *See* GX 705 at 48.  Notably, the Government also introduced a spreadsheet prepared by Mizrahi himself as the fraud was ongoing, showing the amounts charged and the payments due to co-conspirators.  *See* GX 1034.  This spreadsheet showed that, as of May 19, 2021, Mizrahi had charged $1,577,907 on cards supplied by Zubaid, and that payments totaling $954,000 had been made to Khan.  *Id.*  WhatsApp messages between Zubaid and Mizrahi similarly confirmed that Zubaid and Mizrahi were discussing the six-figure payments to Khan as the fraud was ongoing.  *See* DX RRR at 68 (May 10, 2021 message:  "Marty I gave the cc people 80k the other day and 160k today.  Total so far I've given him 240k").

## APPLICABLE LAW

### A.  Rule 29 Motion

A motion for judgment of acquittal under Rule 29 may be granted only if "no rational trier of fact could find guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 317 (1979). In other words, a judgment of acquittal is warranted "only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  *United States v. Jiau*, 734 F.3d 147, 152 (2d Cir. 2013) (quoting *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004)).

In considering a Rule 29 motion, a Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence."  *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019).  The "place for a challenge to a witness's credibility is in cross-examination and in subsequent argument

11

to the jury." *United States v. Roman*, 870 F.2d 65, 71 (2d Cir. 1989).  The jury then decides how these arguments bear on "the weight [it] should accord to the evidence." *United States v. Truman*, 688 F.3d 129, 140 (2d Cir. 2012).  The Court must defer to the jury's resolution of conflicting testimony.  *See United States v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002).

As the Second Circuit has explained, a defendant challenging a jury's guilty verdict "bears a heavy burden."  *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017).  Deference is "especially important when reviewing a conviction of conspiracy ... because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019) (quoting *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir. 1992)).

### B.  Rule 33 Motion

Federal Rule of Criminal Procedure 33 provides that a court "may grant a new trial to [a] defendant if the interests of justice so require."  Fed. R. Crim. P. 33.  "[M]otions for a new trial are disfavored in the Second Circuit," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), and may be granted only where letting a guilty verdict stand would be a "manifest injustice," *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992).  To meet this demanding threshold, "[t]here must be a real concern that an innocent person may have been convicted.  It is only when it appears that an injustice has been done that there is a need for a new trial in the interest of justice." *United States v. Bell*, 584 F.3d 478, 483 (2d Cir. 2009).

The Second Circuit has cautioned that Rule 33 "motions are granted only in 'extraordinary circumstances,' and are committed to the trial court's discretion."  *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (citing *United States v. Torres*, 128 F.3d 38, 48 (2d Cir. 1997)).  Because courts "generally must defer to the jury's resolution of conflicting evidence and

assessment of witness credibility," only in "exceptional circumstances" may the court "intrude upon the jury function of credibility assessment." *McCourty*, 562 F.3d at 476; *see also United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (explaining that, in considering a Rule 33 motion, a district court must "strike a balance between weighing the evidence and credibility of witnesses and not 'wholly usurp[ing]' the role of the jury").

The defendant bears the burden of proving that he is entitled to a new trial under Rule 33. *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009).

## ARGUMENT

### POINT I

### THE COURT SHOULD DENY MIZRAHI'S RULE 29 AND RULE 33 MOTIONS

**A.     Substantial Evidence Supported the Jury's Guilty Verdicts on the Fraud-Related Counts**

At trial, Mizrahi was convicted of four fraud-related offenses charged in the superseding indictment: (i) Conspiracy to Commit Wire Fraud and Bank Fraud (Count One); (ii) Wire Fraud (Count Two); (iii) Bank Fraud (Count Three); and (iv) Aggravated Identity Theft (Count Six). Substantial evidence supported the jury's guilty verdict as to each of these charges.

#### 1.   Elements of the Offenses

*a.   Count One.*  Mizrahi was convicted in Count One of conspiring, in violation of 18 U.S.C. § 1349, to: (i) commit wire fraud, in violation of 18 U.S.C. § 1343, and (ii) commit bank fraud, in violation of 18 U.S.C. § 1344.

There are two elements for this conspiracy offense: (1) the existence of the conspiracy, and (2) that the defendant knowingly participated in the conspiracy. *United States v. McGinn*, 787 F.3d 116, 124 (2d Cir. 2015).

13

Wire fraud, which is the first object of the conspiracy, has the following elements: *first*, that there was a scheme to defraud to obtain money or property by use of materially false or fraudulent representations; *second*, that the defendant knowingly participated in the scheme with specific intent to defraud; and *third*, that, in furtherance of the scheme, the defendant used or caused the use of interstate wires.  *See United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000).

Bank fraud, which is the second object of the conspiracy, has the following elements: *first*, that there was a scheme or artifice to defraud a bank *or* obtain money owned by or under the custody or control of a bank by means of materially false representations; *second*, that the defendant acted with specific intent; and *third*, that the bank involved was federally insured.  *See United States v. Ferrara*, 788 F. App'x 748 (2d Cir. 2019)

    *b.  Count Two*.  Mizrahi was convicted in Count Two of the substantive crime of wire fraud, the elements of which are set forth above.

    *c.  Count Three*.  Mizrahi was convicted in Count Three of the substantive crime of bank fraud, the elements of which are set forth above.

    *d.  Count Six*.  Mizrahi was convicted in Count Six of the substantive crime of aggravated identity theft, which has the following elements: *first*, that the defendant knowingly used, transferred, or possessed a means of identification of another person, *second*, that the defendant used the means of identification during and in relation to one of the above-referenced offenses of wire fraud, bank fraud, or conspiracy to commit wire fraud and bank fraud, and *third*, that the defendant acted without lawful authority.

### 2.  Substantial Evidence Supported the Jury's Guilty Verdicts as to Counts One, Two, Three, and Six

As described above, at trial, the Government introduced overwhelming evidence that Mizrahi conspired to commit wire and bank fraud, committed wire fraud and bank fraud, and committed aggravated identity theft.

_a.  Wire Fraud (Count Two)._  Mizrahi primarily argues that the Government failed to establish that he had the requisite specific intent to defraud.  Dkt. 140 at 6.  The evidence at trial, however, overwhelming proved that Mizrahi knowingly participated in a scheme to charge millions on credit cards without providing any goods or services.

As initial matter, the evidence was overwhelming that Mizrahi was personally involved in running the charges, providing specific instruction to Mr. Pyatkov as to their amounts and timing. _See, e.g._, Tr. 854, 856.  As Dan Titus, a representative from American Express explained, merchants such as LV Net were prohibited from using cards for charges that did not represent bona fide sales, and, when running the charges, merchants are implicitly representing that the charge is legitimate and that they are providing goods or services to the customer.  Tr. 1204-06.

The undisputed evidence further showed that it was Mizrahi who instructed Mr. Pyatkov as to what purported goods and services should be described in the fraudulent invoices that were later created and submitted to both banks and credit card companies to justify the charges.  _See, e.g._, Tr. 880-81, 913-14, 917, 919.  In addition, the evidence showed that that LV Net never provided any of the goods and services listed on the relevant invoices, Tr. 864, 914, 917, 919, 920, 933, nor were there any records indicating that there had ever been any steps taken towards doing so.  In particular, Special Agent Sonny Hillyard testified that he reviewed documents produced in response to a trial subpoena to LV Net that requested records relating to, among other things, a

number of the card holders, and that LV Net did not produce any records indicating it had provided any goods, services, or done any work in connection with the charges that were run.  Tr. 1373-74.

Taken together, a reasonable jury could have easily concluded from the above-described evidence that Mizrahi purposefully acted with a specific intent to defraud banks and credit card companies by submitted fraudulent charges for approval.

But that was not all.  Zubaid testified that Mizrahi agreed to, and did, participate in this scheme.  *See*, e.g.*,* Tr. 225-231.  Goran also Mizrahi was a knowing participant in the scheme.  Tr. 1101-1102.  Indeed, Goran specifically recollected that Mizrahi wanted to hold the money received for several months before distributing it to co-conspirators because he was worried about chargebacks, Tr. 1108-1109—a concern that is consistent with Mizrahi's awareness that the charges being run were invalid and likely to be disputed.   And a spreadsheet created by Mizrahi showed that the funds were being split between Mizrahi, Zubaid, Khan, and other co-conspirators—a record that was consistent with fraud, not legitimate transactions.  GX 1034.

*b.  Bank Fraud (Count Four)*.  With regard to the bank fraud charge, Mizrahi again argues that he lacked the requisite specific intent.  Dkt. 140 at 6.  But the evidence discussed above with regard to the wire fraud charge would also easily permit a jury to conclude that Mizrahi acted with the intent to obtain funds under the control of a bank by fraudulent means.  Indeed, there is no real dispute that the purpose of submitting the charges into the credit card processing system was to get funds released from banks (i.e., the bank accounts of cardholders or the credit card companies) to Mizrahi and his co-conspirators.  *See* Tr. 1205-06.  And for the reasons described above, the evidence was overwhelming that those charges were fraudulent and that Mizrahi submitted false invoices, among other things, to facilitate the fraud.

The evidence further showed that Mizrahi participated in a scheme to defraud a bank by lying to Bank of America about why LV Net had received funds that had been stolen from Brownsville, after the bank had flagged the wires as potentially fraudulent. Specifically, when asked about the purpose of those wire transfers, Mizrahi falsely told Bank of America that the wire transfers were payment for "hosting services" LV Net had provided to OB Marketing. GX 319. But the evidence showed that, in truth, the wires were sent to Mizrahi solely so that he could convert the funds into cryptocurrency for Zubaid; OB Marketing never did any business with LV Net for which LV Net would have provided hosting services. GX 601 (Letter from LV Net's in-house counsel stating that the wire transfers were "tendered . . . as payment for Bitcoin" by Zubaid); Tr. 936 (Pyatkov testimony that OB Marketing wires "were for the sale of cryptocurrency"); Tr. 1083 (Goran; similar); Tr. 1353-54 (Hillyard; LV Net produced no contracts or business records regarding OB Marketing). Mizrahi admitted this during cross-examination, acknowledging that the "wires from OB Marketing" were sent because he "sold [Zubaid] Bitcoin." Tr. 1924. Mizrahi lied to the bank in order to maintain access to those funds and be able to withdraw them. *See* Tr. 811 (Olivia Rivera testimony that Mizrahi refused to give Bank of America authorization to return the wires to the sender). This evidence thus overwhelming and separately showed that Mizrahi committed bank fraud.

_c.  Conspiracy to Commit Wire Fraud and Bank Fraud (Count One)_. With regard to the conspiracy count, Mizrahi does not dispute that Zubaid, Goran, and others were involved in a criminal conspiracy, but argues that the Government failed to prove that Mizrahi knowingly and willfully became a part of their scheme. As discussed above, however, both Zubaid and Goran testified that Mizrahi knowingly and willfully agreed to engage in the scheme to fraudulently charge credit cards and launder funds obtained via wire transfer from Brownsville. In assessing

17

the Rule 29 motion, the Court is obligated to defer to the jury's assessment that their testimony was credible.  *See Pauling*, 924 F.3d at 656.  Regardless, their testimony on this front was extensively corroborated by substantial other evidence, including WhatsApp messages, emails between Mizrahi and Zubaid, and evidence of Mizrahi's lies and concealment that provided strong circumstantial evidence of consciousness of guilt.  Mizrahi's argument with regard to the conspiracy count should therefore be rejected.

> *c. Aggravated Identity Theft (Count Six)*.  The evidence was similarly more than sufficient for a reasonable jury to find all of the elements of aggravated identity theft satisfied.  First, the evidence showed that Mizrahi received a number of emails from Zubaid containing copies of driver's licenses and credit card numbers—i.e., means of identification—for other people.  *See, e.g.*, GX 995 (Scott Walker); GX 1001 (Yaser Hamada).  Second, as discussed above, it showed that Mizrahi possessed and used that information to both charge the credit cards and create fake invoices in an attempt to justify the fraudulent charges that are the basis for the wire fraud, bank fraud, and above-discussed conspiracy charges.  *See, e.g.*, GX 1088, 1110, 1118.  And, finally, the evidence showed that Mizrahi did so without lawful authority—both because he lacked authority from the cardholders and because he was using the cards unlawfully to commit a fraud.  *See* Tr. 714-725 (Walker testimony that he did not authorize charges); Tr. 1389-1397 (Loflin; similar). Taken together, this evidence was more than sufficient to support the jury's guilty finding.

**B.    Substantial Evidence Supported the Jury's Guilty Verdicts on the Money Laundering-Related Counts**

Mizrahi was also convicted of three money laundering-related offenses: (i) conspiracy to commit money laundering (Count Four); (ii) concealment money laundering (Count Five); and

(iii) conspiracy to operate an unlicensed money transmitting business (Count Seven).  Substantial evidence supported the jury's guilty verdict as to each of these charges.

### 1. Elements of the Offenses

*a.  <u>Count Four</u>*:  Mizrahi was convicted in Count Four of conspiring, in violation of 18 U.S.C. § 1956(h), to:  (i) engage in concealment money laundering, in violation of 18 U.S.C. § 1956(a), or (ii) engage in monetary transactions derived from criminal proceeds, in violation of 18 U.S.C. § 1957(a).

Conspiracy to commit money laundering has two elements:  *first*, the existence of the conspiracy charged in the indictment, and; *second*, that at some point the defendant knowingly and willfully participated in the conspiracy.  *See United States v. Wiseberg*, 727 F. App'x 1, 5 (2d Cir. 2018) (citing *United States v. Garcia*, 587 F.3d 509, 515 (2d Cir. 2009)).

The first object of the conspiracy (*i.e.*, concealment money laundering) has the following elements:  *first*, that the defendant conducted (or attempted to conduct) a "financial transaction," which in some way or degree affected interstate or foreign commerce; *second*, that the financial transaction involved the proceeds of specified unlawful activity ("SUA"); *third*, that the defendant knew that the financial transaction involved the proceeds of some form of unlawful activity; and *fourth*, that the defendant knew that the transaction was designed in whole or in part either to conceal or disguise the nature, location, source, ownership or control of the proceeds of the unlawful activity.  *See United States v. Gotti*, 459 F.3d 296, 334 (2d Cir. 2006); *United States v. Ray*, No. 20-CR-110 (LJL), 2022 WL 17175799, at *7 (S.D.N.Y. Nov. 23, 2022).

The second object of the conspiracy (*i.e.*, transactions in criminally derived property) has the following elements:  *first*, the defendant engaged in a monetary transaction affecting interstate commerce; *second*, the transaction involved criminally derived property worth more than $10,000;

19

*third*, the property was derived from a SUA; *fourth*, the defendant knew the transaction involved proceeds of a criminal offense, and; *fifth*, the transaction took place in the United States or the defendant is a U.S. person.  *United States v. Bick*, 711 F. App'x 664, 667 (2d Cir. 2017).

     *b.*  <u>Count Five</u>.  Mizrahi was convicted in Count Five of the substantive crime of concealment money laundering, the elements of which are set forth above.

     *c.*  <u>Count Seven</u>.  Mizrahi was convicted in Count Seven of conspiracy to operate an unlicensed money transmitting business, in violation of 18 U.S.C. § 371.  "The elements of a conspiracy under § 371 are: '(1) an agreement between two or more persons to commit an unlawful act; (2) knowingly engaging in the conspiracy intending to commit those offenses that were the objects of the conspiracy; and (3) commission of an 'overt act' by one or more members of the conspiracy in furtherance of the conspiracy.'"  *United States v. Allen*, 788 F.3d 61, 70 (2d Cir. 2015) (quoting *United States v. Reyes*, 302 F.3d 48, 53 (2d Cir. 2002)).

     The crime of operating an unlicensed money transmitting business, in turn, has three elements: *first*, that an unlicensed money transmitting business existed; *second*, that the defendant or a co-conspirator controlled, conducted, managed, supervised, directed, or owned all or part of that business with knowledge that it was used as an unlicensed money transmitting business; and *third*, that operation of the money transmitting business affected interstate or foreign commerce. *See* 18 U.S.C. § 1960; Tr. 2247:7-2248:8.

### 2. Substantial Evidence Supported the Jury's Guilty Verdicts as to Counts Four, Five, and Seven

     As set forth above, at trial, the Government introduced substantial evidence that supports the jury's finding that Mizrahi conspired to launder money, laundered money, and conspired to engage in the unlicensed transmission of money.

a. _Concealment Money Laundering (Count Five)_.  To begin, the evidence overwhelmingly established that Mizrahi engaged in concealment money laundering.  The Government introduced evidence that Mizrahi received the proceeds of not just one but two different kinds of specified unlawful activity—narcotics sales and wire fraud.

As to the first SUA, narcotics sales, both Zubaid and Goran testified that the bulk cash that they gave to Mizrahi was in fact drug proceeds.  _See, e.g._, Tr. 142:11-13 (Zubaid:  "The source of the money was by selling drugs in U.S., and they had to get the Bitcoin to send it back to the cartel so they can get their money back."); Tr. 1022:9-10 (Goran:  "It was from a Mexican mafia cartel or drug proceeds, criminal activity.").  This testimony was strongly corroborated by, among other things, pictures of the bulk cash, emails and financial records showing the volume and frequency of the money that was transmitted, messages from Negra and others relating to converting the money into Bitcoin, the economically irrational nature of using multiple intermediaries, and evidence relating to threats of violence when money went missing.  _See, e.g._, GX 226A and GX 227A (pictures of cash), GX 703 (summary of transfers), GX 197 and GX 198 (messages from Negra), and GX 1365 (messages from Zubaid about "protect[ing]" Mizrahi).

As to the second SUA, wire fraud, it was uncontested at trial that Brownsville was subject to a business email compromise fraud.  And the Government introduced financial records showing that money from that fraud went directly from Brownsville to OB Marketing to LV Net.  _See_ GX 702 at 6.

The Government similarly introduced substantial evidence that Mizrahi knew the money he received was the proceeds of _some_ form of unlawful activity.  To start, Zubaid testified that he and Mizrahi specifically discussed that the cash he was receiving had come from selling drugs and that the wires he sent from OB Marketing had come from fraud.  Tr. 161:6-19, 214:1-12.  Goran

21

similarly testified that he heard discussions with Mizrahi about the fact that the cash Mizrahi was getting had come from cartels.  Tr. 1050:22-1052:16.  Their testimony, moreover, was thoroughly corroborated by documentary evidence.  Pictures and emails showed that Zubaid and Goran were regularly bringing Mizrahi piles of cash.  *See, e.g.*, GX 226A, 227A.  Emails show that Mizrahi was aware that this money was coming from third parties, including Negra.  *See* GX 197, 198. And messages show that Mizrahi may have been in touch directly with some of those third parties, including Lucas.  *See* GX 224A.  Numerous emails also show that Mizrahi willingly gave Zubaid information for his girlfriend's account and then continued doing business with Zubaid after that account was used for fraud.  *See* GX 112 (May 6, 2021 email from Mizrahi to Zubaid regarding "My bank fraud").  The documents also show that Mizrahi was not only aware that cash had been stolen from Zubaid but was willing to help him collect stolen funds from third parties; indeed, he admitted in a message that he was successful in recovering $380,000.  GX 1365.  The documents also show that when he was questioned by the bank about the transfers from OB Marketing he lied to make the transactions appear legitimate.  *See* GX 319.  Any one of these pieces of evidence would be more than sufficient to support the jury's verdict.  Taken together, and especially viewed in the context of the ongoing credit card fraud scheme, the evidence clearly demonstrates Mizrahi's knowledge that the money he was getting from Zubaid was coming from unlawful sources.

Finally, the evidence plainly showed that Mizrahi engaged in financial transactions designed at least in part to conceal the nature and source of the drug and fraud proceeds he received from Zubaid.  As the Government proved at trial, Mizrahi conducted these schemes in large part through his company LV Net, thereby disguising the source of the money he received from Zubaid and washing the illegal proceeds through the entity when introducing the funds into the financial system.  A substantial portion of the proceeds that Mizrahi got came in cash.  Mizrahi did not

deposit this money into a financial institution; instead, he pulled out significant sums of money from LV Net, making it far more difficult to connect the subsequent Bitcoin transfers to the monies received from Zubaid.  He also transferred the money in several steps.  He first sent money from LV Net to his personal account, then from his personal account to Coinbase, and then ultimately on to a rotating cast of anonymous Bitcoin wallets supplied by Zubaid.  Each one of these steps constitutes a financial transaction, and the jury was certainly entitled to conclude that these transactions were designed at least in part to conceal the origin of the proceeds.  Indeed, Zubaid testified that the entire purpose of involving Mizrahi in these transactions—*i.e.*, the reason Mizrahi was being paid—was to hide where the money was coming from.  Tr. 189:6-10 (Q.  "If you'd already deposited the money, why didn't you just send it to an exchange and just buy the Bitcoin yourself?"  A. "Because Mr. Mizrahi had the ability to transfer the Bitcoin, and I wanted to have a clear -- I wanted to hide my identity also.").  And that makes sense.  In a legitimate transaction, there would be no need to introduce multiple intermediaries and bank accounts simply to convert cash into Bitcoin.  Rather, as the defense's own money laundering expert, Colin Schmitt, conceded at trial, such behavior constitutes layering, which makes laundered money harder to trace.  Tr. 163215-17 ("So if I'm following your question, so transferring the funds via wire through multiple bank accounts and then through cryptocurrency, yes, that can be an example of layering.").

      *b.  Money Laundering Conspiracy (Count Four)*.  Because the elements of concealment money laundering are satisfied, the jury was entitled to convict on the conspiracy charge in Count Four simply by finding that a conspiracy to commit this offense existed and that the defendant knowingly and willfully participated in the conspiracy.  Such a conclusion was plainly well supported by the evidence.  Indeed, as set forth above, both Zubaid and Goran testified that Mizrahi

knowingly and willfully participated in the money laundering scheme.  And their testimony was supported by substantial evidence, including pictures, emails, and WhatsApp messages.

Alternatively, if it wished to do so, the jury was entitled to conclude that the second object of the conspiracy (*i.e.*, transactions in criminally derived property) was satisfied.  Here again, as set forth above, there is substantial evidence that Mizrahi (a U.S. person) knew that the money coming from Zubaid was criminally derived property.  And he plainly engaged in numerous transactions in this United States, including interstate wires, that exceeded $10,000.

*c.   Money Transmitting Conspiracy (Count Seven)*.  Finally, overwhelming evidence supported the jury's finding that Mizrahi conspired to operate an unlicensed money transmitting business.  As an initial matter, it was uncontested at trial that Mizrahi and his company LV Net were not registered as money transmitting businesses.  *See* GX 618 (no registration for Mizrahi); GX 619 (no registration for LV Net).  Yet, despite being unregistered, the evidence clearly showed that Mizrahi moved *millions* in cash and wires for Zubaid on behalf of third parties, and that he did so for money.  Indeed, despite telling multiple falsehoods, even Mizrahi begrudgingly admitted on cross examination that he "[a]t times" charged Zubaid fees to convert money into Bitcoin.  *See* Tr. 1932:11-13 ("Q. OK. But you were charging Joel Zubaid more than the cost of just the Bitcoin, right?  A. At times.").  Mizrahi was also forced to admit, given the overwhelming evidence, that he understood that Zubaid was bringing him cash that belonged to others.  *E.g.*, 1851:19 ("He told me that Negra was his client.").  The evidence thus showed that Mizrahi was, in exchange for a fee and without a license, taking money from third parties and transferring it by sending out Bitcoin, which plainly satisfies the standard for operating an unlicensed money transmitting business.  *See* Tr. 2246:22-2252:23 (describing legal standard).

24

In addition to his knowing and intentional participation in the conspiracy, the Government also proved that Mizrahi and other conspirators committed multiple overt acts in furtherance of the conspiracy, including those listed in the Superseding Indictment.   Most notably, the Government introduced numerous documents showing that, in exchange for cash and wires, Mizrahi transferred more than $3 million to specific Bitcoin wallets supplied to him by Zubaid. *See, e.g.*, GX 703 (summarizing Coinbase records showing 29 transfers, totaling $3,855,704.30, from Mizrahi's Coinbase wallet to four cryptocurrency wallets associated with Negra); *see also* GX 167, 190, 197, 198, 424, 430, 957 (underlying financial records).  The Government also proved that Mizrahi took additional acts in furtherance of the conspiracy, including, among other things, engaging in multiple meetings with Zubaid and Goran to accept cash, transferring money from LV Net to his personal accounts, and transferring money from his personal accounts to Coinbase. Taken together, this evidence was more than sufficient to support the jury's guilty finding.

## CONCLUSION

For these reasons, the Government respectfully requests that the Court deny the defendant's motions for a judgment of acquittal, pursuant to Rule 29, and for a new trial, pursuant to Rule 33.

Dated:  White Plains, New York
      April 29, 2024

                              Respectfully submitted,

                              DAMIAN WILLIAMS
                              United States Attorney
                              Southern District of New York

                    by:   /s/ Benjamin Klein
                          Benjamin Klein / Emily Deininger
                          Assistant United States Attorneys
                          (914) 993-1940 / (212) 637-2472