## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

United States of America,                :

                            :      No. 22-cr-650 (JPO)

           v.           :      Judge J. Paul Oetken

Martin Mizrahi,                          :

                Defendant.    :

_____

## SENTENCING MEMORANDUM ON BEHALF OF MARTIN MIZRAHI

Richard A. Portale
Chad Mair
PORTALE RANDAZZO LLP
245 Main Street, Suite 605
White Plains, N.Y. 10601
rportale@portalerandazzo.com
cmair@portalerandazzo.com
(914) 359-2400

Richard Weber
WINSTON & STRAWN LLP
200 Park Avenue
New York, N.Y. 10166
rweber@winston.com
(212) 294-1718

Christopher D. Man (*pro hac vice pending*)
WINSTON & STRAWN LLP
1901 L Street, N.W.
Washington, D.C. 20036
cman@winston.com
(202) 282-5622

*Counsel for Martin Mizrahi*

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................1

ARGUMENT ......................................................................................................4

    I.    THE RECOMMENDED PSR SENTENCE VIOLATES THE FIFTH
AND SIXTH AMENDMENTS ..............................................................6

    II.   THE PSR'S DRUG-RELATED ENHANCEMENTS ARE NOT
WARRANTED ......................................................................................9

        A.    Mr. Mizrahi Was Not Convicted Of Any Drug-Related Offenses .............9

        B.    The 6-Level Enhancement For Knowingly Laundering Drug
Money Is Inapplicable.................................................................15

        C.    The 18-Level Enhancement For the Amount Of Money Laundered
Is Excessive................................................................................15

    III.  THE 4-LEVEL ENHANCEMENT FOR BEING IN THE BUSINESS OF
MONEY LAUNDERING IS INAPPLICABLE....................................16

    IV.  MR. MIZRAHI DID NOT OBSTRUCT JUSTICE .............................17

    V.   MR. MIZRAHI IS ENTITLED TO THE ZERO-POINT OFFENDER
REDUCTION ......................................................................................19

    VI.  A *LAUERSEN* DEPARTURE IS WARRANTED ...............................21

    VII.  MR. MIZRAHI'S HISTORY AND CHARACTERISTICS WARRANT A
DOWNWARD VARIANCE ...............................................................22

        A.    Mr. Mizrahi's ASD And Developmental Disorders .................................24

        B.    Mr. Mizrahi Is Devoted To His Family .....................................38

        C.    Mr. Mizrahi Has Demonstrated Extraordinary Kindness And
Generosity .................................................................................43

CONCLUSION....................................................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atkins v. Virginia,*
    536 U.S. 304 (2002)...............................................................................37

*Blakely v. Washington,*
    542 U.S. 296 (2004).................................................................................7

*Cunningham v. California,*
    549 U.S. 270 (2007).................................................................................7

*Erlinger v. United States,*
    2024 WL 3074427 (U.S. June 21, 2024) ................................................7

*Gall v. United States,*
    552 U.S. 38 (2007)....................................................................8, 42, 49

*Graham v. Floria,*
    560 U.S. 48 (2010).................................................................................36

*Jackson v. Virginia,*
    443 U.S. 307 (1979) .............................................................................11

*Koon v. United States,*
    518 U.S. 81 (1996) ........................................................................22, 23, 37

*Loper Bright Enterp. v. Raimondo,*
    2024 WL 3208360 (U.S. June 28, 2024) ................................................6

*Pepper v. United States,*
    562 U.S. 476 (2011)........................................................................22, 23, 49

*Rita v. United States,*
    551 U.S. 338 (2007)................................................................................8

*Roper v. Simons,*
    543 U.S. 551 (2005)..........................................................................36, 37

*Thompson v. City of Louisville,*
    362 U.S. 199 (1960)..............................................................................11

*United States v. Abiodun,*
    536 F.3d 162 (2d Cir. 2008)..................................................................21

*United States v. Banks*,
    55 F.4th 246 (3d Cir. 2022) ...................................................................5

*United States v. Bisanti*,
    414 F.3d 168 (1st Cir. 2005)...............................................................48

*United States v. Blanco*,
    102 F.4th 1153 (11th Cir. 2024) ........................................................36

*United States v. Booker*,
    543 U.S. 220 (2005)........................................................................7, 8

*United States v. Catano-Alzate*,
    62 F.3d 41 (2d Cir. 1995)...................................................................18

*United States v. Chandler*,
    732 F.3d 434 (5th Cir. 2013) ...............................................................8

*United States v. Cruz-Valdivia*,
    526 F. App'x 735 (9th Cir. 2013) .........................................................8

*United States v. Delgado*,
    608 F. App'x 230 (5th Cir. 2015) .......................................................17

*United States v. Gamez*,
    1 F. Supp. 2d 176 (E.D.N.Y. 1998) ...............................................12, 16

*United States v. Garcia*,
    413 F.3d 201  (2d Cir. 2005)..............................................................48

*United States v. Gigante*,
    94 F.3d 53 (2d Cir. 1996)...................................................................21

*United States v. Green*,
    480 F.3d 627 (2d. Cir. 2007)..............................................................15

*United States v. Jackson*,
    346 F.3d 22 (2d Cir. 2003)....................................................21, 22, 46

*United States v. Lauersen*,
    348 F.3d 329 (2d Cir. 2003)..........................................................21, 22

*United States v. Lucarell*,
    2023 WL 3756191 (6th Cir. 2023) ......................................................36

*United States v. Mitchell*,
    613 F.3d 862 (8th Cir. 2010) ........................................................16, 17

*United States v. Nelluml*,
  2005 WL 300073 (N.D. Ind. Feb. 3, 2005)............................................................48

*United States v. Paul*,
  561 F.3d 970 (9th Cir. 2009) ........................................................................8

*United States v. Quarshie*,
  2007 WL 107754 (S.D.N.Y. Jan. 16, 2007) ........................................................17

*United States v. Rosario*,
  988 F.3d 630 (2d Cir. 2021)........................................................................18

*United States v. Shonubi*,
  998 F.2d 84 (2d Cir. 1993)........................................................................16

*United States v. Shore*,
  2020 WL 3791550 (E.D. Penn. July 7, 2020)..............................................36, 37

*United States v. Singh*,
  877 F.3d 107 (2d Cir. 2017)........................................................................8

*United States v. Taffaro*,
  919 F.3d 947 (5th Cir. 2019) ........................................................................48

**Statutes**

18 U.S.C. § 3553(a) .........................................................................1, 16

28 U.S.C. § 994(j) ...........................................................................1

U.S.S.G. app. C, amend. 634, C-736 (2009)..........................................................11

U.S.S.G. § 2A1.3 ...........................................................................3

U.S.S.G. § 2A3.1 ...........................................................................3

U.S.S.G. § 2B1.1(b)(1) ...........................................................................11

U.S.S.G. § 2S1.1(b)(2)(C), Comment, n.4..........................................................12

U.S.S.G. § 4C1.1(a)(3)...........................................................................13

**INTRODUCTION**

A criminal trial provides the Court with an introduction to a human being that examines a moment in that person's life when that person typically has made a serious mistake in judgment or worse, but that snapshot in time rarely tells the whole story about the man and his character. There may be no other case that comes before the Court where the difference between the person depicted at trial and his true character is more stark than it is here, with Martin Mizrahi. Although he was depicted at trial as a fraudster and some sort of violent enforcer for a drug-trafficking cartel, an avalanche of letters from those who know him best describe him as a man with no history of violence and who is honest to a fault. (Ex. A (collection of letters).) His lifelong friends describe him as someone who is "loved and adored by everyone." (S. Tabibian, Esq. Ltr.; *see also* G. Khalil Ltr. at 1 ("Marty helps everyone and expects nothing in return.").) And the acts of kindness they describe demonstrate more than that he is a nice guy, but someone whose acts of charity border on saintly.[1]

---

[1] Because Mr. Mizrahi is so well known for his honesty and goodwill, many people who know him best find the allegations against him shockingly inconsistent with the ethical man they know him to be. His friend of thirty years and his longtime business lawyer Sigal Chattah illustrates the sentiment, explaining: "When Marty was charged with the underlying indictment, not only was I baffled professionally as a lawyer, but also as his friend. Nobody who has known Marty actually believed that this indictment was for real." (S. Chattah Ltr. at 2.) His family lawyer Rachel Jacobson finds it "truly difficult, and rather impossible," for her to connect Mr. Mizrahi to the charges as they "seem completely uncharacteristic of the Marty I have known for over twenty years." (R. Jacobson Ltr.; *see also* R. Cook Ltr. (former Nevada Senator: "I was surprised at the indictment; this event is so uncharacteristic of Marty that I know and have known for over 30 years."); M. Segal Esq. Ltr. (lifelong friend finding it hard to wrap her "head around the fact that his character is even in question"); P. Taheri, Esq. Ltr. (friend of 30-plus years explaining the charges are "very inconsistent with who Marty is as a person"); S. Tabibian, Esq. Ltr. (lifelong friend noting "[t]his stark contrast between the charges and my friend who has been a figure of immense integrity and generosity throughout his life"); S. Tallard Ltr. (a friend of twenty years explains: "It is unimaginable to think he would have committed these offenses, its completely not like him and goes against everything I have come to know about his character. . . .").) Unfortunately, the jury did not hear from character witnesses who consistently voice that opinion with the Court now at sentencing.

The good that Mr. Mizrahi has done throughout his life is a reflection of his positive point of view that people are innately good and that we all should strive to help one another, but it is the naivety in his belief that everyone else believes and acts the same way that is the reason he is before this Court. Mr. Mizrahi has found great success in life, but he has done it with a blind spot created by his Autism Spectrum Disorder (ASD) and related developmental and learning disabilities. (*See* Dr. Romanoff Report (Ex. B).) In short, Mr. Mizrahi is overly trusting and gullible, and the Court will hear that has led to him being conned and exploited throughout his life. Joel Zubaid and David Goran are merely the most recent in a long line of nefarious people to have taken advantage of him. (*See, e.g.*, *id.* ("One of Marty's most commendable yet vulnerable traits is his unwavering trust in others. This trust, while a sign of his generous and open heart, has made him susceptible to exploitation. Sadly, it is this aspect of his character that has led to his current legal predicament. It is very important to recognize that Marty's involvement stems more from being deceived by these individuals than from any criminal intent on his part.").) And Mr. Zubaid and Mr. Goran entered Mr. Mizrahi's life while he was further mentally compromised by a debilitating Post-Traumatic Stress Disorder (PTSD), and experiencing brain fog and memory loss, following a violent attack, for which he was receiving weekly treatment from Dr. Rozalin Banafsheian. (Dr. Banafsheian Report (Ex. C).)

To be sure, Mr. Mizrahi comes before the Court as a convicted man and he must be sentenced. It is unfortunate that Mr. Mizrahi's trial counsel did not have the evidence at the time of trial to put forth a defense at trial based on his ASD, PTSD, and related disabilities, as that would have helped the jury contextualize why he failed to perceive the numerous red flags in this case for what they were in evaluating whether he was willfully blind to them. Had defense counsel

offered a defense based on Mr. Mizrahi's impaired mental state, it would have been powerful.[2]

Unfortunately, the full extent of Mr. Mizrahi's psychological deficits was not apparent to his

counsel until after trial.

After spending numerous hours with Mr. Mizrahi, interviewing those who know him best, and

reviewing his medical history, Dr. Richard Romanoff concluded his forensic examination of Mr.

Mizrahi's ASD diagnosis on the facts of this case:

> The following thoughts are my own personal thoughts, and are being offered respectfully
> to the Court. They are being offered as I enter my fortieth year of practice as a forensic
> psychologist, who has evaluated approximately 3000 defendants ranging from homeless
> individuals who stole food to individuals involved in death penalty cases. I am aware of
> the seriousness and importance Courts attach to guilty verdicts, especially when made by
> a jury. It is also my personal experience that in almost all cases, a guilty verdict is the
> product of an accurate assessment of that guilt. However, occasionally a guilty verdict,
> even by a jury, can be in error. Based on my evaluation of Mr. Martin Mizrahi, as
> summarized in this report, and for all of the reasons summarized in this report, I believe
> consideration should be given to the possibility this guilty verdict may be one of those
> rare ones made in error. I have never before written a paragraph like this, as I have never
> before been as concerned about the possibility of this type of error in an evaluation I have
> personally conducted. I also want to note I have not been asked to provide this final
> paragraph, and the thoughts contained in it on my own, and should not be held against
> anyone other than me.

(Dr. Romanoff Ltr. at 28.)[3]

---

[2] It is not clear that the jury was unanimous in genuinely believing that Mr. Mizrahi was guilty. One juror contacted Ms. Davis after the trial and explained that, in violation of the Court's instructions, he researched her on social media during the trial. He told her that "I don't feel right about the whole thing. I am not convinced" of Mr. Mizrahi's guilt. He says he wanted to give Mr. Mizrahi the "benefit of doubt" and found "a lack of support and evidence" in the government's case, but apparently went along with other jurors who voted to find Mr. Mizrahi guilty. (Davis Ltr. at 7; *see* Ex. D (screen shots of text messages from juror).)

[3] Similarly, Mr. Mizrahi's counsel at sentencing would not normally include this point by Dr. Romanoff or the many letters from friends and family questioning a defendant's guilt at the sentencing stage, but this case proves an exception to the rule. Given Dr. Romanoff's evaluation and the overwhelming evidence that Mr. Mizrahi has been taken advantage of so consistently over his life, it is difficult to escape the sense that there has been a miscarriage of justice in that evidence not being presented to the jury.

Although Mr. Mizrahi's ASD, PTSD, and developmental disorders were not offered at trial to help prove his innocence, the Court should consider them at sentencing both because his condition is mitigating as to his culpability and because it would make a prison sentence especially difficult for him. Given that Mr. Mizrahi is subject to a two-year mandatory minimum under 18 U.S.C. § 1028A, Mr. Mizrahi asks the Court to sentence him to imprisonment for two years, followed by supervised release for three years with the conditions that he be subject to home confinement and receive treatment for his ASD.

## ARGUMENT

Following a conviction, prosecutors and probation have a tendency to scour the Sentencing Guidelines for every possible sentencing enhancement in an effort to maximize punishment, so it is important for the Court to remain mindful that Congress did not direct this Court to adopt such a maximalist approach. Rather, the Court's instruction from Congress is to "impose a sentence sufficient, but not greater than necessary" to achieve justice. 18 U.S.C. § 3553(a). In doing so, Congress recognized "the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 U.S.C. § 994(j).

To be sure, Mr. Mizrahi stands convicted of serious offenses, but the PSR's call for a 235-month sentence—effectively a life sentence—[4] and a sentence that is entirely disproportionate to

---

[4] Mr. Mizrahi is 53 years old. The average life expectancy for an American male is 74.8 years. *See* https://www.cdc.gov/nchs/fastats/life-expectancy.html. Mass incarceration in the United States coupled with the adverse impact of incarceration on a person's lifespan is so detrimental, that it knocks the national average down by about two years. Emily Widra, *Incarceration Shortens Life Expectancy*, Prison Policy Initiative (June 26, 2017), https://www.prisonpolicy.org/blog/2017/06/26/life_expectancy/. Studies suggest that every year in prison reduces life expectancy of the inmate by two years. Evelyn Patterson, *The Dose-Response of Time Served in Prison on Mortality: New York State*, 1989-2003, 103 Am. J. Pub. Health 523 (Mar. 2013). A recent analysis of younger inmates shows that most will lose five years

the offense.  Even the government recognizes that such a heavy sentence is unnecessary, as it

offered Mr. Mizrahi a plea deal with a recommended Sentencing Guideline range of 33–41 months.

Mr. Mizrahi is a first-time offender[5] who did not engage in a violent crime.  Mr. Mizrahi's

culpability also is substantially mitigated, as explained in more detail below, because he suffers

from ASD and PTSD that has rendered him extremely gullible and too often has allowed nefarious

people, including Mr. Zubaid, to manipulate him.  Additionally, as 130 letters from friends and

family attest, Mr. Mizrahi is a man of good character and he has done an extraordinary amount of

good over his lifetime.  His family needs him at home, particularly as he is the only source of

support for his elderly parents who have long lived with him.  And while the law calls for him to

be punished, there is no need to strip him of his liberty for the remainder of his life.

   The PSR treats the Sentencing Guideline calculation as though the base calculation is a

naked Christmas tree looking to be adorned with sentencing enhancements, but the facts found by

the jury beyond a reasonable doubt establish no more than the base offense level of 8.  In piling

on, the PSR first asks the Court—not the jury—to find under a mere preponderance of the

evidence, rather than under the beyond a reasonable doubt standard, that somewhere between $3.5

and $9.5 million was laundered and impose an 18-level enhancement.[6]  Second, the PSR asks the

---

off their life expectancy by age 40, raising a concern that incarcerated persons over age 45, like
Mr. Mizrahi, "could experience the brunt of excess mortality risk."  Sebastian Daza et al., *The
Consequences of Incarceration on Mortality in the United States*, Demography (Apr. 2020),
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7710643/.

[5] Mr. Mizrahi was involved in petty offenses as a teenager, but the PSR recognizes him as a zero-
point offender because these offenses "were sustained approximately 30 years ago."  PSR at 36.

[6] Although the PSR relies upon the money laundering guideline to determine Mr. Mizrahi's
sentencing recommendation, it suggests he would face a 20-level enhancement under the fraud
guideline based on "intended loss."  PSR ¶43.  The Third Circuit recently found that loss should
be calculated based on actual loss, and that the Sentencing Commission's interpretation of loss to
include intended loss was unreasonable.  *United States v. Banks*, 55 F.4th 246, 257 (3d Cir. 2022).
The Supreme Court's recent decision overturning *Chevron* deference further demonstrates that the

Court to add 6 more levels by finding Mr. Mizrahi knew he was laundering funds from the distribution of controlled substances under Section 2S1.1(b)(1)(A)(B)(i). Third, the PSR asks the Court to find Mr. Mizrahi was in the business of money laundering and add 4 more levels under Section 2S1.1(b)(2)(C). Fourth, the PSR asks the Court to find Mr. Mizrahi perjured himself and add 2 more levels for obstruction of justice, apparently under the view that defendants should be penalized in this manner whenever they testify in their defense and are convicted as a sort of penalty for testifying. The cumulative result is a sentence that is disproportionate to the offense: level 38 with a recommended 235–293 months of incarceration. Mr. Mizrahi could face less jail time if he had committed more serious offenses, including rape (U.S.S.G. § 2A3.1, base offense 30 plus 4-level rape enhancement = level 34 (151–188 months)) or a voluntary murder (U.S.S.G. § 2A1.3, base offense 29 (87–108 months)).

## I.    THE RECOMMENDED PSR SENTENCE VIOLATES THE FIFTH AND SIXTH AMENDMENTS

The PSR's Guideline calculation is largely driven by facts it asks this Court to find by a preponderance of the evidence, rather than facts found by the jury beyond a reasonable doubt as the Fifth and Sixth Amendments require. The PSR recognizes that the base offense level for the offense is 8 under the Sentencing Guideline for money laundering in Section 2S1.1(a)(2), which corresponds to a sentence of 0–6 months and allows for a non-custodial sentence. This is the only Guideline calculation supported by the jury's findings. Nevertheless, the PSR asks the Court to find many facts that the jury did not, which would dramatically raise Mr. Mizrahi's total offense

---

Sentencing Commission's interpretation should not receive any deference. *Loper Bright Enterp. v. Raimondo*, 2024 WL 3208360, at *21 (U.S. June 28, 2024). Some charges were disputed, and everyone got their money back. The only losses were Mr. Mizrahi's in paying the merchant fees. Mr. Mizrahi refunded the bulk of the rest of the charges before any disputes were made, so there was no actual loss.

level to 38, corresponding to a sentencing range of 235–293 months of incarceration.  Here, that is a difference between a potential noncustodial sentence and imprisonment for nearly 25 years, a sentence that would likely mean that Mr. Mizrahi would die in prison.  *See supra* n.4.  Such a disparate outcome cannot constitutionally rest upon judge-found facts under a mere preponderance of the evidence standard.

The PSR's approach trivializes the jury right enshrined in the Sixth Amendment and would make judge-found facts, reached under a lower standard of review, the driving force behind Mr. Mizrahi's sentence.  The punishment inflicted on Mr. Mizrahi would rest almost entirely upon judge-found facts, rather than anything the jury found that he had done wrong.  That is not how sentencing should work.

Pursuant to the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), "under the Sixth Amendment, any fact that exposes a defendant to a greater potential sentence must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely a preponderance of the evidence."  *Cunningham v. California*, 549 U.S. 270, 281 (2007).  The Supreme Court recently reiterated that "the Fifth and Sixth Amendments sought to ensure that a judge's power to punish would 'deriv[e] wholly' from, and remain always 'control[led]' by, the jury and its verdict."  *Erlinger v. United States*, 2024 WL 3074427, at *6 (U.S. June 21, 2024) (quoting *Blakely v. Washington*, 542 U.S. 296, 306 (2004)).  This traditional role for the jury "guaranteed that a judge could not 'swell the penalty above what the law . . . provided for the acts' found by a jury of the defendant's peers."  *Id.* (citation omitted).  "By requiring a unanimous jury to find every fact essential to an offender's punishment, those amendments similarly seek to constrain the Judicial Branch, ensuring that the punishments courts issue are not the result of a

judicial 'inquisition' but are premised on laws adopted by the people's elected representatives and facts found by members of the community." *Id.*

By eliminating the mandatory nature of the Guidelines, *Booker* remedied—but did not eliminate—a significant constitutional flaw in the Guidelines. Under the mandatory Guideline regime, the Guideline score dictated a mandatory sentencing range, such that every sentencing enhancement that would raise that score would have to be found by the jury. Finding that is not the result Congress intended through the Sentencing Guidelines, the *Booker* majority severed the requirement that the Guidelines be mandatory. Because judge-found sentencing enhancements would not necessarily raise the sentence that the judge would impose, the Fifth and Sixth Amendments would not necessarily be violated through such judicial fact finding.

But *Booker* did not create a free-for-all where a judge can sentence a defendant anywhere from nothing to the statutory maximum based on a general verdict of conviction. Rather, post-mandatory Sentencing Guidelines, appellate courts "consider the substantive reasonableness of the sentence imposed." *Gall v. United States*, 552 U.S. 38, 51 (2007). Thus, unreasonable sentences are invalidated even when they are below the statutory maximum. *See, e.g.*, *United States v. Singh*, 877 F.3d 107, 116–17 (2d Cir. 2017); *United States v. Chandler*, 732 F.3d 434, 437, 440 (5th Cir. 2013); *United States v. Cruz-Valdivia*, 526 F. App'x 735, 737 (9th Cir. 2013); *United States v. Paul*, 561 F.3d 970, 973–75 (9th Cir. 2009) (per curiam). A sentence that rests heavily upon judicial fact-finding may still be deemed unconstitutional. *See, e.g.*, *Gall*, 552 U.S. at 60 (Scalia, J., concurring) ("The door … remains open for a defendant to demonstrate that his sentence, whether inside or outside the advisory Guidelines range, would not have been upheld but for the existence of a fact found by the sentencing judge and not by the jury."); *Rita v. United States*, 551 U.S. 338, 375 (2007) (Scalia, J., concurring) (explaining that the Court's opinion "does not rule

out as-applied Sixth Amendment challenges to sentences that would not have been upheld as reasonable on the facts encompassed by the jury verdict or guilty plea").

This is such a case. The PSR's sentence of 235–293 months of incarceration simply is *not* reasonable in the absence of judge-found sentencing enhancements. The Guidelines themselves make that clear in recommending a sentence of 0–6 months as the base offense, based solely on the jury's verdict alone. If that is a substantively reasonable sentence, a 253–293-month sentence based on the same facts cannot be. The difference in sentencing ranges can be lost on no one. A 293-month sentence is nearly *50 times* higher than a 6-month sentence. There is a massive difference in a sentence of 6 months or less and one exceeding 20 years. As a practical matter, that is the difference between Mr. Mizrahi being able to build a life for himself with his family and a future where Mr. Mizrahi gives up hope of ever leaving prison due to a non-violent offense. Because the PSR's recommended 235-month sentence is not reasonable without further fact-finding, and no such fact-finding was conducted by the jury, such a sentence—or any sentence approaching it—violates the Fifth and Sixth Amendments.

## II.    THE PSR'S DRUG-RELATED ENHANCEMENTS ARE NOT WARRANTED

### A.    Mr. Mizrahi Was Not Convicted Of Any Drug-Related Offenses

This case is unusual in that the government alleges that money from illicit drug sales was laundered, but no evidence was offered at trial (or since then) that any of the money involved in this case was derived from illicit drug sales. Normally, the point of these prosecutions is to target those who sell drugs, primarily by charging those on the front-end who engage in drug transactions. The whole point of the money laundering charges on the back-end is to discourage drug trafficking by making it unprofitable. Nevertheless, the government has offered no evidence tracing the money at issue to drug trafficking and no one has been charged with any drug-trafficking offense.

That result is all the more remarkable because the government has cooperating witnesses in Mr. Zubaid and Mr. Goran, who claim they received money from a Mexican cartel engaged in drug trafficking.  Despite that cooperation, however, they apparently have not led the government to charge, arrest or even identify anyone in this supposed cartel.  Nor has the government apparently uncovered any evidence of a single drug transaction that generated any of the money at issue in this case.

That result is best explained by the fact that Mr. Zubaid and Mr. Goran are well seasoned con men with over twenty years' worth of experience in running fraudulent schemes, who simply lied about the involvement of a drug cartel after they were caught to make their cooperation appear more meaningful.  Mr. Zubaid claimed he was dealing with the "Chino" cartel (Tr. 361), which does not appear to exist.  Even the government's expert, Alfred Hernandez, had never heard of this "Chino" cartel.  (Tr. 701).  The government certainly offered no evidence that there is such a cartel, and—even with the cooperation of Mr. Zubaid and Mr. Goran—there does not appear to be any evidence that any such cartel exists or engaged in drug trafficking.  The government may want headlines declaring a victory over Mexican cartels and tout this to be such a victory, but there is no evidence that is true beyond Mr. Zubaid's unsubstantiated and self-serving statements in seeking cooperation credit that he thought it was true.  *See* U.S. Atty's Office, S.D.N.Y., Press Release, *Chief Executive Officer Of A Las Vegas-Based Company Convicted For Multimillion-Dollar Fraud And Money Laundering Scheme* (Mar. 4, 2024), https://www.justice.gov/usao-sdny/pr/chief-executive-officer-las-vegas-based-company-convicted-multimillion-dollar-fraud (claiming the conviction was for "launder[ing] more than $4 million in fraud and illegal narcotics proceeds"—less than the PSR estimates—for "a Mexican-based cartel," which notably goes unnamed in the press release).

Importantly, while Mr. Zubaid and Mr. Goran claimed it was cartel money, neither claimed to have witnessed any drug sales by this cartel or otherwise had any first-hand knowledge of how the money was generated. Mr. Goran claimed the only reason he believed the money was cartel money was that this is simply what Mr. Zubaid told him. (Tr. 1031.) Their testimony was admitted to establish their mental state, not to prove that the money actually was derived from drug trafficking. *See* Fed. R. Evid. 602 (testimony must be based on personal knowledge).

The jury's convictions are not to the contrary. Mr. Mizrahi was convicted of the substantive offenses of wire fraud and bank fraud, but there was no charge that he had anything to do with selling illicit drugs. Count 5 charged Mr. Mizrahi with a substantive money laundering offense, but only for laundering the proceeds of fraud. There was no substantive money laundering charge for laundering drug trafficking proceeds, presumably because the government knew it could not prove that had occurred. Counts 4 did charge Mr. Mizrahi with a money laundering conspiracy based on laundering the proceeds of wire fraud, bank fraud, and illicit drug sales, but the Court expressly told the jury it could convict on the money laundering charge if it found money laundering concerning *any* of these specified unlawful activities. (Tr. 2238, 2242.) The jury did not need to find drug money was laundered to convict. The jury's convictions on the wire fraud and bank fraud counts would support the money laundering convictions on Counts 4 and 5. Thus, the jury's convictions on those counts do not reflect that the jury found any drug money was laundered.

Moreover, no conviction on laundering drug trafficking proceeds could be upheld, even if that were what the jury intended, because there is no evidence of drug trafficking. *See Thompson v. City of Louisville*, 362 U.S. 199, 206 (1960) (a conviction rendered with no evidence in support of a conviction violates due process), *overruled*, *Jackson v. Virginia*, 443 U.S. 307, 316 (1979)

(holding *Thompson* did not go far enough and that even convictions resting on some evidence may violate due process). Criminal organizations often are involved in activities aside from narcotics sales and it is difficult to prove that those who launder money know the precise source of the money when they were not involved in the underlying transactions. *United States v. Gamez*, 1 F. Supp. 2d 176, 182 (E.D.N.Y. 1998). Additionally, Mr. Zubaid and Mr. Goran claiming to have some kind of understanding that they were dealing in cartel-related drug trafficking is not evidence that they actually were. To the contrary, Mr. Zubaid's own experience in being robbed twice shows precisely why someone may lie about their money belonging to a dangerous cartel as a way to discourage such theft. And, as noted above, they may claim they were laundering drug money for a cartel now to make their cooperation appear more valuable to the government as part of a plea agreement.

In dealing with Mr. Mizrahi, however, neither man told him he would be laundering drug money for a cartel because they knew he would not have helped them if that was the case. Mr. Mizrahi abhors illicit drug use, which plagued his brother and led to his death, and he has a long history of helping people get into drug recovery programs. Mr. Mizrahi's overt hostility toward illicit drug use is well known, as is the drug-free, vegan lifestyle he adheres to, and many friends note that he would never support drug-trafficking in any way. (*See, e.g.*, J. Horvitz Ltr. (explaining Mr. Mizrahi would have nothing to do with aiding drug traffickers because "Marty hates anything and everything to do with Drugs. He has a deep disdain for dealers and drugs, as he has seen them ruin the lives of so many, some even very close to him, most notably his brother, who had issues with drugs his whole life and died as a result of it."); R. Wasserman Ltr. at 2 ("Marty has never touched a drug. He hates anything drug related and even does not allow people to smoke near him. His brother died young only a few years ago because of drug overdose. The mere fact that the

current charges were, to my understanding, related to drug money is another sign that he had no knowledge of the source of any cash. Based upon his hatred of anything related to drugs, he would have stayed far away from anything directly or indirectly related to drugs, especially in a way to assist drug organizations.").)

Nevertheless, Mr. Zubaid claimed that he had told Mr. Mizrahi that he was in debt to this cartel (Tr. 151, 161, 637) and that Mr. Zubaid believed the source of the money that he was moving was from selling drugs in the United States (Tr. 142, 145, 159, 638), but that testimony is simply not credible and contradicts statements Mr. Zubaid previously made to the government. Mr. Mizrahi, by contrast, testified that Mr. Zubaid never told him he was in trouble with the cartel. (Tr. 1730.) Mr. Mizrahi credibly testified that he would never have done business with a dangerous cartel, especially out of his home where he lived with his daughters and parents. (Tr. 1736–37, 1851.) Rather, Mr. Zubaid portrayed himself as a successful businessman who needed Mr. Mizrahi's help in buying Bitcoin for his investors. (Tr. 1659 (Saffron), 1703 (Mizrahi).) Believing these transactions were legitimate, Mr. Mizrahi had photos of the cash to be taken in his home in front of pictures of his family (Tr. 1736-37, 1851, 1909) and even reported the income on his taxes. (Tr. 1532, 1575.) These are not the sort of things people do when they believe they are illegally laundering money for a drug cartel. (*See* Tr. 700–01 (Agent Hernandez testifying money launderers typically do not report money laundering income on their taxes).)

And the Court has text messages between Mr. Mizrahi to Mr. Zubaid to back that up. When Mr. Mizrahi was not getting a satisfying explanation from Mr. Zubaid, Mr. Mizrahi texted Mr. Zubaid that he would go to the police—something no one would do if they believed they were engaged in wrongdoing. (Tr. 1777; Ex. G33.) Later, Mr. Mizrahi texts Mr. Zubaid saying, "I can't believe I let you and your people con me for that much money." (Tr. 1833). Mr. Zubaid claimed

in response, "we got conned." (*Id.*)  Mr. Mizrahi accused Mr. Zubaid of lying to him about the source of funds.  (*Id.*)  If, as Mr. Zubaid testified, he had told Mr. Mizrahi they were working together to launder drug money for the cartel or doing anything illegal, Mr. Zubaid would not have responded to Mr. Mizrahi's claims of innocence by claiming he "got conned" too.  Mr. Zubaid would have told Mr. Mizrahi that he had not lied, and Mr. Mizrahi knew exactly what he had gotten himself into.  Mr. Zubaid would have warned him that he would get himself in trouble by going to the police.  Instead of saying anything like that, Mr. Zubaid continued the con on Mr. Mizrahi.

Again, there is no jury finding to the contrary.  The jury's verdict does not reflect a finding that Mr. Mizrahi laundered drug money.  Nor does the jury's verdict reflect that it rejected Mr. Mizrahi's claims that Mr. Zubaid repeatedly gave him innocent explanations in an effort to con him.  The Court gave the jury a conscious avoidance instruction (Tr. 2256), and the jury likely convicted Mr. Mizrahi because it believed that red flags must have alerted him to a high probability that Mr. Zubaid had led him into an unlawful scheme, even if Mr. Zubaid had told him otherwise.

The testimony of a con man about a sensational Mexican drug cartel conspiracy in the hope of a reduced sentence for his cooperation does not undermine Mr. Mizrahi's testimony, particularly when Mr. Zubaid is relying upon a fictional cartel and there is no evidence that any cartel or drug activity was involved.  Daniel Saffron was present at meetings between Mr. Zubaid and Mr. Mizrahi as well, and he recalls Mr. Zubaid explaining the money was from his investors looking to buy Bitcoin and with no mention of cartels or drug trafficking—something that Mr. Saffron surely would have remembered if it had been said.  (Tr. 1659.)  That is the same explanation that Mr. Zubaid told the government he had been told by Sergio Knight.  (2/28/23 Zubaid proffer at 2 (Zubaid "thought [the money] came from small mom and pop people," and "Z had suspicion

money was from drug money, but SK said small mom and pop.") (Ex. E).)  Even Mr. Goran told the government that Mr. Zubaid had initially told him that the money was from "mom and pop stores with cash."  (3/8/23 FBI 302 at 2 (Ex. F); *see also* 12/20/22 FBI 302 at 3 (claiming he was told the money was from "shop owners who wanted Bitcoin") (Ex. G).)  And remember that Mr. Zubaid admitted in the conversation recorded at Denny's that Mr. Mizrahi was not in on the scheme.  (Trial Ex. XX1.)  More than Mr. Zubaid's testimony is warranted before locking Mr. Mizrahi up for the remainder of his life for drug-related money laundering that there is no evidence actually occurred.

### B.    The 6-Level Enhancement For Knowingly Laundering Drug Money Is Inapplicable

The burden is on the government to prove a sentencing enhancement, and there is no evidence to support the 6-level enhancement for knowingly laundering drug money in Section 2S1.1(b)(1)(A)(B)(i).  *United States v. Green*, 480 F.3d 627, 635 (2d. Cir. 2007).  As explained above, there is no evidence that Mr. Mizrahi actually laundered illicit drug sales proceeds or believed that is what he was doing, and the jury's verdict is not to the contrary.  Therefore, this enhancement is inapplicable.

### C.    The 18-Level Enhancement For the Amount Of Money Laundered Is Excessive

Likewise, the government has failed to meet its burden in justifying an 18-level enhancement based on between $3.5 million to $9.5 million being laundered under Section 2S1.1(a)(2).  The PSR calculates the amount of money laundered from drug offenses as $5.2 million (PSR ¶22) and an additional $690,000 from the fraud offenses (PSR ¶30).  But, as explained above, the government has failed to establish the $5.2 million it attributes to the laundering of illicit drug sales proceeds was in fact the proceeds of illicit drug sales, so this amount

should not be considered in the calculation.[7]  The Second Circuit will reverse where quantity-related assessments rest on "surmise and conjecture," and that is all we have here—Mr. Zubaid's purported understanding of the origins of the money that is not based on any first-hand knowledge. *United States v. Shonubi*, 998 F.2d 84, 90 (2d Cir. 1993).  Criminal organizations often are involved in activities aside from narcotics sales and it is difficult to prove that those who launder money know the precise source of the money when they were not involved in the underlying transactions. *Gamez*, 1 F. Supp. 2d at 182.  Thus, even if only the amount of fraud-related money laundering was proven (and no quantity was found by the jury beyond a reasonable doubt), there should be a 14-level enhancement for the laundering of the fraud proceeds of between $550,000 and $1.5 million, rather than an 18-level enhancement. *See* U.S.S.G. § 2B1.1(b)(1).

## III.    THE 4-LEVEL ENHANCEMENT FOR BEING IN THE BUSINESS OF MONEY LAUNDERING IS INAPPLICABLE

The 4-level enhancement in Section 2S1.1(b)(2)(C) for a defendant "in the business of laundering funds" is meant to apply to someone operating similarly "to a professional 'fence,'" something Mr. Mizrahi did not do.  *United States v. Mitchell*, 613 F.3d 862, 869 (8th Cir. 2010) (quoting U.S.S.G. app. C, amend. 634, C-736 (2009)).  Mr. Mizrahi founded LV.Net decades ago (founded business in 1994, registered name in 2010 (Tr. 1688)), but the PSR itself identifies the alleged money laundering as occurring over only a few months between February 2021 to May 2021.  PSR ¶17.  Moreover, the alleged money laundering took place with the same people each

---

[7] The origins of this money remain unknown.  It is not clear if the money is the proceeds of any criminal conduct at all or, more particularly for the purposes of the money laundering statute, the proceeds of anything defined as "specified unlawful activity."  In any event, the only specified unlawful activity charged by the grand jury and that the government claimed at trial was drug trafficking.  There is no basis for the Court to conclude the money was derived from any other specified unlawful activity.

time.  Nor did Mr. Mizrahi profit from this activity.  Thus, he was not operating like a professional fence, regularly providing his services to the underworld.  *See Mitchell*, 613 F.3d at 869 (reversing application of enhancement for defendant who engaged in 45 transactions over 16-18 months for the same person); *United States v. Quarshie*, 2007 WL 107754, at *3 (S.D.N.Y. Jan. 16, 2007) (declining to apply enhancement because conduct did not occur over an extended period of time); *see also United States v. Delgado*, 608 F. App'x 230, 236 (5th Cir. 2015) (reversing application where defendant boasted about his money laundering business, but the evidence did not show he actually laundered money).

This enhancement is not meant to reach everyone who launders money through a business, but only defendants who operate a money laundering business.  Application Note 4 to Section 2S1.1(b)(2)(C) instructs courts to "consider the totality of the circumstances" and provides a non-exhaustive list of factors "that may indicate the defendant was in the business of laundering funds," including whether: (i) the defendant regularly engaged in laundering funds; (ii) the defendant engaged in laundering funds for an extended period of time; (iii) the defendant engaged in laundering funds from multiple sources; (iv) the defendant generated a substantial amount of revenue in return for laundering funds; (v) the defendant had one or more previous convictions for money laundering-related offenses; and (vi) during the course of an undercover investigation, the defendant made statements that she engaged in any of the conduct indicating that she was in the business of laundering money.  U.S.S.G. § 2S1.1(b)(2)(C), Cmt., n.4.  Absolutely none of these factors are present.  Not one.

## IV.    MR. MIZRAHI DID NOT OBSTRUCT JUSTICE

Mr. Mizrahi should not be penalized for testifying in his own defense.  While it is true that the jury must have concluded that some of his testimony was inaccurate, that does not mean that

this Court should find that he lied.  Courts should "not automatically enhance sentences whenever the accused takes the stand and is thereafter found guilty."  *United States v. Rosario*, 988 F.3d 630, 632 (2d Cir. 2021) (*quoting United States v. Catano-Alzate*, 62 F.3d 41, 42 (2d Cir. 1995)).  Mr. Mizrahi has ASD, significant learning disabilities and comprehension deficits, and he was clearly flustered and stressed when he took the witness stand.  It would be unfair to conclude that he took the stand and intentionally lied.

Nor does the jury's verdict reflect that the jury thought he lied.  Again, the Court gave the jury a conscious avoidance instruction (Tr. 2256), which explains why the jury could convict Mr. Mizrahi without finding that Mr. Mizrahi had lied in maintaining that he did not knowingly engage in wrongdoing.  The jury could have concluded that Mr. Mizrahi accurately denied having such knowledge but concluded that he consciously avoided learning the truth.

As explained in more detail below, Mr. Mizrahi's ASD may have contributed to misinterpretation of his testimony.  "Unusual or maladaptive behaviors either demonstrated during offending or in court by a defendant with ASD may be misinterpreted, which may skew dispositional outcomes or potentially lead to prejudicial impressions."  Colleen M. Berryessa, *Defendants With Autism Spectrum Disorder In Federal Court: A Judge's Toolkit*, 13 Drexel L. Rev. 841, 845 (2021).  People with ASD who testify "may take a long time to answer questions, which may appear evasive."  *Id.* at 851.  "They may also misinterpret or nit-pick questions asked of them during questioning or cross-examination.  For instance, defendants may fail to pick up on cues which signal the end of a line of questioning, or attempt to shift the conversation to a topic of their interest.  Such behavior may be misunderstood as the defendant being 'cagey,' or unwilling to discuss a particular area or answer questions" and they may instigate arguments with

prosecutors.  *Id.*  Regrettably, Mr. Mizrahi demonstrated all these behaviors when testifying. Again, that reflects that he has ASD, not that he was lying.

## IV.    MR. MIZRAHI IS ENTITLED TO THE ZERO-POINT OFFENDER REDUCTION

The Sentencing Commission recently adopted a Guideline amendment that calls for a 2-level reduction for zero-point offenders, like Mr. Mizrahi, in Section 4C1.1.  Amendment 821 became effective on November 1, 2023, reflecting that zero-point offenders are less likely to recidivate.

The PSR erroneously rejected the application of this adjustment under an exception where the defendant used "violence or credible threats of violence in connection with the offense." U.S.S.G. § 4C1.1(a)(3).  The PSR looked to its allegations in Paragraphs 24 and 25 to make this claim.  PSR at 33.  Those paragraphs, and Paragraph 26, identify only two incidents and neither involved actual violence or threats of violence, and neither was in any way "in connection with the offense[s]" of wire fraud, bank fraud, or money laundering that were charged.  Moreover, the government never called anyone to testify who was threatened by Mr. Mizrahi or witnessed any supposed threats being made.

In both incidents, Mr. Zubaid urged Mr. Mizrahi to help him collect money that was owed to him.  Mr. Zubaid may have wanted Mr. Mizrahi to do whatever he could to help him collect the money, including use violence or threats of violence, but there is no allegation that Mr. Mizrahi used violence or made any threats.  The first incident involved Andrew Demaio, but the evidence is only that Mr. Mizrahi called him and tried to arrange a meeting that apparently never happened. Mr. Zubaid testified that he never collected from Mr. Demaio (Tr. at 363), nevertheless, Mr. Mizrahi clearly never threatened or harmed Mr. Demaio.  While Mr. Demaio did claim he was

threatened, he claimed those threats came from "Joel Zubaid," who "kept calling" him and that he never even heard Mr. Mizrahi's name.  (1/19/24 FBI Interview Notes; Ex. H.)

Mr. Demaio never testified to being threatened or harmed by Mr. Mizrahi, and he told an investigator that he does not even remember Mr. Mizrahi or ever hearing his name.  (Tr. 8.)  Even the prosecution acknowledged that Mr. Demaio told the government that he does not know who Mr. Mizrahi is.  (Tr. 13.)  It is not surprising that Mr. Demaio cannot remember Mr. Mizrahi, as Mr. Mizrahi testified they spoke only once briefly by phone about doing business.  (Tr. 1731–32.)  He also testified that he told Mr. Zubaid that there was not much he could do to help him get his money back because he did not know Mr. Demaio.  (*Id.*)

The second incident involved Anthony Anderson, who Mr. Zubaid met at Mr. Mizrahi's house.  Mr. Anderson later took $500,000 from Mr. Zubaid in exchange for Bitcoin from the Bellagio, but he did not provide the Bitcoin.  Mr. Mizrahi testified that he called Mr. Anderson's girlfriend and told her what happened, and that she talked Mr. Anderson into giving the money back.  (Tr. 2025–26.)  There was no violence or threats of violence.  Neither Mr. Anderson nor his girlfriend testified otherwise.  Thus, there is no evidence of violence or threats of violence in this instance either.

Both incidents also undercut Mr. Zubaid's claim that this money belonged to a Mexican cartel that was dangerous and would kill anyone who crossed them.  If that were true, why would Mr. Zubaid need the help of a 5'9", middle-aged, vegan, tech guy with no history of violence to help him recover the money?  If cartel money was stolen by such a ruthless cartel, as Mr. Zubaid claims, surely the cartel could send someone to more credibly deliver threats of violence than Mr. Mizrahi.

## V.    A *LAUERSEN* DEPARTURE IS WARRANTED

Guideline complications arise when the multiple sentencing enhancements are applied in the same case, bringing about a cumulative impact that is beyond what the Sentencing Commission could have contemplated.  "[T]he cumulation of . . . substantially overlapping enhancements, when imposed upon a defendant whose adjusted offense level translates to a high sentencing range, presents a circumstance that is present to a degree not adequately considered by the Commission and therefore permits a sentencing judge to make a downward departure."  *United States v. Abiodun*, 536 F.3d 162, 170 (2d Cir. 2008) (quoting *United States v. Lauersen,* 348 F.3d 329, 344 (2d Cir. 2003) (citations omitted); *see United States v. Jackson*, 346 F.3d 22, 26 (2d Cir. 2003) ("an accumulation of somewhat overlapping enhancements, even if not amounting to double counting, can justify a downward departure").  Additionally, as significant enhancements come into play, the Court should apply more rigorous scrutiny in determining whether they have been proven.  *United States v. Gigante*, 94 F.3d 53, 56 (2d Cir. 1996) ("In our view, the preponderance standards no more than a *threshold* basis for adjustments and departures, and the weight of the evidence, at some point along a continuum of sentence severity, should be considered with regard to both upward adjustments and upward departures.  With regard to upward adjustments, a sentencing judge should require that the weight of the factual record justify a sentence within the adjusted Guidelines range.  In doing so, the Court may examine whether the conduct underlying multiple upward adjustments was proven by a standard greater than that of preponderance, such as clear and convincing or even beyond reasonable doubt where appropriate.  Where a higher standard, appropriate to a substantially enhanced sentence range, is not met, the court should depart downwardly.").

In *Lauersen*, for example, a downward departure was available because a 13-level increase for the amount of loss applied in conjunction with an overlapping 4-level increase for a loss of more than $1 million to a financial institution.  348 F.3d at 344.  Such losses would be rare absent the involvement of a financial institution.  Similarly in *Jackson*, the Second Circuit identified a cumulative impact from applying a substantial loss enhancement and enhancements for an extensive scheme, involving careful planning and sophisticated means, as all those enhancements would seem triggered by the same conduct.  346 F.3d at 26.

The same sort of overlap exists here.  An 18-level enhancement for laundering more than $3.5 million overlaps with the 4-level enhancement for someone in the business of laundering money.  The same is true of the 6-level enhancement for knowingly laundering drug proceeds, it is commonly drug trafficking that yields such high volumes of money laundering.  Cumulatively, that is a 28-level enhancement for largely overlapping conduct and it transforms an already serious sentence into one with the practical effect of being a life sentence.  The Court should grant a substantial downward departure to prevent the stacking effect of cumulative sentencing enhancements from yielding a disproportionate sentence that will move past punishing Mr. Mizrahi to instead destroying his life and his family.

## VI.    MR. MIZRAHI'S HISTORY AND CHARACTERISTICS WARRANT A DOWNWARD VARIANCE

"There is a longstanding tradition in American law, dating back to the dawn of the Republic, that a judge at sentencing considers the whole person before him or her 'as an individual.'"  *Concepcion v. United States*, 597 U.S. 481, 496 (2022) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).  "Underlying this tradition is the principle that 'the punishment should fit the offender and not merely the crime.'"  *Pepper v. United States*, 562 U.S. 476, 487–88 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)); *see also id.* ("For the

determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender.") (quoting *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937)). "Indeed, '[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Concepcion*, 597 U.S. at 492 (quoting *Koon*, 518 U.S. at 113). A careful consideration of a defendant's history and characteristics "ensures that the punishment will suit not merely the offense but the defendant." *Pepper*, 562 U.S. at 488 (quoting *Wasman v. United States*, 468 U.S. 559, 564 (1984)). Today, that requirement is embodied in 18 U.S.C. § 3553(a), which instructs the Court to consider "the history and characteristics of the defendant" and "impose a sentence sufficient, but not greater than necessary," to serve the ends of justice.

Viewed through that lens, Mr. Mizrahi should face minimal punishment. Mr. Mizrahi's culpability for his offenses is mitigated by his ASD, concurrent PTSD that was being treated at the time, and his learning and developmental disabilities that have throughout his life allowed people like Mr. Zubaid to take advantage of him. A mountain of letters to the Court demonstrate that Mr. Mizrahi is a good person who is filled with kindness, but someone who is hopelessly naïve and gullible and an easy mark for those who would take advantage of him. Society does not need Mr. Mizrahi to be imprisoned for its protection, and prison is no place for Mr. Mizrahi to find a healthy way to live with his ASD. To the contrary, prison would be torturous for a person with Mr. Mizrahi's ASD.

### A.    Mr. Mizrahi's ASD And Developmental Disorders

Ashley Davis describes her boyfriend, Mr. Mizrahi as "the Smartest Stupidest person I've ever known," and that sentiment captures what may seem enigmatic about him.  (A. Davis Ltr. at 3.)  Mr. Mizrahi has been successful in building many businesses and he has succeeded in cultivating a supportive network of friends and family, but those closest to him express amazement at his gullibility and the numerous times people have taken advantage of him and swindled him. His gullibility is so pronounced that those close to him find a need to try to protect him and confront the frustration that Mr. Mizrahi typically refuses to accept the possibility that anyone who he thinks of as a friend would lie to him or cheat him.  Too often though, that is exactly what happens.

We now recognize Mr. Mizrahi as suffering from ASD, an umbrella label for persons who do not check all the boxes for a more specific developmental disorder, such as autism, but who nevertheless are afflicted with symptoms along the same spectrum of those disorders.  (Dr. Romanoff Ltr.)  The difficulties of Mr. Mizrahi's ASD are compounded by his lifelong and severe learning disabilities, which particularly impact his reading comprehension, ability to write and his spelling.  His mental acuity is limited.  For example, he has never read a book.  More recently, Mr. Mizrahi also has been diagnosed with prosopagnosia, a difficulty in recognizing people's faces, and dysnomia, a sense that words may be on the tip of his tongue but that he is unable to recall. (M. Mizrahi Ltr. at 1.)  His memory also has significant deficits in which he is unable to remember anything before the third grade and a surprising inability to recall a host of things that we would expect him to remember, including the name of his middle school and whether he graduated from high school.

Given his learning disabilities, Mr. Mizrahi learned to play to his strengths.  He found that he did not have to be the smartest guy in the room.  He learned that if you show people kindness

and that you have a strong work ethic—as everyone will attest that he does—people would give him a chance. Despite his poor performance in school, Mr. Mizrahi was quite smart when it came to figuring out how machinery and technology worked. When he was 14, he brought his computer into a repair shop. Unable to pay the cost of repairs, Mr. Mizrahi worked in exchange for the repairs. (B. Toubian Ltr.) In high school, he taught himself how to build his first car and he started a computer repair business right after he left high school. (M. Mizrahi Ltr. at 1–2.) He became fixated on technology. People gave him a chance to prove himself and he did so, over and over again, most notably through LV.Net, his highly successful internet service provider company.

Mr. Mizrahi's work history is consistent with his ASD. This technology field is well-suited for someone with ASD because "computer technology [is] an area of knowledge devoid of any need to understand feelings or to possess capacities for meaningful emotional empathy." (Dr. Romanoff Ltr. at 26.) Similarly, Mr. Mizrahi's history of rarely getting much sleep and working virtually non-stop is consistent with the need for many people with ASD to engage in repetitive behaviors. (*Id.* at 23–24.) The fact that this repetitive behavior was constructive and facilitated his success does not diminish that it is an ASD trait. (*Id.* at 24.)

Mr. Mizrahi also has difficulty understanding social interactions. Unlike many with ASD, Mr. Mizrahi has been quite successful in forming social connections with other people, but he does not seem to grasp the nuances of his relationships. He is quick to assume that all people who display kindness toward him are his friends, and he has a rigid belief in an overly idealistic view of friendship in which friends do not lie or cheat one another. The rigidity of this view is so strong that when he is warned that someone is lying or taking advantage of him, Mr. Mizrahi has great difficulty in accepting that possibility. He has difficulty conceptualizing a world in which people who appear to be his friends do not adhere to the same code of friendship that he does. For him,

25

the existence of such people just does not compute, and he does not know how to navigate in a world with such people in it.  Mr. Mizrahi does not seem to give the word of a close, lifelong friend any more weight than the word of a stranger.  He assumes that whatever he is told is literally true.

One of the beautiful things about Mr. Mizrahi is that he is perpetually positive and lives his life by the golden rule, trying to treat others as he would like for them to treat him.  This is not a personal philosophy for him, but something he believes all people innately do.  He assumes that others will reciprocate the same kindness to him that he shows others.  And they often do.

This has been the backbone of Mr. Mizrahi's success in life.  People see in him someone who is kind, who does not lie, who does what he says he will do, and who will go well out of his way to help his friends.  Coupled with his hard work ethic and knowledge of technology, Mr. Mizrahi is the sort of business partner most people want to work with.  In this sense, his success is not surprising.

But Mr. Mizrahi's assumption that everyone operates under the same world view that he does is rather naïve, and his gullibility has repeatedly led to him being taken advantage of in serious ways.  Throughout his life, there have been nefarious people who view Mr. Mizrahi as an easy mark due to his naivete.  *See also* Colleen M. Berryessa, *Defendants With Autism Spectrum Disorder In Federal Court: A Judge's Toolkit*, 13 Drexel L. Rev. 841 (2021) (explaining people with ASD "may mistake malevolent intentions with friendship, leading to their risk of exploitation").  Everyone who knows him well views this as Mr. Mizrahi's Achilles' heel and they all have stories of him falling for the most incredible of lies.  Those close to him find a need to help protect him, and express frustration in Mr. Mizrahi's refusal to accept that someone who he thinks of as a friend would take advantage of him.  Mr. Mizrahi sees no need for contracts—which he struggles to read and make sense of anyway—because he feels he can trust in a handshake or a

verbal agreement.  He ignores the advice of his lawyers and others who advocate risk mitigation strategies because he assumes people will resolve any difficulties that may arise in good faith.  No matter how many times he has been cheated, he has had difficulty changing his view of the world.

While Mr. Mizrahi's learning disabilities were diagnosed when he was quite young, it has only been in the last few years that Mr. Mizrahi has been seeing a psychologist and his other developmental disabilities have been diagnosed.  Mr. Mizrahi began receiving counseling after he was the victim of a violent attack in October 2020, shortly before he began doing business with Mr. Zubaid.  (M. Mizrahi Ltr.)  One of Mr. Mizrahi's employees was involved in a minor car accident at the Cosmopolitan Hotel and called Mr. Mizrahi for help.  Mr. Mizrahi drove to the hotel and attempted to resolve the situation, but he was unsuccessful and attempted to walk away. At that point, four security guards violently attacked him as he was walking away and choked him out.  This was the first violent encounter or fight of Mr. Mizrahi's life and he feared they would kill him.  (*Id.*; Dr. Romanoff Ltr. at 15.)[8]  The experience was jarring for Mr. Mizrahi, particularly given his nonviolent nature and inability to process a world in which people would act as the security guards did.  He began therapy and was subsequently diagnosed with PTSD, anxiety, and depression related to this incident, but other developmental disabilities became apparent, and he was diagnosed with prosopagnosia (difficulty in recognizing people's faces) and dysnomia (inability to recall words).  (Dr. Banafsheian Report; M. Mizrahi Ltr. at 1.)

---

[8] Security at the Cosmopolitan Hotel has a history of engaging in such abuses. *See, e.g.*, *New York Man Wins $160.5m In Lawsuit Against Vegas Casino*, AP (Apr. 28, 2017), The https://apnews.com/general-news-658ebb543b0f4db9b702452308209bc0 (addressing brain injury caused by Cosmopolitan Hotel security guards throwing a patron to the ground and beating him).

Mr. Mizrahi received weekly therapy from Dr. Rozalin Banafsheian from December 2020 through the end of February 2022. (Dr. Banafsheian Report at 4–6.) The charges in this case concern Mr. Mizrahi's interactions with Mr. Zubaid from February to June 2021, while he was in therapy. (PSR ¶16.) Dr. Banafsheian explains that she was treating Mr. Mizrahi for "his symptoms of posttraumatic stress, anxiety, depression, and panic attacks." (Dr. Banafsheian Report at 1.) She notes: "Martin was experiencing severe daily headaches, nightmares, wakefulness, recurring flashbacks, low energy, tension in his neck and shoulders, difficulty concentrating, memory issues, anxiety, and moments of panic attacks. Martin described 'not feeling at ease' and 'mentally messed up.'" (*Id.*) Additionally, "[t]he recurring flashbacks he experiences are very intrusive and disruptive and at times lead to panic attacks. Martin explained that the flashbacks usually occur in the middle of night and disrupt his sleep." (*Id.*) Mr. Mizrahi told her "that he 'thinks about it all the time' and often feels sleepy and achy when he wakes up; doesn't have quality sleep from the nightmares and flashbacks." (*Id.*)

Dr. Banafsheian's Report continues:

> A very troubling symptom for Martin is also the memory issues he is experiencing. He would describe that his memory is 'not all there' and at times his talking isn't normal. Martin explains that prior to the incident, he wouldn't forget things and had no trouble remembering appointments etc. For example, after the incident, he explains that he couldn't remember that he saw his doctor two days prior and thought he missed the appointment so he called to reschedule an appointment he had attended. This kind of behavior was very unusual for him and a common symptom of posttraumatic stress disorder and depression.

(*Id.* at 1–2.)

After Mr. Mizrahi was indicted, it was apparent that Mr. Mizrahi did not recognize the many warning signs that Mr. Zubaid was lying to him, and that he was struggling to even comprehend that case the government brought against him. For example, Robert Wasserman explains:

> The night before closing arguments in March 2024, I was with Marty in his lawyer's office. I witnessed Marty reading the charges out loud. He could not fully read them. So his daughter read them for him. He struggled to understand the concepts behind each charge. He asked how his actions were remotely related to the specifics of the charges. All of us in the room were downtrodden because we realized that this is just an extension of his years of trusting others without real knowledge of the broader situation. His friends and I often joke that we can't figure out how he built a business without understanding so many basic educational concepts.

(R. Wasserman Ltr. at 2.) Even now, with numerous people explaining to him why there were so many red flags that Mr. Zubaid was lying, Mr. Mizrahi seems to accept that he should have figured the lies out sooner because others would have done so, but he also seems to struggle to understand how he could have figured it out. The fact that Mr. Zubaid always had an innocent explanation seems to shut down any reason for Mr. Mizrahi to question whether he was being lied to.

Mr. Mizrahi underwent an extensive forensic psychological evaluation by Dr. Richard Romanoff. (Dr. Romanoff Ltr. at 1.) It was Dr. Romanoff who diagnosed Mr. Mizrahi's ASD, explaining "Mr. Mizrahi has since his childhood years met the criteria for an autism spectrum disorder." (*Id.* at 18.) Dr. Romanoff noted "that language impairments, including specific learning disorders, such as reading and reading comprehension disorders frequently co-occur with an autism spectrum disorder, as appears to be the case for Mr. Mizrahi." (*Id.* at 17.)

Dr. Romanoff explains that Mr. Mizrahi's "autism spectrum disorder undermined his ability to accurately read Mr. Zubaid, or to recognize the possibility he was being fooled by someone with a collection of skills for which he had no meaningful psychological defense." (*Id.* at 26.) Dr. Romanoff elaborates:

> Robbed of the ability to have access to the kinds of feelings that would have enabled him to better detect deceitfulness, or to question more actively the growing number of red flags that began to emerge, as a direct consequence of his disorder, he rigidly persisted in moving forward beyond a point that any other individual not on the autism spectrum, but with the same level of intelligence and business success, would ever have done.

(*Id.* at 26–27.)

Those ASD-related deficits were compounded by the trauma Mr. Mizrahi suffered after the Cosmopolitan incident. Dr. Romanoff explained:

> Making matters worse, the additional deterioration generated by his more recent psychiatric difficulties - stemming from his traumatic encounter with security officers at the Cosmopolitan Hotel - then further undermined both his abilities to more quickly recognize the situation he was in, or to effectively extricate himself from it, by generating a collection of additional physical and psychiatric symptoms. Now combined together, this considerable collection of serious mental health difficulties became psychologically overwhelming in relation to his available coping resources, creating a kind of perfect storm of difficulties that I believe directly led to the particular behaviors that have now led to his current conviction.

(*Id.* at 27.)

Although it was clear that Mr. Mizrahi had demonstrated ASD symptoms throughout his life, it is not surprising that he was not diagnosed earlier because ASD, as it is understood today, is a relatively new diagnosis. The criteria for diagnosing ASD was not adopted by the American Psychological Association until 2013 in the Diagnostic and Statistical Manual of Mental Disorders (DSM-5). (*See* Dr. Romanoff Ltr. at 23 ("This is by no means unusual, especially for older individuals, who were exhibiting these symptoms prior to the heightened levels of awareness for this condition that now prevails.").) Dr. Romanoff found a striking historical pattern of Mr. Mizrahi's interpersonal naivete and rigidity. (*Id.* at 18–19.)

> Mr. Mizrahi is an individual with a wide gap in how he views himself relative to how those closest to him view him. . . . [T[he gap is at its widest in regard to the difference between Mr. Mizrahi's perception of his ability to accurately judge others relative to the perception those closest to him have in his ability to accurately judge others, especially when it comes to detecting deceitfulness or disingenuousness. I view this as an extremely consequential example of a deficit in social communication and social interaction possessed by Mr. Mizrahi.

(Dr. Romanoff Ltr. at 26.)

Additionally, based on interviews of Mr. Mizrahi's closest friends and in reviewing the letters from a multitude of others submitted on Mr. Mizrahi's behalf to the Court, Dr. Romanoff explains that many

> noted their repeated efforts to warn Mr. Mizrahi about errors they perceived he was about to make, as a direct consequence of his misperception of himself. They reported providing these warnings over decades of time and dozens of examples. Many of these examples led to considerable pain and loss for Mr. Mizrahi, both interpersonally and financially. And yet, no matter how often anyone warned him, and no matter how much suffering he experienced as a consequence of this lack of awareness, he continued to follow the same rules of trusting others, and giving second and even third chances to them. He continued to treat both new people he was meeting and even previously met people who had taken advantage of him in exactly the same fashion as before, with no evidence of any change in his pattern of behavior. I view this as precisely the type of rigidity regularly witnessed in individuals with an autism spectrum disorder.

(*Id.* at 26.)

Mr. Mizrahi's mother explains that being exploited by others has been a constant problem for Mr. Mizrahi throughout his life, writing:

> I saw him get taken advantage of and conned by many people in his life, which led to him losing a lot of money but it never stopped him. He just kept going forward and did the best he could do. As a mother, it kills me that sometimes his kindness puts him in some awkward situations. I wish I could have protected him from the people who didn't have his best interest at heard, but as a mother, I could only do so much. He trusts the wrong people and gets taken advantage of personally and financially.

(E. Mizrahi Ltr.) Morris Mizrahi, Mr. Mizrahi's father, echoes that sentiment: "the Marty I know wouldn't do the things he's accused of. Marty is too honest and from his past too trusting." (Morris Mizrahi Ltr.) Mr. Mizrahi's daughter Kylee similarly explains: "One of the faults is that he trusts too easily and people tend to take advantage of his trust. His blind trust has led to many people screwing him over." (K. Mizrahi Ltr.) With the benefit of hindsight, Mr. Mizrahi realizes that he is often exploited. He writes: "Unfortunately, I have been taken advantage of many times in my life. My mistake was that I continue to believe in people blindly. I always give people the benefit of the doubt." (M. Mizrahi Ltr. at 3.)

Friends who learn of Mr. Mizrahi's ASD diagnosis are not surprised. His close friend of twenty-five years, Ginger Michele, agrees, "I can unequivocally state that Marty has telltale symptoms of ASD. Unlike Karl Marx, Marty can't distinguish between the bourgeoisie or the proletariat. Socially, Marty would interact with the Pope or Oprah in the exact manner that he does the janitor in his office or a beggar in the street." (G. Michele Ltr. at 1.) She explains: "Marty is an enigmatic individual, so often misjudged by others. A person who doesn't know Marty, might find his demeanor arrogant or haughty. Marty is neither, quite the contrary. Marty's a bit eccentric but his aberrant behavior doesn't stem from any superiority complex, Marty's brain just doesn't function like anyone else's." (*Id.*)

This gap in Mr. Mizrahi's ability to identify when people are scamming him has long been a source of concern to others who are close to him. Mr. Mizrahi's close friend since grade school Ammar Kubba explained, "[h]e's not a good judge of character, in fact he's a terrible judge of character." (Dr. Romanoff Ltr. at 11.) His friend since childhood, Toan Ludac, explains that he questions Mr. Mizrahi's judgment because he was "always trusting" new acquaintances "and was easily influenced by these individuals." (T. Ludac Ltr.). Mr. Mizrahi's cousin, Susie Romano, writes, "I believe that he operates in a way whereby he expects people to behave the way he does – in a straightforward, honest, law abiding and respectable manner." (S. Romano Ltr.) Employee Richard Tyler explains, "Marty is so generous and kind that people often take advantage of him. . . . They know he rarely says no and trusts everyone easily." (R. Tyler Ltr.) Lifelong friend Richard Wasserman writes that Mr. Mizrahi "lacks any sort of education and struggles with language skills that impairs his ability to coherently write and his comprehension of even basic reading materials," he cannot "understand normal social cues," and lacks the ability to evaluate "the negative characters of those around him." (R. Wasserman Ltr.) His friend of twenty years,

Monique Garcia, insists that Mr. Mizrahi would never intentionally have committed the crimes charges, but writes that "[i]t is also not surprising how he could have ended up in a situation of this nature, solely because of his trusting nature and seeing the best in people." (M. Garcia Ltr.)

Mr. Mizrahi's difficulty with reading comprehension has added to his ASD difficulties. His employee, Jennifer Levin, explains: "Marty has a very difficult time comprehending information.  It was on the regular that he would have me read contracts, emails etc. and explain to him in layman's terms." (J. Levin Ltr.)  Mr. Mizrahi has avoided the use of contracts because of his inability to comprehend their contents, instead trusting his counterpart to deal fairly.  Ron Cook writes that Mr. Mizrahi "has always been a 'handshake' person. . . .  He has a habit of trusting people, not documenting the business arraignment, and not properly managing their activities." (R. Cook Ltr.)  Bart Watts echoed this sentiment, writing, "[h]e always did business with a simple handshake." (B. Watts Ltr.)

Throughout his professional life, bad actors have taken advantage of Mr. Mizrahi because he was overly trusting.  Mr. Mizrahi's lifelong close friend Geoff Silver explains, "Marty is too generous and gets taken advantage of many times in his life." (G. Silver Ltr. at 1.)  When Mr. Mizrahi left school, he began what became a successful internet business with a high school friend with a handshake agreement.  (M. Mizrahi Ltr.)  "Marty paid for everything," but his partner stole the business out from under him.  (G. Silver Ltr. at 1–2; *see also* E. Mizrahi Ltr.; Morris Mizrahi Ltr.)  Mr. Silver explains that Mr. Mizrahi's business partner

> completely took advantage of Marty and the business ended up in a lawsuit.  [His business partner] ended up paying Marty a fraction of what Marty lost.  I was there during the entire situation, and I kept telling [the business partner] to do the right thing and pay him back, but he never did.  Marty had to start over from the bottom and has built the company to what it is today.  Unfortunately, this has been a common occurrence for Marty.  Marty has always been a generous friend and has been taken advantage of more times than I can count.

(G. Silver Ltr. at 1–2.)  Without Mr. Mizrahi, the prior business failed, and Mr. Mizrahi's new business, LV.Net, became much more successful with 115 employees and multiple offices.

But Mr. Mizrahi continued to be scammed in the same manner.  He set up another company called Core Scientific with a business partner based on another handshake deal, and Mr. Mizrahi explains "he screwed me out of my shares since we had no contract or paperwork.  I lost a lot of money and time on this project and Core Scientific shortly after became a billion dollar publicly traded company.  This resulted in a lawsuit in which I eventually 'won' a little compensation." (M. Mizrahi Ltr. at 4.)

Another example of Mr. Mizrahi being taken advantage of is when he hired a live-in assistant from a Craigslist advertisement.  (Dr. Romanoff Ltr at 19).  Two close friends, Ammar Kubba and Sean Tabibian, describe how they immediately expressed concerns to Mr. Mizrahi about this assistant, but "Marty didn't see it, and he should have, but he didn't."  (*Id*. at 20.)  This assistant, who Mr. Mizrahi's daughter described as "like a big brother to my sister and me" (A. Mizrahi Ltr.), ended up stealing millions of dollars of computer equipment from Mr. Mizrahi and his partner, causing the partner to sever all business ties with Mr. Mizrahi.  (Dr. Romanoff Ltr. at 20.)

Another notable example occurred in 2019, when Mr. Mizrahi invested in a car dealership. Ms. Davis explains:

> I started asking Marty questions thinking things were off with the amounts [Mr. Mizrahi's business partner] was giving him, and what he was telling Marty in return. . . .  When I raised a lot of concerns I had, Marty immediately told me Well there must be an explanation . . . the owner of the car lot would never screw me over.  I said stuff wasn't adding up.  Turns out, as I suspected, it was all lies he wasn't buying cars with Marty's money, he was living lavish spending money at jewelry stores, vacations, shopping, etc. Marty was almost ready to give him another $500k when I caught this.  He still wanted to believe [the business partner] didn't have bad intentions, when I told him he needed to prosecute.  The guy tried to steal Marty's vehicles and it just went downhill from there and Marty lost about $1 million.

(A. Davis Ltr.)

Daniel Saffron writes the Court as a painful witness to two members of his family taking advantage of Mr. Mizrahi. He explains, "I believe people take Marty's kindness for weakness and take advantage of that." (D. Saffron Ltr.) Mr. Saffron explains that Mr. Mizrahi lost over $200,000 investing in his father's business when his father misspent the money on personal expenses. Nevertheless, he writes that Mr. Mizrahi took care of him and his brother, even allowing them to stay with him in his home. Then, his brother stole Mr. Mizrahi's credit card and ran up a $40,000 bill while under the influence of drugs. Mr. Mizrahi did not report the crime and instead tried to help his brother get into a rehabilitation program. Despite all his family put Mr. Mizrahi through, Mr. Saffron says Mr. Mizrahi never held a grudge against him and continues to look out for him. Mr. Saffron explains that he has "anxiety/panic attacks" and can "get in a really bad mental space," and "Marty has been the one to help me through them when no one else could." (*Id.*)

Mr. Mizrahi's former business partner, Charles Sattler, has glowing things to say about working with Mr. Mizrahi, but complained that "Marty rarely ever fired an employee, even for gross negligence. On numerous occasions, we caught employees stealing red-handed, but he still wouldn't let them go." (C. Sattler Ltr.) Mr. Sattler found it "very difficult to run a business with people you cannot trust or rely on," and this became a point of contention between Mr. Sattler and Mr. Mizrahi because Mr. Mizrahi did not share that view. (*Id.*) Echoing the observations of others, Mr. Sattler explains that Mr. Mizrahi "trusts everyone at face value and either doesn't know how to identify red flags in deals or just wants to believe in people so much that he overlooks the dangers." (*Id.*)

Similarly, Ginger Michele explains:

I've watched employees lie to him, steal from him and take advantage of him. Marty never punished those employees, he didn't fire them, berate them or even threaten them.

Instead, he provided them another opportunity to do better. The same employees would show up in Marty's office, time and again, they'd offer the same sob story and still, Marty would offer the same opportunity. I never understood why Marty allowed this behavior. More often than not, the same employees would show up in Marty's office, months later, desperate in some other circumstance in their lives. Marty would, of course, come to their aid.

(G. Michele Ltr. at 2.)

Mr. Mizrahi's inability to detect lies is further demonstrated through his interactions with Mr. Zubaid. Ms. Davis explains that she "was suspicious of Joel [Zubaid]," but Mr. Mizrahi "soaked up every word Joel said to him, and nothing could have made him believe different at the time." (A. Davis Ltr.) With the benefit of hindsight, Mr. Mizrahi can now acknowledge, "I didn't see the signs with Joel, I overlooked things, I didn't read things through or question things I should have." (M. Mizrahi Ltr. at 5.) He explains: "I worked hard for over 30 years building LV.Net and I allowed my involvement with Joel to destroy all of it. In the end, it's my fault. I should have known better." (*Id.* at 1.)

Mr. Mizrahi's ASD is relevant to this Court at sentencing for two reasons: (1) it mitigates his culpability and (2) it would make prison a particularly miserable experience for him. A defendant's "ASD is a component of the culpability analysis. It bears on his perspective and appreciation of the wrongfulness of his offense conduct. It goes to his intent. Thus, we look at how ASD played a role in [Defendant's] conduct." *United States v. Shore*, 2020 WL 3791550, at *4 (E.D. Penn. July 7, 2020); *see also United States v. Blanco*, 102 F.4th 1153, 1162 (11th Cir. 2024) (affirming substantial downward variance); *United States v. Lucarell*, 2023 WL 3756191, at *2 (6th Cir. 2023) (recognizing autism as a mitigating factor). Courts regularly consider limitations on a defendant's ability to understand their culpability in setting sentences in other contexts. *See, e.g.*, *Graham v. Florida*, 560 U.S. 48 (2010) (sentencing juveniles); *Roper v.*

*Simmons*, 543 U.S. 551 (2005) (sentencing mentally disabled); *Atkins v. Virginia*, 536 U.S. 304 (2002) (sentencing juveniles).

Mr. Mizrahi's ASD would make the prison environment exceptionally difficult for him. In *Koon v. United States*, the Supreme Court blessed the district court's consideration of the fact that the petitioners were "particularly likely to be targets of abuse during their incarceration" in granting a downward departure. 518 U.S. 81, 112 (1996). Courts have recognized that individuals with ASD are particularly vulnerable in a prison environment. *See Shore*, 2020 WL 3791550, at *2 (defendant's "ASD further renders him particularly vulnerable to bullying and worse injury in a prison environment"). Additionally, a study that interviewed a cohort of judges about their attitudes toward ASD found that the judges "believed that the prison environment may be toxic and potentially useless for defendants with ASD, and that they would likely attempt to prioritize alternatives to incarceration for defendants with ASD." Berryessa at 855.

Experts caution:

> Judges should also consider the potential impact of a prison or jail sentence on a defendant with ASD. Prison or jail settings can cause anxiety, acting out, and reactive aggression in response to stressors, while social naïveté may increase defendants' likelihood to be victimized, exploited, or manipulated by other prisoners. Misinterpretation of unwritten social cues and rules may cause conflict between defendants with ASD and other prisoners, and potentially result in physical injuries. Further, communication deficits associated with ASD may hinder interactions with prison staff, security staff, and other inmates.

*Id.* at 861–62. "As incarceration may increase the risk of a defendant with ASD being exploited, physically harmed, or socially isolated, this vulnerability should be considered when weighing whether prison is appropriate for a defendant." *Id.* at 867. Rather, "judges should consider whether defendants with ASD may be more likely to benefit from alternative, non-incarceration-based sentences with more holistic, and less retributive, objectives." *Id.* "For individuals with ASD, non-incarceration-based sentences may be more effective to rehabilitate the defendant, whereas

incarceration may be more taxing and toxic for defendants with ASD as compared to other prisoners." *Id.*

In Mr. Mizrahi's case, he is subject to a mandatory minimum of two years' imprisonment under Section 1028A, but he should be sentenced to no more imprisonment than that. Prison is excessively punitive for someone with ASD and more good would be done by following the mandatory minimum with supervised release conditioned upon Mr. Mizrahi's home confinement and being subject to therapy for his ASD. Not only would Mr. Mizrahi's treatment benefit by him being in a supportive family environment, it would allow him to care for his family as well.

### B.    Mr. Mizrahi Is Devoted To His Family

A multitude of letters to the Court demonstrate that Mr. Mizrahi is a kind man with an especially strong devotion to his family and his many friends. He provides critical support to his family. His elderly parents have lived with him for the past 30 years, and he provides for them financially and otherwise. His father is 80 years old, and his mother is 78 years old. His mother was recently diagnosed with cancer and is currently undergoing chemotherapy. (E. Mizrahi Ltr.) Mr. Mizrahi has played a central role in her treatment and recovery, as his elderly father suffers from the effects of a heart attack, gout, and diabetes. (Morris Mizrahi Ltr.) Mr. Mizrahi is the only source of support for them, as Mr. Mizrahi's older brother Gary died following a difficult life of drug abuse and several prison stints. (*See also* I. Alonzo Ltr. (explaining that her brother, like Gary, suffered from mental illness and drug abuse and "Marty was the only person who consistently opened his doors and heart to [her] brother" and they shared in the pain of his suicide).)

Mr. Mizrahi showed the same kindness to his Aunt Lorraine. He moved her into his house, where she lived for three years, financially and emotionally supporting her as she went through a difficult divorce. (L. Hop Ltr.; D. Mizrahi Ltr.; J. Levin Ltr.) And when Mr. Mizrahi's brother

died, Mr. Mizrahi had Gary's daughter Jaymie come live with him and he treated her as his own daughter.  (E. Mizrahi Ltr.; *see also* J. Monastirsky Ltr. (praising her uncle).)

Mr. Mizrahi also has taken extraordinary steps to care for his two daughters.  Many people with ASD have difficulty establishing healthy romantic relationships and that has certainly been true of Mr. Mizrahi.  His two daughters have separate mothers, and both mothers have struggled with alcoholism and other issues that made them difficult romantic partners and unfit mothers. Mr. Mizrahi was awarded full custody of both his daughters.

Mr. Mizrahi's daughters are his world.  In 2003, Mr. Mizrahi's first daughter—Autumn— was born.  (M. Mizrahi Ltr.)  Mr. Mizrahi took full custody of Autumn as a result of her mother's years-long struggle with alcoholism.  (A. Mizrahi Ltr.)  Mr. Mizrahi has continued to try to help Autumn's mother get sober.  (E. Garza Ltr.)  Mr. Mizrahi is Autumn's only stable parent.  Despite his work schedule, he was and, continues to be, an extremely engaged father.  Autumn writes:

> Even with his busy schedule, we would still go to trampoline parks, the lake, Lazer tag, roller skating, ice skating, adventure dome, shopping, go karting, events, trips, dinner, casino pools, shows, parties, and more.  We had so much fun, he was on his phone a lot for work but he knew how to work and still live in the moment.  Some parents would bring their kids to these places and just watch as they have fun, my dad would have fun with us.

(A. Mizrahi Ltr.)  Autumn, now twenty, recently passed her real estate exam and is beginning her career as a real estate agent.  (M. Mizrahi Ltr.)

In 2005, Mr. Mizrahi's second daughter—Kylee—was born.  (M. Mizrahi Ltr.)  Kylee's mother also struggles with alcoholism, which led to much instability in Kylee's life.  (M. Mizrahi Ltr.; S. Mendoza Ltr.)  When Kylee was 8-months old, her mother pushed Mr. Mizrahi while he was holding Kylee and he fell to the floor and almost hit Kylee's head.  (M. Mizrahi Ltr.)  This incident caused Mr. Mizrahi to end his relationship with Kylee's mother, and Mr. Mizrahi gained full custody after lengthy court proceedings.  (Dr. Romanoff Ltr. at 12.)  When Kylee was 13, she

moved in full time with her father, sister, and grandparents due to health issues being exacerbated by her mother's struggles.  (M. Mizrahi Ltr.)  Kylee just finished her first year of college in Reno, Nevada, where Mr. Mizrahi visits her frequently.  (*Id.*)

As a single parent of two daughters, Ms. Davis explains that Mr. Mizrahi should win "awards for dad of the year" and Mr. Mizrahi's children echo that sentiment.  (A. Davis at 2; *see also* S. Link Ltr. ("Marty is also a great Dad!  One of the most remarkable aspects of Marty's character is his dedication to his two daughters, Autumn and Kylie."); Y. Ripoll Ltr. ("as a dad he was amazing").)  Even his children's friends write about him being a supportive influence on them and helping them through important life struggles.  (*See, e.g.*, V. Del Muro Ltr. ("Marty is an excellent father to his children.  He has always prioritized them and their needs as much as a father should.  He is the person that keeps his family together and grounded."); Y. Noor Ltr. (describing Mr. Mizrahi as "like a second dad to me"); Y. Ripoll Ltr. (explaining that when she came out as a lesbian in high school that she found acceptance in Mr. Mizrahi and he helped her reconcile with her less-accepting family).)

The concept of family extends beyond bloodlines for Mr. Mizrahi.  When employee Jennifer Levin had to move due to an unhealthy situation, Mr. Mizrahi moved her and her son, Tyler Prosky, into his home.  He provided them with cars and financial assistance, and gave Ms. Levin a job.  (J. Levin Ltr.)  Eighteen-year-old Tyler writes "Marty is like a father to me" and "[h]e treats me like his own son."  (T. Prosky Ltr.)  Tyler explains that his own father is not in his life, that his mother has struggled with alcohol, and he "had a lot of behavioral problems" when he met Mr. Mizrahi.  (*Id.*)  He writes: "Marty has done so much for my mom and me.  He gives us a place to live, cars to drive and pays for our utilities, along with 100s of other things."  (*Id.*)  Tyler went from not seeing a future for himself to now being able to say that "because of Marty I could

honestly say I have a shot in life." Mr. Mizrahi provided Tyler with guidance and taught him skills. Tyler explains that "[t]hrough a lot of tough love, Marty fixed me." (*Id.*) He concludes his letter by explaining that Mr. Mizrahi "is the best and only father I have ever known," and pleads with the Court: "Please don't take him away from us." (*Id.*)

Mr. Mizrahi's daughter, Kylee, explains the impact his incarceration would have on their family:

> As a college student I can't imagine walking down the aisle as a graduate and not seeing my dads face as I complete one of my biggest achievements. As a daughter who could potentially lose her everything, please, please take mercy on him. My sister and I really need our dad in our lives and my grandparents and his employees and all the people he helps.

(K. Mizrahi Ltr.) Mr. Mizrahi's uncle, David Mizrahi, agrees that "[i]ncarcerating Marty would devastate our family and countless others who rely on him." (D. Mizrahi Ltr.)

In 2019, Mr. Mizrahi met his partner of four years, Ashley Davis. When she and Mr. Mizrahi met by chance at a small Mexican restaurant by their respective jobs, they became fast friends. (A. Davis Ltr.) At the time, Ms. Davis was in an abusive relationship, which she was able to escape with the help of Mr. Mizrahi. (*Id.*) They later began a romantic relationship and have been each other's rock ever since. Ms. Davis writes:

> He is truly my best friend. He is the most reliable man I've ever known to everyone. His word is gold. He is my confident, who I go to for advice, my problem solver, my personal accountant, my fix it man, my dog's dad, my father's son he never had, my emotional support, my therapist, and I genuinely have no idea what I am going to do without him, and it breaks my heart into pieces to think of that future.

(A. Davis Ltr.)

As Mr. Mizrahi and Ms. Davis both describe in their letters to the Court, they have undergone a great tragedy in recent weeks. The bright spot in this difficult time for them had been that Ms. Davis was pregnant with their child, and they were both very excited about that.

41

Unfortunately, Ms. Davis lost the baby in her seventh month of pregnancy and had to give birth to a four-pound stillborn child. They described the difficulty of enduring childbirth only to walk out of the maternity ward childless, and returning to a home with a finished nursery that is hauntingly empty. Ms. Davis' brain knew she lost the baby, but it has taken her body longer to learn that there was no baby to nurse.

Every family faces hardship and this is theirs, but families cope with hardships together and help one another through them. This is the time when they need one another, and prison would shatter that support system. As John Martin, former U.S. Attorney and later District Judge in this District observed in retiring from the bench:

> Every sentence imposed affects a human life and, in most cases, the lives of several innocent family members who suffer as a result of a defendant's incarceration. For a judge to be deprived of the ability to consider all the factors that go into formulating a just sentence is completely at odds with the sentencing philosophy that has been a hallmark of the American justice system.

John S. Martin, Jr., *Let Judges Do Their Jobs*, N.Y. Times, June 24, 2003, at A31. Here, the Court may sentence Mr. Mizrahi to prison, but others will feel the brunt of that punishment—Mr. Mizrahi's elderly parents who he cares for, his partner Ms. Davis who is suffering, and his children who need his guidance. (*See, e.g.*, R. Barry Ltr. ("Sending him to prison will be an extreme hardship for not only his daughters, but his parents who he has always supported (emotionally and financially)."); G. Silver Ltr. at 2 ("I believe that an extended prison term will serve as a tremendous hardship for his elderly mother and father, his daughters and all the employees and people that he helps.").)

The Court should downwardly depart or provide a downward variance to shield Mr. Mizrahi's family from the damage that would be done by incarcerating him long term. In *Gall*, even the government conceded that a probationary sentence would be appropriate if "there are

compelling family circumstances where individuals will be very badly hurt in the defendant's family if no one is available to take care of them." 552 U.S. at 59. Many courts have applied Section 3553 to reduce sentences for defendants similar to Mr. Mizrahi, who are relied upon to support their families, as well as others. *See, e.g.*, *United States v. Smith*, 359 F. Supp. 2d 771, 776–782 (E.D. Wisc. 2005) (reducing defendant's sentence by half, even after a 15-level downward departure on other grounds—because he had been married several years, supports his children, cares for his mother and obtained letters as to his good character from members of his community); *United States v. Beamon*, 373 F. Supp. 2d 878, 887 (E.D. Wisc. 2005) (considering "Defendant's admirable service as a mentor to young men, his assistance to his ill father, and his positive influence on younger family members merited some consideration").

### C.    Mr. Mizrahi Has Demonstrated Extraordinary Kindness And Generosity

Mr. Mizrahi's kindness and generosity extends beyond his family. Ben Toubian who has known Mr. Mizrahi most of his life and gave him the first job making computer repairs explains, "I have seen him in action helping needy people, giving them jobs and saving many families during his lifetime, even during the Covid era, he has saved many families from going under." (B. Toubian Ltr.)

Among other notable acts of generosity, his lifelong friend Melanie Segal writes that "Marty is somewhat of a crusader against domestic violence. He literally shelters women and their children needing to escape abuse." (M. Segal Ltr. at 1.) She explains that it is a crapshoot as to whether Mr. Mizrahi has room for her to stay with him when she visits because extra rooms are so often in use by "someone staying there until they can get on their feet." (*Id.*). Numerous people in need who were taken by Mr. Mizrahi have written the Court, many of their letters are addressed below. (*See, e.g.*, L. Gray Ltr. ("After I was kicked out of my parents house he offered me shelter

and a job, he allowed me in his home and took me in as a family where I got to feel and be part of the family for a few years!").)

Sigal Chattah, Mr. Mizrahi's friend of thirty years, jokes that she calls Mr. Mizrahi's home "Marty's kibbutz of the fallen." (S. Challah Ltr.) She explains: "Marty would never miss an opportunity to give someone who has fallen on his luck, a chance to bounce back. Marty is the king of facilitating people's comebacks. There was always some broken person Marty was trying to fix and launch a new career for. That's the magic of Marty." (*Id.*) Being so generous, it is not surprising but still disappointing that she reports having seen many people "take advantage of" Mr. Mizrahi's support. (*Id.*)[9]

Mr. Mizrahi also is known for treating his employees like family. (*See* W. Porter Ltr., A. Miller Ltr.; T. Rodda Ltr.; T. George Ltr.; M. Abdolqader Ltr.; Z. Kaplan Ltr.; A. Christensen Ltr.; D. Lofton Ltr.; A. Monday Ltr.; C. Hinojal Ltr.; J. Morgan Ltr.) When Richard Tyler and his brother needed a place to stay, Mr. Mizrahi got them a place to stay rent free and later put down half the money for them to buy a house of their own. (R. Tyler Ltr. at 2.) Maria Labrado, one of Mr. Mizrahi's former employees, explained that when she could not afford childcare, Mr. Mizrahi allowed her to bring her three young children to the office, even allowing the kids to play in his own office. (M. Labrado Ltr.) When Carlos David Tunubala, another employee, arrived in the United States from his home in Colombia, Mr. Mizrahi personally picked him up from the airport, gave him a sim card with internet so he could speak to his family back home, and invited him to spend holidays with the Mizrahi family so he would not have to be alone. (C. Tunbala Ltr.) When

---

[9] Mr. Mizrahi has been taken advantage of by women seeking romantic relationships as well. Mr. Kubba and Mr. Tabibian describe how several women facing personal problems had come to view Mr. Mizrahi as someone they could exploit for personal gain. (Dr. Romanoff Ltr. at 14.) They described confronting Mr. Mizrahi about their concerns on numerous occasions, and Mr. Mizrahi was unwilling or unable to take their concerns seriously. (*Id.*)

Carol Hatcher lost her 16-year-old son at the hands of a drunk driver, Mr. Mizrahi paid her rent, allowing her to focus on rebuilding her life. (C. Hatcher Ltr.)

Ms. Davis explains:

I have seen him throughout the years help so many of his employees with their personal lives. Whether it's a customer service employee who needs surgery and doesn't have coverage. An employee who is behind on rent and bills. If an employee wants to lose weight, he'll give them a gym membership and hire a personal trainer and teach them how to eat clean. When his employees want to venture out and try new things, Marty always hears them out, and gives them advice. People who aren't afforded many opportunities such as people who have struggled with addiction or criminal backgrounds, he'll give them a job with no judgement.

(A. Davis Ltr. at 3.) She gives the example of Phil Olague. She explains that Mr. Olague struggles with drug addiction and had been in and out of jail, but Mr. Mizrahi hired him anyway. Many times, "Marty put him through detoxes and rehabs (along with countless other people)." *Id.* Mr. Mizrahi continued to help Phil, "even after he was caught stealing[.] Marty made him pay him back and then Marty started helping Phil get custody of his kids back, bailing him out of jail, buying him a car, giving him and his kids a place to live. Marty always saw so much potential in Phil, he kept giving him more chances." (*Id.*; *see* T. George Ltr. ("When our coworker Phil Olague was having a tough time and kept relapsing on drugs and alcohol, Marty did everything he could to help. Even though Phil had ongoing problems, Marty gave him and his family a place to live at one of our buildings. When it was clear Phil couldn't get his life on track, Marty sadly had to let him go due to being in the middle of his trial and being unavailable. Marty isn't the type of person who would throw anyone on the street, so he found Phil and his family an apartment, paid their insurance, rent, credit card bills, and phone bills, and even rented storage units for them. He continued to pay for three months. Marty was a huge support for Phil during his hardest times, showing how committed he is to helping others, even when it cost him personally.").)

Often, Mr. Mizrahi gives jobs to those in need. Scotlan Hutcherson, for example, explains that Mr. Mizrahi hired him knowing he had just had a kidney transplant and had a long recovery ahead of him, but he desperately needed a job. (S. Hutcherson Ltr.) Similarly in need, Tekino George explains:

> He gave me a job opportunity when I needed it most, loaned me money many times, and even provided a place for me and my family to stay. He gave me an auto loan and once flew me back to Alabama for a family emergency while he was out of the country. Marty has provided my children with clothes, shoes, food, and medical care. He also helped me with legal counsel for a situation I was in. Additionally, he has paid off bills for me when I was in a jam, showing his generosity and willingness to support those in need.

(T. George Ltr.)

Ms. Davis recounts that Mr. Mizrahi has a habit of hiring and assisting many homeless people. She explains, "I've seen him give them cellphones, clothes from his closet, and always meals and waters on his way back in the office." (*Id*). She discusses a long-time employee named Lonnie Jackson who Mr. Mizrahi took in off the street and explains that Mr. Mizrahi "treats that man the same exact way he treats the COO of his company, with kindness and respect. I think Marty single handedly brought a spark back in this man's life and it's a beautiful thing to witness." (*Id.*) She adds that Mr. Mizrahi "gives people chances, some probably that he shouldn't in my opinion. He loves to help people and he says that all the time. I know that sounds cheesy, but it's the truth. He truly enjoys and goes out of his way to do whatever he can to help people, even if he doesn't know them, he'll go the extra mile." (*Id.*)

Wendall "Smokey" Porter writes that he is such a person. He is sixty-eight years old and suffered a stroke seven years ago, which severely limits his ability to work, but Mr. Mizrahi still finds work for him and provides for his family. (W. Porter Ltr.) After his stroke, Mr. Mizrahi provided housing for him and his family, and helped him get a car and insurance. (*Id.*) Mr. Porter wonders how he would get by without Mr. Mizrahi's assistance. (*Id.*) He notes that Mr. Mizrahi

was always "hir[ing] people off the streets, homeless etc.. to help people and give them another chance." (*Id.*; *see also* S. Estrada Ltr. ("he gives homeless people jobs to put a little money in their pockets" and he "has helped people go to rehab to get off the streets"); T. George Ltr. ("He has hired many of my friends who were in desperate need of a job, giving them a chance to turn their lives around. Marty has also hired homeless people, offering them an opportunity to get back on their feet and reintegrate into society."); T. Rodda Ltr. (explaining Mr. Mizrahi gave him a chance with a job as a convicted felon that others would not give him and helped him turn his life around); M. Wilson Ltr. (explaining Mr. Mizrahi facilitated his early release from prison by hiring him through a jail work program).) Like Mr. Porter, Darrell Lofton writes that Mr. Mizrahi kept him employed even after he had a stroke and could no longer work, just so Mr. Lofton could support his family. (D. Lofton Ltr.)

Mr. Mizrahi was especially close to his assistant of fifteen years, Rachel Wilson, who died of breast cancer in 2020,[10] around the same time that Mr. Mizrahi's brother died, and Mr. Mizrahi started doing business with Mr. Zubaid. After her cancer diagnosis, Mr. Mizrahi put a down payment on a home for her to alleviate financial and emotional stress. (A. Akerman Ltr.)

Ms. Davis tells an anecdote about an encounter at a holiday party. "A guy named Tony [Caporicci] and his wife came up to Marty and I and began thanking Marty with tears in their eyes, they explained to me 'Marty saved my husband's life.'" (A. Davis Ltr. at 3.) They explained that

---

[10] Ms. Wilson was a crucial support system for Mr. Mizrahi. She was keenly aware of his shortcomings and would protect him from making mistakes. Mr. Mizrahi explains, "[i]t was really hard for me to function normally without her double-checking my work and crossing the T's and dotting the I's." (M. Mizrahi Ltr. at 4.) "[S]he literally helped him with everything. She was Marty's right hand in his business and personal life." (A. Davis Ltr. at 4.) Had Ms. Wilson lived, there is reason to speculate that she could have helped Mr. Mizrahi avoid getting deeply entangled in Mr. Zubaid's lies.

"Tony was extremely sick and unhealthy in and out of the hospital.  Marty got him insurance that he didn't have and intervened, forced Tony to quit smoking cigarettes, and worked with him daily about his diet, went to the gym with him, and trained him." (*Id.*)  Tony told her that he was alive today because of Marty's intervention. (*Id.*)  Ms. Davis adds, "I could tell you 100 more stories of people I have encountered throughout the years with Marty that he has done the most beautiful things for." (*Id.*)

Many people who have submitted letters to this Court tell those stories in their own words. Simon Winthrop, a close friend, explains how after a recent heart attack which resulted in a two-week-long coma, Mr. Mizrahi stayed by his side in the hospital and handled his affairs.  (S. Winthrop Ltr.)  Sonya Duarte, a close employee, explains that when she had excessive medical bills that insurance would not cover that Mr. Mizrahi paid them and got her a needed operation. (S. Duarte Ltr.)  Lifelong friend Geoff Silver describes how when he was struggling financially, Mr. Mizrahi paid his water and power bills. (G. Silver Ltr.)  Countless friends describe how Mr. Mizrahi has an "open-door policy" for friends who need a place to stay. (M. Garcia Ltr.; *see* K. Babaei Ltr.; C. Herscu Ltr.; S. Pak Ltr.; P. Taheri Ltr.; V. Del Muro Ltr.)  Mr. Mizrahi has also helped numerous friends struggling with addiction. (*See* I. Alonzo Ltr.; S. Tallard Ltr.; M. Wilson Ltr.)  In short, "there are many many lives that count on Marty." (S. Berlie Ltr. at 2.)

Mr. Mizrahi shows the same generosity to the broader community.  "Mr. Mizrahi is well known for paying college tuition for many employees; he has helped numerous people pay their debts, Therapy, Medical expenses, Professional licensing, and vehicles for transportation" and he "has donated his time and finances to charitable causes throughout Las Vegas, perhaps too many to list." (M. Del Castillo Ltr.)  His Rabbi explains that he has been particularly generous in

supporting his synagogue (Rabbi Shuchat Ltr.), and he never says no to assisting charities, such as the Las Vegas "Turkey Gobble," which feeds the hungry at Thanksgiving (S. Chattah Ltr.).

Plainly, Mr. Mizrahi is a man of extraordinary character, and a downward departure or variance also would be warranted by his dedication to his family, community, and his history of generosity. *United States v. Nellum*, 2005 WL 300073, at *4 (N.D. Ind. Feb. 3, 2005); *see, e.g.*, *United States v. Garcia*, 413 F.3d 201, 229 n.19 (2d Cir. 2005); *United States v. Bisanti*, 414 F.3d 168, 173 (1st Cir. 2005). In *Pepper*, for example, the Supreme Court looked to a defendant's rehabilitated relationship with his family and explained "there is no question" this is a "critical part" of his "history and characteristics" that should be considered at sentencing. 562 U.S. at 492. Similarly, in *Gall*, the Supreme Court affirmed a downward variance from a recommended sentencing range of 30–37 months to a 36-month purely probationary sentence following a "small flood" of letters of support and in part because the defendant's family and friends, which made recidivism less likely. 552 U.S. at 43–44; *see id.* at 45 (explaining probation is a meaningfully punitive sentence). In opposing that sentence, even the government conceded that a probationary sentence would be appropriate if "there are compelling family circumstances where individuals will be very badly hurt in the defendant's family if no one is available to take care of them." *Id.* at 59; *see also United States v. Taffaro*, 919 F.3d 947, 949 (5th Cir. 2019) (upholding a downward variance from a sentencing range of 27–33 months to 60-months' probation based on a defendant's age, physical condition, family ties, and charitable acts, among other factors).

## CONCLUSION

The massive number of letters submitted to the Court demonstrate that time after time, Mr. Mizrahi has been instrumental in providing those who have stumbled in life with a second chance. (*See, e.g.*, J. Silberman Ltr. ("What I admire most about Marty was he gave people second chances

in life.").)  As saddened as all of those who he has helped are to see Mr. Mizrahi in his present predicament, they find it incredibly meaningful to address this Court and ask that Your Honor show Mr. Mizrahi the same courtesy he has shown so many others.  This is a community telling the Court that it does not need protection from Mr. Mizrahi and pleading that the Court give him a second chance.  They know him best and should be heard.  For a man who has done so much to restore a hopeful future to those who have lost hope, it would be a cruel twist of fate for him to be given a sentence that would deny him any hope of regaining his freedom and the connections that he has with his family and so many friends who love him.

The Court's hands are tied in having to sentence Mr. Mizrahi to a two-year mandatory minimum prison term, but it is within this Court's power to ensure that the ends of justice are met by requiring no more incarceration than that.  The Court can supplement that sentence by imposing conditions of home confinement and requiring him to obtain rehabilitory treatment for his ASD.  That is a humane punishment that would preserve his ability to care for his family and leave him with some hope of happiness in his future.

July 26, 2024                                     Respectfully submitted,

Richard A. Portale                              *s/ Richard Weber*
Chad Mair                                       Richard Weber
PORTALE RANDAZZO LLP                            WINSTON & STRAWN LLP
245 Main Street, Suite 605                      200 Park Avenue
White Plains, N.Y. 10601                        New York, N.Y. 10166
rportale@portalerandazzo.com                    rweber@winston.com
cmair@portalerandazzo.com                       (212) 294-1718
(914) 359-2400
                                                Christopher D. Man (*pro hac vice pending*)
                                                WINSTON & STRAWN LLP
                                                1901 L Street, N.W.
                                                Washington, D.C. 20036
                                                (202) 282-5622
                                                cman@winston.com

*Counsel for Martin Mizrahi*