# EXHIBIT B

### Richard I. Romanoff, Ph.D.
10780 Santa Monica Boulevard, Suite 460
Los Angeles, CA 90025
(O) 310-443-1570  (F) 310-443-1569
email: richard@romanoffphd.com

July 18, 2024

The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
500 Pearl Street
New York 10007-1312

RE:        Martin Mizrahi
Case No.:    S2 22CR00650-004  (JPO)

Dear Judge Oetken,

I evaluated Mr. Martin Mizrahi at my above noted office on April 11, 2024 and April 19, 2024; and via Zoom videoconference on May 7, 2024; May 14, 2024; May 21, 2024; May 23, 2024; and June 25, 2024.  We met for a total of fourteen and a half hours.  The purpose of this evaluation is to provide information about Mr. Mizrahi's current and overall psychological functioning, with a particular focus on his mental state at the time of his involvement in the current offense.  I was also asked to explore potential mitigating factors to be considered in connection with his upcoming sentencing hearing.

As a licensed psychologist, I have conducted approximately three thousand forensic psychological evaluations over the past thirty-nine years.  I have conducted these evaluations in state and federal courts, and have been retained by defense attorneys and appointed by prosecutors and judges.  I have evaluated men and women whose charges range from simple misdemeanor cases to death penalty cases.  My evaluations regularly focus on efforts to assess competency, reconstruct mental states at the time of an offense, assess dangerousness, and recommend appropriate treatment plans for those deemed to be in ongoing need of mental health and/or substance abuse treatment.

In addition to the patient interview, the following information was also considered as part of this evaluation:

1)    United States District Court, Southern District of New York, Superseding Indictment, for Case No. S2 22CR00650 (JPO), filed on December 19, 2023.
2)    United States District Court, Southern District of New York, Expert Witness Disclosure for Colin L. Schmitt, CFE, filed on January 18, 2024.
3)    United States District Court, Southern District of New York, Expert Witness Disclosure for N.G. Berrill, PhD, filed on January 18, 2024.

Martin Mizrahi                                                          July 18, 2024
Case No. S2 22CR00650-004 (JPO)                                       Page 2 of 28

4)     One hundred and sixteen character letters written on behalf of Mr. Mizrahi by a wide
       range of family members, long term friends, employees, people he met through work,
       and people he has helped over the years.
5)     United States District Court, Southern District of New York, Presentence Investigation
       Report, for Case No. S2 22CR00650-004 (JPO), filed on June 3, 2024.
6)     Letter and Psychotherapy Progress Notes produced by Rozalin Banafsheian, PhD,
       documenting treatment provided by him to Mr. Martin Mizrahi for the period of
       December 17, 2020 through February 23, 2022.


<u>Pertinent History</u>

The United States District Court, Southern District of New York, Presentence Investigation
Report for this case, for a sentencing date scheduled for July 26, 2024, indicates Mr. Mizrahi
was convicted on March 4, 2024 by jury trial on all seven counts listed in the Superseding
Indictment filed on December 19, 2023.  These convictions include Conspiracy to Commit Wire
Fraud and Bank Fraud; Wire Fraud; Bank Fraud; Conspiracy to Commit Money Laundering;
Money Laundering; Aggravated Identity Theft; and Conspiracy to Operate an Unlicensed Money
Transmitting Business. He is currently awaiting sentencing in connection with these convictions.
These convictions stem from events that unfolded from February 2021 through June 2021.  The
Presentence Investigation Report also recommends an additional adjustment for Obstruction of
Justice based on "falsehoods" made by Mr. Mizrahi in the course of his testimony to the jury.

I also reviewed the Expert Witness Disclosure for Colin L. Schmitt, CFE in connection with this
case, filed on January 18, 2024.  Mr. Schmitt indicates he is the founder and owner of a forensic
accounting and private investigation firm and a former agent with the Federal Bureau of
Investigation, where he worked for over twenty-five years.  I will refer the reader to this report
for a more complete review of his findings and conclusions, though I will note he drew attention
to a variety of specific characteristics he found that were associated with Mr. Mizrahi throughout
his communications with investigating officers, and with additional characteristics associated
with commissions earned by Mr. Mizrahi that in total led him to conclude, "Zubaid is an
organizer of fraud.  He identifies and grooms Mr. Mizrahi to unwittingly launder his stolen
money." [United States District Court, Southern District of New York, Document 76-2, page 5
of 25]

I also reviewed the Expert Witness Disclosure for N.G. Berrill, PhD, filed in connection with
this case on January 18, 2024.  Dr. Berrill is the Executive Director of New York Forensic, a
firm that provides diagnostics, psycho-legal consultation and treatment to individuals, including
to clinicians, attorneys, the courts, social service and criminal justice agencies.  Once again, I
refer the reader to that report for a more complete review of his findings and conclusions, though
I will note he met with Mr. Mizrahi personally and oversaw the administration of relevant
psychological testing to him.  From his evaluation and testing he found evidence of average
intellectual abilities and significant learning problems.  Specifically, Dr. Berrill indicates Mr.
Mizrahi currently has, "reading comprehension at a high school level, while his spelling is a
middle school to high school level."  Noting that he receives approximately 400 emails daily,

Martin Mizrahi                                                July 18, 2024

Case No. S2 22CR00650-004 (JPO)                    Page 3 of 28

that he, "cannot read and adequately digest," he described a pattern of coping that has left him unusually reliant on subordinates, and at increased risk for missing important information. He also documents an additional number of characteristics by Mr. Mizrahi that include regularly engaging in business transactions "with a handshake," and without more formal business agreements; and of sometimes ignoring legal advice, in a manner that has on previous occasions resulted in him losing, "a great deal of money over the years." Finally he notes a tendency in Mr. Mizrahi to be impulsive and to exhibit, "interpersonal naïvete," that has also led to past financial losses.

I then reviewed a letter and psychotherapy progress notes produced by Dr. Rozalin Banafsheian documenting his work with Mr. Mizrahi. These records document treatment administered to Mr. Mizrahi by Dr. Banafsheian between December 17, 2020 and February 23, 2022. This treatment was pursued shortly after an incident that occurred at the Cosmopolitan Hotel in Las Vegas on October 30, 2020 when Mr. Mizrahi was physically assaulted and then detained for several hours under painful and difficult circumstances by hotel security officers. Dr. Banafsheian diagnosed Mr. Mizrahi with Posttraumatic Stress Disorder, Depressive Disorder, Generalized Anxiety Disorder, and Panic Disorder. Initial treatment focused on the amelioration of symptoms associated with these condition, that included daily headaches, nightmares, sleep disturbance, recurring flashbacks, low energy, neck and shoulder pain, difficulties concentrating, impaired memory, increased anxiety and periodic panic attacks. Records go on to indicate slow improvement over time, though in a letter dated February 24, 2022 Mr. Mizrahi was still continuing to experience some ongoing symptoms from these conditions.

Finally, I reviewed one hundred and sixteen letters written on behalf of Mr. Mizrahi by a wide range of family members, long term friends, employees, people he met through work, and people he has helped over the years. I have read hundreds of collections of letters written on behalf of defendants over approximately four decades. I have never read a collection of letters that as a whole reveal so much about the person they are writing about. It took about five hours of my time to read through all these letters, that were each uniquely detailed, not because they were describing a different person, but because there was an endless collection of specific examples of a similar pattern of behavior Mr. Mizrahi has pursued with an unusually large number and wide ranging group of individuals over a very long period of time. Many of these individuals have known Mr. Mizrahi since his elementary and middle school years. This does not just include family, but an unusually large number of friends he has kept up with since then. From start to finish these letters reflected the considerable effort each author made to describe the person they knew and loved. Each was clearly aware of his recent conviction, and each and every one of them founded it impossible to believe that Mr. Mizrahi would ever knowingly behave in a criminal fashion. A surprising number of these letters contain a statement indicating their continuing trust and faith in Mr. Mizrahi - a person most had known for a decade or more - despite his conviction; as they noted no change in their concern and support for him.

These letters taken together describe an individual who has changed little since his childhood years. A person who gives generously of himself in an endlessly thoughtful, caring, and non-judgmental fashion. There were letters from individuals in almost every major ethnic and

Martin Mizrahi                                                                July 18, 2024
Case No. S2 22CR00650-004 (JPO)                                  Page 4 of 28

religious group. More than fifty of these letters document life changing assistance they received from him, without any strings attached. While sometimes this assistance included financial assistance, there is no substitute for reading all of the letters to gain a full appreciation for the endless action oriented efforts Mr. Mizrahi pursued on behalf of these individuals. Rarely did two people ever receive the same assistance from him. Overwhelmingly, each received the specific concrete assistance they needed in that moment, in a kind of just in time fashion.

Equally important, these letters document a considerable level of honesty and integrity in Mr. Mizrahi, pursued in his business activities and in his overall life. They describe a person who differentiated little between work and play, and who behaved in an almost identical fashion in whatever setting he was in. Some report firsthand knowledge of Mr. Mizrahi's serious verbal difficulties, including his poor reading abilities and very weak verbal comprehension abilities. Some referenced his unique interactive style in his business dealings, that led to agreements sealed with a handshake, even when Mr. Mizrahi was making a new arrangement with someone he hardly knew, and when millions of his dollars were in play.

It is also important to note how many of these letters describe a particular pattern of communication they found to be unique to Mr. Mizrahi. Some described him as, "concrete," "abrasive," "candid" and "frank," as they made reference to initial difficulties they experienced in adjusting to his communication style. All of these individuals ultimately came to find this style helpful to them, as they came to view his comments as useful and from the heart, given in a genuine effort to be helpful. Many referenced this particular communication style - that focused on honest and non-judgmental feedback - as the unique gift they received from him. At one point his oldest daughter Autumn described him as robotic like and "an alien," as she then went on to describe a collection of unique qualities in him, with a unique parenting style that helped her overcome a collection of life challenges, by being a role model she could follow, to put her life back on a much more positive track.

Perhaps most importantly, many referenced his naïvete and his tendency to be "too trusting." They gave a myriad of examples of times when people took advantage of him, as they simultaneously described how these encounters led to no observable change in Mr. Mizrahi, who continued to trust others, often including the very people who had just taken advantage of him. Some referenced occasions when Mr. Mizrahi lost considerable money of his own, but never pursued legal actions against someone, who either through criminality or negligence lost his money. There are even letters when individuals who had literally stolen money from him were given another chance to work for him, after addressing some issue, based on Mr. Mizrahi's almost universally recognized tendency to give everyone second and third chances and opportunities to grow and change.

Finally, for purposes of the current evaluation I want to specifically draw attention to periodic references in these letters to Mr. Mizrahi being "empathic." Almost always these letters contained specific examples the author used to illustrate their use of this word. These examples did not indicate Mr. Mizrahi was someone who was adept at discerning their inner feelings. Rather, these examples clearly documented his ability to engage in thoughtful and caring actions

Martin Mizrahi                                                    July 18, 2024
Case No. S2 22CR00650-004 (JPO)                                  Page 5 of 28

in the moment, that met very specific concrete needs they had at that moment, in a way that turned out to be extremely useful, and at times literally life-saving.  They also regularly described an almost totally nonjudgmental approach they experienced from him, that enabled them to open up to him, and to feel safe with him, and to trust him with very personal matters.

I will return to these letters at the end of this report, in connection with my findings and conclusions.  I want to stress at this point the degree to which they provide a very unique and useful collection of information about who Mr. Mizrahi is, based on the observations of more than 100 individuals who have collectively and conservatively spent in excess of 100,000 hours of time with him over the past forty years.

Relevant Background Information

In order to efficiently focus in on the issues relevant to the current assessment I will limit my review of the collected information to the particular background information deemed most important to the referral questions noted above.  I will also note that all of the information summarized below was obtained in the course of individual interviews conducted by me for purposes of the current evaluation.  This includes the above noted interviews with Mr. Mizrahi, spanning fourteen and a half hours; an interview with Mr. Sean Tabibian, conducted on May 30, 2024, lasting one hour; an interview with Mr. Ammar Kubba, conducted on May 30, 2024, lasting one hour; and an interview with Ms. Ashley Davis, conducted on June 3, 2024, lasting one hour.

Current Life Situation

Mr. Mizrahi, currently fifty-three years of age, lives in a home owned by him in Las Vegas.  His parents and older daughter lives home with him full-time, and his younger daughter divides her time between this house and an apartment in Reno.  His life partner, Ms. Ashley Davis, also spends time at the house, while also maintaining her own independent residence in Las Vegas. [I have also recently learned that Ms. Davis, who until about two weeks ago was pregnant with their son, whose due date would have been in September was stillborn.]  He also described having an ever-changing number of additional people who come and go through his house, sometimes for periods of months or even years.

A long-standing workaholic, Mr. Mizrahi reported typically working eighty hours a week or more, though he said that more recently he now spends most of his time working on issues associated with this case.  He also continues to spend time managing some real estate holdings.  It was at this point that he began to explain for the first time his view of himself as, "an anomaly," and when asked to clarify said, "Because of how I think and do things," as he quickly added, "You'll see."  Continuing on with his current work activities he explained, "I enjoy working, I've enjoyed working my whole life, and for me work is play."  He said he is also currently engaged in multiple different lawsuits, "and there's a lot of reading, and I have a reading comprehension problem, I've had it my whole life."

Martin Mizrahi                                                                                      July 18, 2024
Case No. S2 22CR00650-004 (JPO)                                                      Page 6 of 28

Mr. Mizrahi reported an active social life, though he did report a significant decrease in socializing since his current legal difficulties began. This included his frequent contact with his daughters, parents, life partner and with a large number of friends. He described in some detail an extremely close relationship between him and both daughters, that clearly reflected a significant relationship between them. He reported regular contact with his parents, though he also described their relationship as limited, noting he rarely if ever confides in them or asks for their advice.

Discussing his relationship with Ms. Davis, he exhibited what would go on to become a pervasive absence of more normative expressions of empathy, even towards those closest to him. Rather, he tended to provide more concrete transactional descriptions that often included actions he would take to help others, rather than conversations he would have with others so he could better understand them. Discussing Ms. Davis he said, "She's great, she's sweet, she's smart and pretty, and she has her own mind." He then explained, "And she's helping me with the case, and she was in the car business, buying and selling cars, and I'm helping her with that."

It was at this point that he first indicated having "a few hundred friends" that he regularly keeps up with who reside in Los Angeles and Las Vegas. Noting that some of these individuals are his employees and some are business associates, he also explained that for him there is little distinction between these categories, as he treats all of these individuals as "friends first."

Interestingly, in my interview with Ms. Davis, when asked to describe Mr. Mizrahi she said, "He's one of the kindest most generous and genuine human beings I've ever met." She also described him as, "An incredible father, an incredible son, and an incredible boss to his employees," adding, "He's very hands on, he gives 100 percent, if anyone needs anything he drops what he's doing to help, he's just very generous and kind." Continuing on she said, "And stress doesn't bother him, he has this positive outlook, he never gets angry or sad or stressed, and I get stressed over little things, but never Marty, he's just a very positive person, he never gets negative, and he doesn't fold, he works things out, he figures out how to fix things." Finally, she described how he treats everyone the same, as if they have always been a close friend of his, regardless of whether he has known them for decades of time or just met them that day.

Discussing his current physical health, he said prior to an incident that occurred on October 30, 2020, when he was assaulted by security guards at a casino in Las Vegas, that has now led to one of his above noted legal cases, he considered himself to be in good physical and mental health. He estimated sleeping between five and six hours a day noting he has regularly been able to get by on very little sleep. He then explained that in his twenties it was common for him to get by on one or two hours of sleep a day, and he has gradually started to sleep for longer periods of time over the years, and at this point is now sleeping about five or six hours a day. He said he feels well rested with this amount of sleep.

Continuing to discuss more recent events, he also reported that about two years ago his older brother [about five years older than him] died from complications associated with diabetes. He described in some detail additional mental health and substance abuse difficulties this brother

developed over the years, and the considerable efforts he pursued to help his brother to deal with these issues [documented in greater detail in many of the letters written by family members and some of his oldest and closest friends]. Again revealing his atypical pattern of describing those closest to him, that in many ways can be viewed as reflecting an absence of a certain type of empathy, especially at the level of feelings, when asked how he felt at the time of his brother's death he said, "People tell me I don't have much empathy." He then said, "Like if people or dogs die, I'm like get over it, move on, and people tell me I have no empathy." Refocused on his brother he then explained, "I felt it was good that he died, because he was miserable, and he was just living home, and unable to work, and he was so negative, and now he's in a better place." Finally he said, "I think for me it was mostly that he wasn't able to be productive, but it was also that he's now released from his suffering."

Responding to some final questions he reported a period of heavy drinking following his conviction, that led him to begin attending Alcoholics Anonymous meetings that he found helpful. He reported no history at any time of recreational drug use. Pressed on this he said, "I don't do drugs," and at a later point in the interview explained how his older brother's history of significant substance abuse, that led to serious life problems for him, left him with an extremely negative view of such drug use, and a firm determination to avoid all recreational drug use that has never wavered for him. [A large number of letters document Mr Mizrahi's efforts over many years to help individuals struggling with substance abuse difficulties. This came to include urging them to seek help, and at times to pay for treatment. Many letters also referenced his willingness to provide recently sober and recovering addicts a job at one of his companies, in an effort to help them get back on their feet.]

<u>Relevant Family History of Mr. Mizrahi's Mother and Father</u>

Mr. Mizrahi described his mother as, "easy-going and very sweet, she likes everyone, and she's always been there for me." He said his mother was born in Chicago and moved to Los Angeles with her parents as a young child. He reported knowing little about her childhood history, though he did note she had a brother who died in his fifties from a heart attack or stroke. He also said his maternal grandfather owned and operated a successful dry cleaning store and he believes family was "financially secure." He reported spending time during his own childhood years with these grandparents that was clearly enjoyable for him. He said as an adult his mother and her parents got along well with each other. He also reported no knowledge of any mental health or substance abuse difficulties on his mother's side of the family.

Shifting to a discussion of his father he immediately and exclusively focused on his work related life explaining, "He was a decorator when I was growing up, and I'd help him sell rugs on the corner, and then at garage sales." Noting he also knows little about his father's side of the family he said, "He grew up in Los Angeles, near Fairfax, and I think his parents grew up in Brooklyn, and they came here on a boat [meaning to the United States], and I think my grandfather was born in Damascus." It is his understanding his father did not get along with his own father, recalling at one point his father telling him, "I want to be a different father [with you] than my father [was with me]." He believes his father's parents owned, "like a mini

Martin Mizrahi                                                                                     July 18, 2024
Case No. S2 22CR00650-004 (JPO)                                                     Page 8 of 28

Target," adding, "I know the family worked hard." In contrast to his mother, he said his father came from a very large family, with "hundreds of cousins" who regularly got together for family functions throughout his growing up years. It was clear he recalled these family get-togethers as a positive part of his own growing up years. He initially said he is not aware of any mental health or substance abuse difficulties on his paternal side of the family, though he then noted that his father regularly smoked marijuana, and as already noted above, his older brother also developed a significant problem with substance abuse.

Discussing the relationship between his parents he said, "It was amazing," adding, "They love each other, they're best friends," though he also noted that neither has made their own independent friends since moving to Las Vegas more than thirty years ago, and even when in Los Angeles, he described their other family members as having been their closest friends, and the people with whom they socialized."

<u>Mr. Mizrahi's Early Childhood History</u>

Mr. Mizrahi was born in Los Angeles. When he was around the age of four the family moved from the San Fernando Valley to Woodland Hills, where he remained through the age of seventeen, when he then moved with his family to Las Vegas. Initially noting an almost exclusively happy childhood, as I began asking more specific questions he said, "I don't recall a whole lot." He reported no memories prior to moving to Woodland Hills, and when asked if he has any recollection of feelings from that time said, "I have no idea what I felt, we just moved and unloaded the truck." Specifically asked about the house they moved into, he said his first memories of that house begin when he was in around second-grade, though he reported little in the way of specifics. His said his first more concrete specific memory was of buying his first car at the age of sixteen recalling, "My grandfather paid half and I paid half, it was a Chevy Sprint, it was a good car, it was gas efficient." Reflecting the development of entrepreneurial tendencies from early on he then reported that after installing a car stereo into his new car he then, "opened my own business installing stereos and car alarms, that was during high school."

Discussing his social experiences at the time, he regularly provided broad statements, such as a consistent sense of him having "a lot of friends," as he remained simultaneously unable to provide specific recollections of things he did with these friends. He did report still having friends from that time, dating back as far as elementary school, and I eventually spoke with one of these individuals, Mr. Ammar Kubba, who reported first meeting Mr. Mizrahi in fourth grade, and read letters produced by several others. Recalling the start of their relationship, Mr. Kubba said he had just moved to the United States from London at that time and recalled Mr. Mizrahi being the first person to approach him and befriend him. He said at the time he recalled Mr. Mizrahi being "very popular," and was grateful to have him as a friend. He recalled them playing computer games together, and at one point learning to program while in high school. He then reported drifting apart from him when Mr. Mizrahi and his family moved to Las Vegas, before later reconnecting as adults. He also recalled Mr. Mizrahi's parents fondly, recalling his mother as, "a sweetheart, very caring," and his father as, "more opinionated."

Martin Mizrahi                                                                            July 18, 2024
Case No. S2 22CR00650-004 (JPO)                                                     Page 9 of 28

Another friend who was interviewed for purposes of the current evaluation, Mr. Sean Tabibian, recalled meeting Mr. Mizrahi when they were both fourteen and in ninth grade. Describing him at that point he said, "Marty is a special and unique character, there is no one else like him," adding, "It's hard to explain." Asked to elaborate he said, "He's like a character out of a movie, a person who doesn't want to grow up, he's fun-loving and happy-go-lucky, but he's also very driven and motivated, and he works very hard," and, "He's been like that his whole life, he makes friends with everyone, from a homeless person to a billionaire, every culture and ethnic background," finally stating, "He likes to make people laugh, to make them happy." He also recalled how during high school the two of them would regularly engage in "pranks" beginning in their freshman year, that often got them into trouble. Asked to further clarify this statement he said, "We were never destructive." Finally, asked if he has changed since those years he said, "Yes, life makes you grow up," and when asked if Mr. Mizrahi has changed he initially paused and finally said, "To a certain degree, but less," adding, "He's still striving to be that funny kid."

<u>Mr. Mizrahi's School History Through His High School</u>

Mr. Mizrahi said he could not recall if he attended school before kindergarten, but "believes he did," indicating he recalled attending a private elementary school through second or third grade. [Mr. Mizrahi periodically corrected himself from one point in the interview to another on occasions when he initially recalled some incident occurring at one point in his life, only to subsequently correct himself at a later point, when some other memory enabled him to more accurately identify the time frame associated with that incident.] Pressed for any memories from that school he said, "I remember talking to the girls and passing notes and being funny, the class clown." Asked if he recalled being teased he said, "Maybe, I don't recall," and then added, "I do recall being teased, but I'm not sure when."

He reported transferring to a military academy for third or fourth grade, recalling the name of this school as Ridgewood. [The Internet identifies a school called Ridgewood Military Academy that opened in Woodland Hills in 1942 and closed in 1981.] Initially he did not recall why he was transferred to this school, but later on, when talking about his brother, recalled that his brother was already attending this school, and his parents decided to transfer him there so they would both be at the same place. He did report having more memories of this school, though when asked about them, reported ones exclusively centering on memories of the school associated with the military training. For example, he recalled that each student received a rank, in part based on their skills such as marching, or shining their shoes and belt buckles, or maintaining proper dress explaining, "I was good at that, and I enjoyed getting the reward." He said this provided him with an opportunity for leadership explaining, "I became head of my platoon, I became the leader." He also recalled getting along well with peers. In contrast, asked about his academics he reported little or no memory for actually being in class, though at one point he said, "I couldn't read, and I had low comprehension, and I had tutors [privately paid for by his parents]," adding that he required tutors for reading and reading comprehension through his Senior year of high school. Overall, describing his academic experiences he said, "I recall learning to read was horrible, I hated it," as he then said, "I've never read a book in my life." Pressed on whether this was actually true or an exaggeration he said, "Yes, it's true." Finally, he

Martin Mizrahi                                                                July 18, 2024
Case No. S2 22CR00650-004 (JPO)                                              Page 10 of 28

said he believes he spent only one or two years at this school, before it closed due to "running out of money."

He reported returning to public school at that point, believing he was in fourth grade at the time, as he once again qualified his answer by noting he was not sure. He reported being ahead of other students in math, as he continued to struggle with reading and reading comprehension. Overall he said, "I disliked school in general, but I liked having friends, and I looked forward to going so I could see them." He had trouble recalling the name of his junior high school, the grades he got while in junior high school, or how he did on standardized tests. He did recall consistently getting into trouble for, "talking too much," explaining, "I was never mean or destructive, I was more disruptive, I'd get bored, I was definitely bored." Finally, he reported attending three different high schools for ninth through twelfth grade, again reiterating he did not enjoy attending school and by this time, "I was just waiting for it to end." He reported attending schools in Woodland Hills, Canoga Park, and Chatsworth, noting that his misbehavior at previous schools was responsible for these transfers.

Focusing in on his academic performance in high school he recalled struggling in English, and being assigned to remedial English reporting, "I think I just passed, I almost didn't graduate." [I am aware the Presentence report indicates there is no documentation confirming he actually did graduate from high school. Asked about this in our discussions he said he did graduate from high school, and is currently pursuing efforts to obtain the necessary paperwork from his last high school.] Importantly, there was no point when Mr. Mizrahi saw his poor academic performance as a consequence of any cognitive or emotional limitations in him. Rather, he consistently saw himself as bright and capable [with the exception of reading and reading comprehension], and simply disinterested or misjudged by his teachers. Specifically asked if he was ever placed in special education classes, given the clear evidence of learning difficulties with reading and reading comprehension, he said he was not, though as already noted above, he did report participating in private tutoring through the end of his high school attendance [confirmed by his mother in her letter]. Finally, he also reported that by his middle school years, and even more so during his high school years, he began working at various jobs outside of school, that began taking up more and more of his time [more will be said about this below]. During my evaluation with him, he said he graduated from high school in 1989. Asked about his plans at that point he said, "I wasn't sure, but I was thinking something in the computer industry, the technical part," adding, "I'd been fixing computers since I was fifteen." He reported no additional history of formal schooling from that point on.

    Mr. Mizrahi's Work History

As already noted above, by his elementary school years Mr. Mizrahi was helping his father at work. For example, he recalled spending time in a warehouse associated with his father's business explaining, "I'd play in the warehouse, and I became the paint booth expert, and I memorized the paint chart to mix the colors, and I was better at that than anyone else," as he talked with pride about his ability to advise adults on how to mix particular paints. By high school he regularly had two or three jobs at once, reporting that during those years he worked as

a pizza delivery person, as someone stocking shelves at night at various grocery stores and markets, and at a cousin's furniture store selling furniture. At one point he said, "Whatever I did I wanted to be the best at it." He also opened smaller individual word-of-mouth type businesses, such as repairing computers for people he knew, or installing stereos in his friends' cars.

As with so many of his eventual career efforts, his entry into real estate originated organically when he helped to sell his parents home in Los Angeles at the age of seventeen in preparation for their move to Las Vegas. After moving back and forth for several months between Los Angeles and Las Vegas, he finally decided to settle in Las Vegas, and decided to open his own business selling and repairing computers from his garage. He soon began obtaining more clients, including ones with growing computer needs, that led to larger and larger inventory needs. Again reflecting his entrepreneurial orientation and willingness to work hard he said at the time there was no wholesale distributor of computer parts in Las Vegas, forcing him to drive back and forth to Los Angeles to get the equipment he needed. This led him to the idea of opening his own wholesale distributorship for computer parts in Las Vegas.

In pursuit of opening this business he recalled meeting "this Chinese guy" who was also at the time operating out of his apartment and, "We decided to partner up, and we bought a house, and we made a good team." He said their business grew rapidly, though having exclusively described this individual in positive terms up through this point, he said as their business began to grow he came to realize his partner was, "a big gambler, and he had a bad attitude, and we weren't getting along, and finally we parted."

Still in his early twenties he decided to open another computer wholesale distributorship. He described driving back and forth to Los Angeles to obtain computer parts explaining, "I was buying hundreds of thousands of dollars of equipment on credit, and they were trusting me, and I finally bought a building, and my parents were working for me, and I started taking care of my parents, and I was working twenty hours a day." During this same time he also started his own pager company, then a cell phone company, and finally an Internet Service Provider [ISP] company and, "then I brought a friend over from LA, and there was no paperwork, and we became partners, and he screwed me."

Asked to explain how this individual "screwed" him he said, "We had no contract, and one day we decided we needed a contract, and I said 70 percent of the business would go to him and 30 percent to me, and he disagreed and said I was never his partner." Noting he was the owner of all the unsold equipment stored in their building, he decided to remove the equipment from that building and, "I opened a new company [his ISP business] with a new guy by the next day." Asked about this individual, he said at the time there was a new technical school that just opened in Las Vegas called Advanced Technology Academy, that was training people in the skills needed to manage computers and other equipment needed to take growing advantage of the Internet. He then explained, "So there were all these kids going to this school, and I met one of them at this party, and he was a marketing genius, and we still had no contract, just a handshake," again reiterating that he met this person just days before at a party both had attended.

Martin Mizrahi                                                                                July 18, 2024
Case No. S2 22CR00650-004 (JPO)                                              Page 12 of 28

Mr. Mizrahi also described yet another business he opened at about this time, that involved obtaining and registering domain names, that at the time were available for free.  He reported registering thousands of names in this fashion, focused on "destination websites" that came to include domain names such as Vegas.com, LA.com, etc. In the meantime, he said the original individual noted above who had "screwed" him in their wholesale computer parts business had now gone out of business, leaving him as the sole source of wholesale computer parts in Las Vegas.  He also described how over the next several years he continued to plow most of the profits he began to make from his growing number of businesses back into his existing businesses, and to new businesses he was still developing, including a real estate business.

By around 2000, he was now involved with a number of individuals in his various businesses, as he explained that some of these businesses would get sold, some would fail, and some succeeded.  One of his most consistently stable and profitable businesses became his ISP business, that currently has approximately 10,000 subscribers, though he noted several of these subscribers are large companies who have purchased a considerable amount of bandwidth from him.  He estimated this company currently employs about 100 individuals, and it was clear he is very proud of the success of this company.  Asked what he attributes this success to he said, "I'm a people person, I'm great with that, and I have no ego, nothing is personal."

Mr. Tabibian, a person who has known Mr. Mizrahi since they both attended high school together said they have now also partnered together on some business deals over the years, and have regularly discussed with each other Mr. Mizrahi's various business efforts with others during this same period of time.  Discussing his friend as a businessman he said, "He's good at figuring out things, but not in the traditional way, he's had no formal schooling, like with computers, it's all self driven."  He also described him as someone who has "a good eye" for real estate and as someone who, "makes people feel comfortable, so people gravitate to him, he's very likable."  Finally he said, "And he's very committed, if he starts something he follows through, he commits 110 percent."  Asked to characterize his weaknesses as a businessman he said, "He trusts everybody, there are examples that blow my mind."  He then explained how at times Mr. Mizrahi has hired a wide range of people he perceived to be in need of help, such as recently released felons, or recovering addicts, or women attempting to extricate themselves from unhealthy relationships, without any background checks or investigation stating, "I mean that's nice, but it's also stupid."

Another friend, Mr. Kubba, who has also closely followed and periodically advised Mr. Mizrahi in connection with some of his business efforts described him as someone who, "takes a lot of risks," and as someone who in business, "thinks he can make anything work, he's very entrepreneurial, but he takes a lot of chances."  He then described him as, "an overachiever," noting, "I wouldn't have expected him to build a business as big as it is."  Asked why he now thinks Mr. Mizrahi was able to succeed in this fashion he said, "He's very very scrappy and resourceful, and he's surrounded himself with people that can complement his weaknesses."  Asked what he meant by weaknesses he quickly stated, "He's not a good judge of people, in fact he's a terrible judge of character."  Finally he said, "I think Marty has been a very lucky person,

Martin Mizrahi                                                                    July 18, 2024
Case No. S2 22CR00650-004 (JPO)                                        Page 13 of 28

he's defied some crazy odds as a risk taker, but I think his luck ran out because of his trust in the wrong people."

<u>Mr. Mizrahi's Prior Dating and Marital History</u>

Though he reported a long-standing interest in making and keeping both male and female friends he reported little dating until the end of his high school years, and no serious dating relationships until he was living in Las Vegas and was around nineteen or twenty. Describing his first "serious" dating relationship he recalled her as "very sweet and very pretty," though when asked why he considered this relationship to be serious said, "She was the first person I ever told I love you." Asked if he loved this person he said, "I don't know," as he then said he does not have any recollection of his feelings, but simply interprets his use of the above noted statement as an indicator of something that must have meant it was serious. Asked why he liked her he said, "She told me I was good looking and funny and fun to be around." He then reviewed a sequence of several additional "serious" dating partners, lasting for several months to a year, that were each described similarly. Overall he described himself as "not ready to go to the next level" with any of these women, noting he meant to marry them, and enjoyed spending time with each until he didn't, at which point he would then break up with them. He also described an overall pattern of socializing during these years that centered on going out to clubs, and regularly meeting women at these clubs, who he would socialize with while there. He said this led several of his more serious dating partners to feel "jealous" and also contributed to some of the breakups. Interestingly, though he recognized it was his tendency to surround himself with other women, despite his involvement at various points in a more committed dating relationship that led to this jealousy, he expressed a total lack of comprehension of why any of these women might feel jealous, given what he perceived to be his obvious lack of interest in pursuing these other women for purposes of dating. He also made clear in connection with this period of his dating life that he was overwhelmingly focused on having a good time in the moment, and on being free to "be myself," stressing his unwillingness to change in response to pressure placed on him by the women he was dating.

In 2002 he met the woman who went on to become the mother of his oldest daughter. He said this woman was at the time working as a newscaster on a Spanish TV channel while also working as a go-go dancer at nightclubs. At one point she became pregnant with their child, though he noted that prior to that time his relationship with her had been in most ways similar to the relationships he'd had with previous more serious dating partners. Upon becoming pregnant, he pushed her to marry him, and their daughter was born one month later. Specifically asked, he said that but for this pregnancy he, "probably wouldn't have married her," adding, "I didn't believe in marriage without a kid involved." Interestingly, in contrast to his somewhat more limited level of engagement with his various serious dating partners, he reported an almost instant willingness to remain more engaged with his first child, even as he continued to report events in a more seemingly emotionally detached fashion. For example, describing his initial experiences with his first child he said, "I was present at her birth," adding, "I videotaped it." However, he again indicated he does not recall how he was "feeling" at the time, though he did recall, "me holding her," as he then explained, "There was this storm in Vegas, and the delivery

Martin Mizrahi                                                                                          July 18, 2024
Case No. S2 22CR00650-004 (JPO)                                                          Page 14 of 28

was two weeks early, and usually when there are flash floods there are a lot of deliveries, and our doctor had nine deliveries that day, and we named her Autumn Rain."

Soon after their daughter's birth, he reported the development of growing difficulties in his relationship with his daughter's mother, in part due to difficulties his wife had that he had previously minimized and ignored, and in part due to his failure to make any significant changes to his own lifestyle of continuing to socialize with a wide range of individuals on a regular basis. Responding to some follow-up questions from me he then for the first time began to describe a past history of significant life difficulties his wife had since well before they met. He recalled her becoming "depressed" following the birth of their child as he then explained, "And then she reverted back to drinking," adding, "And I said if you drink again I don't want to be with you and then one day she brought home two bottles of champagne and I told her we were over." It was in the process of his review of this period in their relationship that additional information emerged regarding long-standing problems this woman had throughout her growing up years, that he had known about but completely ignored until the above noted events occurred. He also noted, "Oh, and I forgot to tell you that she was a pathological liar," as he also described efforts by them, pursued at his insistence, to try to work things out, including attending some couples therapy. Finally, as she continued to lie to him and to maintain her involvement in a lifestyle that was completely unacceptable to him, they again resumed divorce proceedings.

Mr. Mizrahi went on to provide considerable detail about his active involvement in raising their daughter Autumn, and his continuing close relationship with her through the current time. He described difficult court proceedings that unfolded in connection with a custody battle that developed, that ultimately led to him gaining sole custody of their daughter. He also reported how at that point he continue to allow his daughter's mother to visit with her daughter as often as she liked, noting they have had an on and off civil relationship with each other through the current time, as he has consistently served as this daughter's overwhelmingly primary parent.

Still engaged in the above noted divorce proceedings, Mr. Mizrahi soon met the woman who went on to become the mother of his younger daughter, Kylee. Describing this woman at the time they met he said, "She worked as an entertainer [at night clubs], but I didn't know that at first." He also described her as, "street smart and ambitious, and she owned her own house, but after about four or five months I saw she was too crazy, too jealous," as he then said, "Don't get me wrong, my lifestyle isn't always easy, I know a million girls and guys who are always around me, but finally I was done with [this woman]." Then, about two weeks later, he received a telephone call from her, informing him she was pregnant," and given this new information said, "Okay, let's try, and I moved her into my house."

Estimating it was around 2004 at that point, and noting their daughter was born in 2005, he reported an initially positive adjustment. Describing their initial months together he said, "She was sweet, and she was working at a makeup counter from 9 to 5, and I'd come home for dinner, and we'd go out together, and then she had Kylee." Finally, he explained that in the months following their daughter's birth she resumed her prior lifestyle, leading him to insist she discontinue her involvement in this work as a condition for remaining at his house. Finally he

Martin Mizrahi                                                              July 18, 2024
Case No. S2 22CR00650-004 (JPO)                                            Page 15 of 28

recalled, "One day I was holding Kylee, and she pushed me and I fell, and Kylee's head almost hit the floor," as he then said, "My parents finally got her out, I just told them to get her out, I couldn't deal with it anymore." Still involved in dissolution and custody proceedings with his first wife, he now became involved in an additional set of custody proceedings with the mother of his second daughter, and following lengthy court proceedings also gained full custody of his second daughter. [Letters written on behalf of Mr. Mizrahi provide additional significant background information about these events, including information from both daughters, and from other people present at the time. This additional information suggests that if anything Mr. Mizrahi minimized the level of difficulties each of these women were having in their lives, and the efforts he pursued to get them help, that ultimately failed to succeed. It also illustrates his unwavering focus on his daughters, pursued in an effort to provide them with a healthy, stable, and facilitating home environment.]

Importantly, just as with his first daughter, he described in considerable detail a close relationship he developed with Kylee, as he also described how he regularly arranged for both of them to get time to be with each other, so they could meet and get to know each other. He said they now consider themselves to be sisters, and have a close and loving relationship with each other. Over the years he also reported multiple times when he continued to provide assistance to his Kylee's mother, though he said at the current time he is not in contact with her, and she also has little contact with their daughter.

Mr. Mizrahi's next more enduring dating partner is his current dating partner, Ms. Ashley Davis. He said they met about five years ago as she was breaking up with her then boyfriend. Noting that Ms. Davis was wanting to end this relationship, he also explained how when they met her dating partner was threatening to kill her and himself if she went through with the breakup. He then decided to help her extricate herself from this relationship. Referring to this man, he said over the next two years, "Me and him became friends and enemies on and off," as he then added, "And she was scared of him, like she was in prison, like with Stockholm Syndrome, I had to look that up, and he still calls her sometimes, and she blocks him, and she still goes crazy, but then they ended, and we got more and more serious, and now we're together." Responding prior to the loss of their child together, asked for his thoughts about their future as a couple he said both currently live in their own residences adding, "I told her we could be together, and eventually live together now with the baby, and I'll take care of her financially, but I do want her to work, and she wants that too."

Both Mr. Tabibian and Mr. Kubba reported meeting many of the serious dating partners, including Ms. Davis and the mothers of his two current daughters. Both described their friend as a considerate individual who regularly became involved with women who needed help, that Mr. Mizrahi worked hard to provide to them. Regularly, this included his efforts to rescue various women from lives of substance abuse and a wide variety of serious personal life problems they were facing. They viewed several of these women as people genuinely deserving of his assistance, and noted that many benefitted from his help. They also described how on some number of occasions some of these women came to view Mr. Mizrahi as someone they could exploit, based on their belief they could manipulate him into meeting their needs, even if just

Martin Mizrahi                                                                                    July 18, 2024
Case No. S2 22CR00650-004 (JPO)                                                   Page 16 of 28

temporarily.  On several occasions they described directly confronting Mr. Mizrahi with their views that he was being taken advantage of, as they also noted his consistent unwillingness and/or inability to take their concerns seriously.  In effect, regardless of their warnings, Mr. Mizrahi continued to insist that he knew best, and however many times someone took advantage of his generosity over the years, neither ever saw any change in his willingness to engage with the next woman who he believed needed his help.

Mr. Mizrahi's current dating partner, Ms. Ashley Davis, acknowledged in our discussions the assistance Mr. Mizrahi provided to her in her efforts to extricate herself from her prior dating partner.  She made clear she was extremely grateful for this assistance, and saw it as an act of kindness and concern for her that has led her to hold him in the highest possible regard.  She was clearly aware of the many times he has behaved in a similar fashion towards others, and agreed with the above noted friends that on some number of occasions over the last several decades, both men and women have taken advantage of Mr. Mizrahi's kindness and generosity, as she also indicated his continuing difficulties in acknowledging his risk for being taken advantage of by others.  She also described him as "an incredible father" to his two older daughters, noting that both respect him tremendously, and work hard to live up to the high standards he has set for them; both in terms of their moral behavior and work ethic.  She said neither became involved with alcohol or substance abuse, despite both having mothers with significant problems in this area.  She attributed this outcome to the strong modeling and emphasis Mr. Mizrahi placed on the importance of them avoiding any use of alcohol or recreational drugs throughout their growing up years.

<u>Mr. Mizrahi's Substance Use, Mental Health, and Past Criminal History</u>

As already noted above, in contrast to his earlier avoidance of alcohol, Mr. Mizrahi reported a period of heavier alcohol use following his conviction in this case, though he reported no history of recreational drug use at any time.  It is important to note that all of the additional individuals interviewed for purposes of the current evaluation, and many of the people who wrote letters on his behalf confirmed this reported history.  At least at the present time, the only known additional history of substance abuse on either side of the family includes his father's history of marijuana use and the much more significant history of substance abuse by his older brother.

Other than the above noted history of involvement by Mr. Mizrahi in brief couples therapy in an effort to rescue his first [and so far only] marriage, he reported no additional history of formal mental health treatment, including no history of ever taking prescribed psychotropic medication prior to his involvement in the events that led to his already above summarized period of mental health treatment following the incident at the Cosmopolitan Hotel on October 30, 2020.

Discussing these events he reported at one point lending his car to a female friend, who then called him crying after, "crashing my car at the valet at Cosmo [referring to the Cosmopolitan Hotel]."  He immediately drove over to the location and began talking to a security guard who was already there.  At one point this security guard asked him for "$600 in cash" to resolve the matter, and after Mr. Mizrahi said he would pay, but wanted a receipt, the security guard told

him he could not have a receipt for this payment.  Soon other security guards approached, and
began escorting him inside.  As they were walking in, one security guard began "screaming" at
him, as Mr. Mizrahi was continuing to ask for an invoice.  Becoming more disorganized in his
review in our session he recalled, "My hands were up, and I told them I wasn't here to fight, and
I began walking away."  At this point Mr. Mizrahi called a friend of his who worked at the
Cosmopolitan Hotel as a VIP Host, in an effort to help resolve the matter.  Continuing on he
said, "Then outta nowhere they're grabbing me, and began assaulting me, and I'm saying why
are you doing this, and then four guys jump me, and one guy chokes me out, and I thought I was
going to die."  He recalled being handcuffed and placed in "a freezing cold room for three and a
half hours," reporting, "I was terrified they'd beat me up, and I felt like my shoulders were
broken, and I couldn't feel my arms."  Noting this was during the period of time when Covid
was still a relatively new problem he also explained, "I had a mask on me, and I couldn't breathe
well, and I felt like I was suffocating."  Finally, the police came, took off the handcuffs, and after
taking statements from everyone present released him.

He then described in some detail a collection of physical and psychological symptoms that soon
began to develop for him, that eventually led him to meet with Dr. Banafsheian, who diagnosed
him with the above noted mental health illnesses and then began treating him for those illnesses.
He described in our session a collection of difficulties that included orthopedic, neurological,
and psychiatric symptoms including ongoing shoulder and neck pain, numbness in his legs,
frequent headaches, and memory problems.  He reported experiencing nightmares of "someone
strangling me," and said even now, on occasions when he drives by the hotel where these events
took place, "I get the jitters."  He also reported becoming more argumentative and irritable.

It is important to note this incident occurred just before Mr. Mizrahi began to engage with Mr.
Zubaid in connection with the events associated with this case, and the primary activities that led
to his conviction in this case mostly took place during the first half of 2021, when his symptoms
from his physical and psychiatric difficulties were at their peak.

Most importantly for purposes of the current evaluation, in addition to - and beginning well
before - the symptoms and mental health difficulties that began for Mr. Mizrahi following the
events that took place on October 30, 2020 I believe above summarized information and some
additional information still to be reviewed below provides considerable evidence indicating the
presence of a heretofore undiagnosed autism spectrum disorder.

Given the lack of familiarity by many for the specific symptoms associated with this disorder, I
will now provide some essential information taken from the formal criteria contained in the
*DSM-5-TR* [the current edition of the *Diagnostic and Statistical Manual of Mental Disorders*
published by the American Psychiatric Association, the official diagnostic manual in use in the
United States] for an autism spectrum disorder.  The *DSM-5-TR* lists two essential components
that need to be present before diagnosing an autism spectrum disorder.  They are, "persistent
impairment in reciprocal social communication and social interaction," and "restricted, repetitive
patterns of behavior, interests or activities."  [*The Diagnostic and Statistical Manual of Mental
Disorders -Fifth Edition*, page 60].  I will review interview information already summarized

above later on in this report, in an effort to demonstrate how this information is consistent with this diagnosis, but before doing so, I will first provide some additional interview information.

In my interview with Ms. Davis, at one point she referred to Mr. Mizrahi as, "the smartest stupidest person I've ever known." Asked to clarify this statement she said, "With certain things there's no one who's smarter, his brain is unique, like with math, and numbers, and his business mind is incredible," as she then added, "But with unfamiliar things he's dumb, like I'm in the car business, and he makes these outlandish statements, and he thinks it's true, and I have to explain it to him four or five times, and give him examples, and finally he'll say, 'okay I was wrong.'" She then added, "And with people, I don't know what it is, I see through things, but he's eating it up, believing it, and to me that's stupid; and I think it's not true, but he's believing it and running with it and I tell him the guy is lying, he's blowing smoke up your butt, and he doesn't see it." Finally she said, "Like with math he's smart, but he doesn't comprehend normally, it takes him longer, and you have to really explain things, and sometimes he comes across as cocky or condescending like, 'Do you think I'm stupid?,' but it's just him trying to understand it, and you need to give him examples, you can't just tell him."

<u>Mr. Mizrahi's History of Interpersonal Naïvete and Rigidity</u>

Mr. Mizrahi emphasized over and over his tendency to turn anything negative he encounters into something positive. He also emphasized his strict adherence to, "giving everyone the benefit of the doubt," no matter who they are and no matter how long or briefly he has known them. I will now summarize in some detail a significant episode illustrating both the extent of his naïvete and the cost he has sometimes paid for this naïvete associated with a previous business venture that took place in the period of time leading up to the events associated with his current case.

He began by explaining that he had previously engaged in efforts to mine Bitcoin and to sell Bitcoin, mostly by purchasing already mined Bitcoins, and reselling them. At one point, he met Darin Feinstein, a prominent entrepreneur and venture capitalist, who was at the time focusing efforts on forming a new company, Core Scientific, to mine Bitcoin. In the course of these efforts, Mr. Feinstein contacted Mr. Mizrahi, expressing interest in partnering with him. They agreed to work together, with Mr. Mizrahi receiving a share of the company. Describing Mr. Feinstein he said, "He had access to investors, and I think he came from a rich family, and he said we could be the first company to go public, as he was writing checks for $100,000 and $500,000 and $200,000; over $1½ million dollars or $2 million, and there were no invoices, and I didn't know where the money was coming from, and he said it was his investors, and I didn't need to verify this, and I was buying Bitcoin, and the machines were in China, and there were no invoices, and finally we got the machines, and we got a building with his credit, and I was running the operation." At this point, he said Mr. Feinstein decided he wanted to transfer the operation to North Carolina, with Mr. Mizrahi supervising that transfer.

Having already described a relationship he developed with a person he hired, Ian, after seeing an advertisement placed by him on Craigslist, for a position as a housemaid/assistant, he then said, "And Ian lived with me, and he helped me at work, he was my assistant, and I met his parents,

and we became friends, and I knew him for five years, and Darin said let's ship all the machines from Vegas to North Carolina, and I said fine, and I told him my assistant would handle it, and then Ian got a truck, and he'd never lied to me, he'd always been honest, and then he disappears with the truck, and that's when I learned he was into drugs and alcohol and gambling, and he stole $4 million worth of machines, and then Darin sued me, and I filed a police report for Ian, and they recently arrested him, like five years later, and I lost everything." As a result of these events Mr. Feinstein severed all further business relations between them, and settled their accounts by ending Mr. Mizrahi's share in the business, in exchange for the money lost when the equipment was stolen by Ian and a small additional payment.

It was at that point that I began asking more questions about Ian. He described him as, "A normal guy, from Canada, and I got an amazing recommendation from his former boss, and he was working for a gay couple in Florida, as their personal assistant, and I think he was with them for like two years." Continuing on he said, "I knew he was drinking, but nothing terrible, and I didn't know about the drugs till after he left, and I knew he was gambling, not how much, and later on I saw it was more than I knew about." Finally, he said the company he and Mr. Feinstein developed together eventually went public as he explained, "I'd have gotten two million shares right away, and a lot more when the company went public." [A Google search of Core Scientific indicates Darin Feinstein was the founder of this company, that is currently valued at $1.72 billion.]

It is important to note Mr. Tabibian and Mr. Kubba both knew Ian and both immediately expressed concerns about him to Mr. Mizrahi. Mr. Tabibian said, "I thought he was a con man from the start, he told me he was here to gamble, and he was always partying and tricking girls into banging him, and he never had a penny to his name." At one point he said he tried to tell Mr. Mizrahi about his concerns but, "Marty didn't see it, and he should have, but he didn't," adding, "It was there to be seen," as he then finally said, "He just doesn't listen, that's his nature, he believes in people." Mr. Kubba said sometimes he'd sit in on occasions when Mr. Mizrahi was considering whether to invest in a particular business opportunity. He recalled there being several times when, "I'd listen to the person, and I'd tell Marty the business ideas made no sense, and I told him not to invest, and then he'd go ahead and invest, he was never logical [in the way he approached making the decision of whether or not to invest]."

Offense Related Behavior

Asked to review his recollections for the events leading up to his current conviction from his perspective Mr. Mizrahi began by explaining, "There was this guy I knew, Joel Zubaid, we met in 2014." At the time he believed Mr. Zubaid provided "high interest financing, and he owned a big hotel, I think in Arizona." Early on he described meeting Mr. Zubaid and his wife, describing both as "friendly." He recalled an early interaction when Mr. Zubaid gave him $10,000 in cash to gamble on his behalf at a casino, noting he was already gambling with his own money at the time. He then explained, "He just trusted me with $10,000 in cash, and I was gambling with $10,000 and I also gambled with his $10,000, and I won $8000, and I gave him half." Asked for his reaction to this interaction he emphasized his surprise at being trusted in

Martin Mizrahi                                                                          July 18, 2024
Case No. S2 22CR00650-004 (JPO)                                           Page 20 of 28

this fashion, that led him to believe this person genuinely trusted him, leading him to reciprocate that trust.

He reported periodic contact between them, that remained friendly, and that left him increasingly positively disposed to Mr. Zubaid, though he also reported no significant efforts by either of them to pursue business opportunities with each other. Noting that Mr. Zubaid was aware of his [Mr. Mizrahi's] involvement in mining and selling Bitcoin he then said, "In 2020, I think in December, he asked about buying some and I said yeah." He described Mr. Zubaid making a number of purchases over the next several months, all in cash, eventually summing to about $5 million. He said he purchased most of this Bitcoin from Coinbase [a secure online platform for buying, selling, transferring, and storing cryptocurrency], reporting he was selling these Bitcoins for a minimal markup, and was not making much money on these transactions.

In addition to purchasing Bitcoin for Mr. Zubaid, they also discussed and then began to pursue an additional business to develop a Bitcoin mining operation, similar to the one he had just been developing with Mr. Feinstein. It was this business effort that became associated with the fraudulent credit card use in this case. Mr. Mizrahi then provided a somewhat confusing review of complications that developed. In the course of further discussions he explained a first batch of credit card payments were disputed, and a second batch were quickly fully refunded by him.

Mr. Mizrahi said he became increasingly frustrated with Mr. Zubaid as a consequence of these difficulties, and was becoming increasingly worried that "something was wrong," though he also said Mr. Zubaid explained to him it was the bank's fault, and there was nothing to worry about, and he would soon get his money. Mr. Mizrahi described pursuing efforts to resolve the difficulties he was encountering, in part based on the explanations Mr. Zubaid was providing to him for these difficulties. For example, he described how at one point, in an effort to resolve this matter with the credit card company he asked Mr. Zubaid for the drivers licenses and signatures of the individuals associated with each credit card, and upon receiving this information from him then provided it to the credit card company, expecting this would lead to a resolution of the disputed funds in his favor.

Then, as these difficulties were continuing to unfold Mr. Mizrahi became aware of an FBI investigation focused on him, that led them to seize some of his funds. Believing at the time that none of the activities he had pursued were in any way criminal in nature, and after consulting with an attorney, he decided to sue the FBI for an improper asset forfeiture against him. He was then indicted about eight months later. Mr. Mizrahi recalled being offered an opportunity to plead guilty at that point, as he then said, "I said no, I did nothing wrong," adding again that at that point he was unwilling to plead guilty to charges that he considered to be a fundamental misrepresentation of his role in this matter.

Asked if he ever began to doubt Mr. Zubaid as these events were unfolding, given the sums of money involved, and the use of so much cash he initially responded, "I trusted him, I believed him, I was giving him the benefit of the doubt." Pressed further on his willingness to continue to trust Mr. Zubaid, despite all of the difficulties he was now encountering he recalled approaching

Martin Mizrahi                                                                July 18, 2024
Case No. S2 22CR00650-004 (JPO)                                            Page 21 of 28

Mr. Zubaid with questions, who then provided him with answers that he viewed as plausible at the time. He also said at the time he believed Mr. Zubaid was a successful businessman, who owned a major hotel in Arizona, before adding during our session, "I didn't know the hotel got foreclosed on until the court case." He also noted that all of the income he earned and all of his own transactions with his banks were managed transparently and as required by law, explaining that he believed this would protect him from any problems that might develop as a result of the transactions taking place. Finally, he said, "I've always been an honest businessman, I always paid my taxes on time, I didn't over file for Covid payments like so many people did, so I thought someone would believe my story based on all this history."

Discussing the jury verdict he then explained, "I do see what they're saying, I think I understand why they think I'm guilty, I think it's because the government brief did a great job, and because maybe they thought I should have seen the red flags." Asked to elaborate on the specific red flags he now believes he should have seen he said, "Like Joel said he needed my username and password [in order to transfer money to him by wire], and I should have known that was a big red flag, and instead of putting money in he took money out." He acknowledged knowing that neither a username or password is needed to wire money to him, as he then said, "Ashley [Davis] was telling me that, and by the end I stopped trusting him, but I thought he was getting conned also."

I also asked if he believed greed was responsible for his failure to pay more attention to the red flags. He said, "No, it wasn't the money," and when asked what it was for him said, "I knew him [referring to Mr. Zubaid], and so I felt he couldn't be scamming me, and if I hadn't known him I think I would have seen it, or I'd think he was being stupid," as he then said, "I mean he was giving me fake credit cards, and I'm going to figure that out eventually, and it only lasted for two or three months."

Pressed further on these explanations during the current evaluation, he acknowledged that the sheer number of explanations provided to him by Mr. Zubaid, that never led to any resolution, should have led him to lose trust in him sooner, as he noted he now sees more clearly it was this failure on his part that served as a major contributing factor to his eventual conviction. Finally, he noted that all of these events occurred over a relatively brief period of time, that coincided with his above noted physical and psychiatric deterioration following the incident that took place on October 30, 2020. He also said he still believes even under these circumstances he would have soon discontinued his involvement with Mr. Zubaid, based on the continuing failure to finalize any of these transactions. He said it was at this point that the FBI became involved leading him to become exclusively focused on efforts to establish his innocence, that he believed would follow quickly once all of the records from this matter were reviewed.

Both Mr. Tabibian and Mr. Kubba indicated surprise upon initially learning of their friends indictment. Mr. Tabibian clarified that he was surprised by the extent of the errors in judgment exhibited by Mr. Mizrahi, but not by his tendency to trust someone who did not warrant such trust explaining, "I saw it as an error of degree, but not of kind." Mr. Kubba also expressed surprise by the scope of the errors made by Mr. Mizrahi, but not by the type of error, noting that

Martin Mizrahi                                                                                          July 18, 2024
Case No. S2 22CR00650-004 (JPO)                                                    Page 22 of 28

he has seen his friend make similar types of errors on multiple occasions before, but never in a manner that was so harmful to him; adding he has often seen Mr. Mizrahi lose money as a result of his misjudgment of others, but has never seen him make an error leading to a potential criminal conviction like those that have now taken place. Asked if he has any thoughts on why Mr. Mizrahi made this more serious error in judgment at this time he focused on the growing size and range of businesses he was running, that left him without sufficient time to adequately attend to any one business.

Asked about these events, Ms. Davis said she first learned about his difficulties, "the day the FBI came to the house," adding, "I was with him that day." Noting she had met Mr. Zubaid on multiple occasions, and had become increasingly suspicious of him as she learned more about some of the difficulties Mr. Mizrahi was encountering she said she began raising her concerns with Mr. Mizrahi, "but Marty never ever saw it that way," as she also said that even though she was suspicious, it never occurred to her he might be involved in something that could turn into a criminal matter.

<u>Psychological Implications of the Above Summarized Assessment Results</u>

Despite the absence of any prior history of psychiatric treatment, or of any self-reported episodes of mental health difficulties prior to October 30, 2020, I will now present the central conclusion from my above summarized assessment results. Specifically, I believe these results provide strong support for a finding that Mr. Mizrahi has since his childhood years met the criteria for an autism spectrum disorder. Of equal importance, above summarized results strongly support a finding that he has been completely unaware of the existence of this condition prior to the current assessment, and that this disorder, and his lack of awareness of its presence has led to long-standing and serious difficulties for him in reciprocal social communication and social interaction; and repetitive patterns of behavior, that together have led to significant impairment in his social and occupational functioning. I also believe the events from October 30, 2020, that came to include the development a variety of serious physical and psychiatric symptoms stemming from those events further undermined his overall cognitive and emotional functioning, rendering him at even higher risk for making the types of serious errors in judgment associated with this case.

I have already identified some of the early examples of patterns of behavior exhibited by Mr. Mizrahi dating back to his early elementary school years reflecting the presence of an autism spectrum disorder. This includes clear academic difficulties and clear difficulties adjusting to a standard school environment. Evidence indicates that in this environment he required continuous tutoring through the end of high school, and also consistently got into trouble, not because he was being aggressive or destructive, but because he was struggling to conform his behavior to the social norms he was expected to follow. His absence of memory for school based experiences is striking, and though it leaves many questions unanswered, I view this absence of memory as an additional source of evidence supporting the presence of this condition. Stated differently, I believe the demands of conforming to academic norms was both confusing and difficult for him, making it less likely to be remembered. In contrast, his ability to

Martin Mizrahi                                                                     July 18, 2024
Case No. S2 22CR00650-004 (JPO)                                           Page 23 of 28

remember working for his father, memorizing color charts, or stocking shelves in a warehouse or grocery store that was enjoyable for him was therefore more easily remembered. This is fully consistent with the types of experiences regularly described by individuals on the autism spectrum.

The *Manual* indicates this disorder typically emerges in the first year or two of the child's life. Given the absence of records from that time, or meaningful evaluations of Mr. Mizrahi at any point during his childhood years, there is only limited objective evidence available. This is by no means unusual, especially for older individuals, who were exhibiting these symptoms prior to the heightened levels of awareness for this condition that now prevails. There is however significant evidence from above summarized information relative to current efforts to arrive at a valid diagnosis. The *Manual* notes that language impairments, including specific learning disorders, such as reading and reading comprehension disorders frequently co-occur with an autism spectrum disorder, as appears to be the case for Mr. Mizrahi. I view his overwhelming focus and enjoyment of marching, polishing his belt buckle, and in other ways abiding by the relatively rigid rules of the military school he attended during his elementary school years as another example of relevant behavior. His memorizing of paint charts during those same years, that included the development of skills that were in excess of the adults present is also viewed by me as consistent with the types of behaviors often seen in individuals on the autism spectrum who also possess above average intellectual abilities.

As he got older additional evidence of restricted, repetitive patterns of behavior, interests or activities continued. Mr. Mizrahi never tired of stocking shelves or building computers. He could work late into the night, night after night, without getting bored or losing interest in that work. He could develop precise systems for tracking inventory, and never became tired of the satisfaction he felt when he consistently had necessary parts for new orders.

Mr. Mizrahi also came to possess some coping strategies that are rarely found in individuals on the autism spectrum. Many on the spectrum withdraw over time from greater social contact as they encounter persistent challenges in reciprocal social communication and social interaction that makes it frustrating and increasingly aversive to succeed in these social encounters. This was never the case for Mr. Mizrahi. He was funny, endlessly forgiving, generous, thoughtful, and able to quickly let go of failure experiences, regroup, and start over. Armed with these relatively persistent set of rules that he conscientiously followed from his earliest childhood years and continuing through the current time, he accumulated a large collection of loyal friends, and he was able to earn their trust and loyalty by almost always giving more that he took. It is hard to argue with this strategy, that would likely help anyone who used it. However, few can do so as doggedly, regardless of the number of negative experiences they encountered along the way. In effect, his rigidity and restricted and repetitive patterns of behavior went on to become one of his greatest strengths, and in many ways one of the keys to his many successes.

There are many examples noted above of the striking absence of typical emotional reactions by Mr. Mizrahi for situations he encountered dating back to his early childhood years and continuing on through the current time. Importantly, these difficulties have almost always

Martin Mizrahi                                                July 18, 2024
Case No. S2 22CR00650-004 (JPO)                              Page 24 of 28

occurred in interpersonal situations when he was pursuing efforts to navigate reciprocal social communications and social interactions.  His reaction to his brother's death is a clear example of an idiosyncratic response relative to the response most people would have, that has led other people to sometimes tell him he lacks empathy.  It is not that Mr. Mizrahi did not care about his brother, or that he did not go to great lengths to help his brother.  He did.  Rather, once his brother died, and his battle for change was now over, the pattern of interaction between them became different than the pattern of interaction that would have followed for two brothers with neither of them being on the autism spectrum.

It is also important to differentiate between the many examples of occasions when Mr. Mizrahi accurately understood a particular individual's difficulties, after that individual communicated with him without any hidden agenda or ulterior motive and occasions when an individual attempted to hide their true feelings, or possessed some ulterior motive.  On occasions when individuals were straightforward with him in regard to their thoughts and feelings, he was regularly able to respond in effective ways to assist them.  However, on occasions when an individual failed to communicate straightforwardly with Mr. Mizrahi, or maintained some hidden agenda that was never explicitly voiced, Mr. Mizrahi was at much higher risk for missing subtle cues that might otherwise have raised more alarm, leaving him much more likely to engage in activities toward that person that were in hindsight labeled as naïve or too trusting by other people around him.   It is precisely these more subtle types of complex social communications and interactions that are most difficult for individuals on the autism spectrum to accurately detect and defend against.

Above summarized evidence also indicates that since his early childhood years Mr. Mizrahi has responded to emotions in a dramatically different manner than most of his peers.  However, upon closer examination it is important to recognize this difference was never an indicator of Mr. Mizrahi being unfeeling or uncaring.  In fact, both Mr. Mizrahi and others [including the vast majority of his letter writers] saw him as unusually caring and generous.  This does not appear to be the type of lack of empathy typically associated with an antisocial personality disorder.  Rather, examples illustrate a fundamentally different pattern of caring relative to most other people.  This can be clearly seen in Mr. Mizrahi's self-reported reaction to his brother's death, and in many additional examples provided by him that were not summarized in this report for purposes of brevity.  In effect, it is not that he did not care about his brother, as evidenced by the considerable efforts he pursued to help him over many years; but that his approach to providing this care almost exclusively focused on actions; as they remained devoid of the kinds of feelings typically associated with empathy.  Stated differently, above summarized examples provide an absence of ability in Mr. Mizrahi for accurately **feeling** the emotions present in the people around him.  He could see by their situations or direct communications they might be angry or depressed or anxious, but he could not feel that feeling in himself in a manner that mirrored the relevant feeling in the other person.  This absence of ability is a defining characteristic of individuals on the autism spectrum.

Martin Mizrahi                                                                     July 18, 2024
Case No. S2 22CR00650-004 (JPO)                                         Page 25 of 28

I have already discussed above a collection of unusual strengths Mr. Mizrahi possesses, that enabled him to make and keep an unusually large number of friends. However, it is important to appreciate these unusual strengths do not make up for characteristics he continued to exhibit as a direct consequence of his autism spectrum disorder. This included characteristics stemming from the second essential element of this disorder, restricted, repetitive patterns of behavior, interests or activities. It is worth noting the unusual consistency in the patterns of behavior the unusually large number of letter writers saw in Mr. Mizrahi's patterns of behavior. Though each provided different examples, all were clearly describing someone with an unusual consistency of behavior. It is also worth noting this consistency in behavior exhibited by Mr. Mizrahi remained stable over decades of time, and almost never changed regardless of the person he was with. Stated somewhat differently, his unusually large number of friends needed to adapt to him, rather than the other way around. They were regularly willing to do so, because they genuinely liked Mr. Mizrahi, because he was consistently thoughtful and caring towards them. However, it would be equally true to characterize this consistency as evidence of, "restricted, repetitive patterns of behavior interests or activities," flowing from an autism spectrum disorder.

It is also important to emphasize that no psychiatric illness, regardless of its severity, ever fully captures the totality of the whole person in all their complexity. Mr. Mizrahi is much more than a person on the autism spectrum. He is hard-working, he is loyal to his friends, he cares deeply about the quality of his work, he honors his commitments, he is unusually honest and more transparent than most. These are qualities that attracted many individuals to him, despite his periodic difficulties in understanding their feelings as they might wish he would, or because he was sometimes too abrasive, candid, or frank.

I also want to emphasize an important finding flowing from behaviors that went undetected in the course of the current evaluation, and that was absent from the more than 100 letters written on his behalf. Specifically, other than his involvement in this case, above summarized information and the above referenced letters contain no other example of an occasion when he lied or behaved dishonestly, or tried to cheat someone or take advantage of them for personal gain. I view this absence as noteworthy, and as an indicator of the unusual nature of the events associated with this case, that appears to represent - for whatever reasons - a significant departure from a lifetime of overwhelmingly prosocial behavior.

I will now focus on evidence supporting the presence of the two essential elements of an autism spectrum disorder, beginning with the first element that requires evidence deficits in social communication and social interaction. To do this I will begin by introducing a concept in the study of psychopathology that draws attention to the degree to which a particular individual's perception of him or her self is at odds with the perception most others have of them. Mr. Mizrahi is an individual with a wide gap in how he views himself relative to how those closest to him view him. It is not that he views himself as kind, while others view him as mean or manipulative. It is not that Mr. Mizrahi views himself as honest, while others view him as dishonest. In this regard, there is almost no gap between his perception of himself and the perception others have of him. Rather, the gap is at its widest in regard to the difference between Mr. Mizrahi's perception of his ability to accurately judge other people's

Martin Mizrahi                                                          July 18, 2024
Case No. S2 22CR00650-004 (JPO)                                        Page 26 of 28

trustworthiness or sincerity relative to the perception those closest to him have in his ability to accurately judge these characteristics in others. I view this as an extremely consequential example of a deficit in his social communication and social interaction skills.

Focusing in on the second essential element of the disorder, we can again make use of the above noted concept of the gap Mr. Mizrahi has between his self perception of himself and the perception of those closest to him in regard to his emotional intelligence. Each of the three individuals interviewed for this assessment, and many of the individuals who wrote letters on his behalf, noted their repeated efforts to warn Mr. Mizrahi about errors they perceived he was about to make, as a direct consequence of his misperception of himself. They reported providing these warnings over decades of time and dozens of examples. Many of these examples led to considerable pain and loss for Mr. Mizrahi, both interpersonally and financially. And yet, no matter how often anyone warned him, and no matter how much suffering he experienced as a consequence of this lack of awareness, he continued to follow the same rules of trusting others, and giving second and even third chances to them. He continued to treat both new people he was meeting and even previously met people who had taken advantage of him in exactly the same fashion as before, with no evidence of any change in his pattern of behavior. I view this as precisely the type of rigidity regularly witnessed in individuals with an autism spectrum disorder. Viewed through the prism of this disorder, it is not that Mr. Mizrahi is stubborn or unwilling to learn, but that it is extremely hard for him to see this weakness, directly due to limitations generated by his autism spectrum disorder. Other more trivial examples of tendency to engage in restricted and repetitive patterns of behavior can be seen in the enjoyment he took in marching properly, or shining his belt buckle or shoes in military school to the satisfaction of his instructors, or correctly mixing paints from a paint chart. It can be seen in his choice of vocation, that from his adolescent years focused on computer technology, an area of knowledge devoid of any need to understand feelings or to possess capacities for meaningful emotional empathy.

<u>Connections Between Assessment Results and Offense Related Behavior</u>

How could a businessman, who has successfully started and run several businesses that have earned him millions of dollars possibly engage in the types of behavior associated with his actions in this case. Above summarized findings provide a clear roadmap to how this could happen. Specifically, his autism spectrum disorder undermined his ability to accurately read Mr. Zubaid, or to recognize the possibility he was being fooled by someone with a collection of skills for which he had no meaningful psychological defense. Robbed of the ability to have access to the kinds of feelings that would have enabled him to better detect deceitfulness, or to question more actively the growing number of red flags that began to emerge, as a direct consequence of his disorder, he rigidly persisted in moving forward beyond a point that any other individual not on the autism spectrum, but with the same level of intelligence and business success, would ever have done.

Viewed from this perspective, his deficits in social communication and social interaction, and his limitations in moving beyond his particular restricted and repetitive patterns of behavior made it

Martin Mizrahi                                                                    July 18, 2024
Case No. S2 22CR00650-004 (JPO)                                        Page 27 of 28

far more difficult for him to recognize the situation he was in, or to take effective steps to extricate himself from these difficulties. Making matters worse, the additional deterioration generated by his more recent psychiatric difficulties - stemming from his traumatic encounter with security officers at the Cosmopolitan Hotel - then further undermined both his abilities to more quickly recognize the situation he was in, or to effectively extricate himself from it, by generating a collection of additional physical and psychiatric symptoms. Now combined together, this considerable collection of serious mental health difficulties became psychologically overwhelming in relation to his available coping resources, creating a kind of perfect storm of difficulties that I believe directly led to the particular behaviors that have now led to his current conviction.

It is also important to consider alternative explanations for Mr. Mizrahi's offense related behavior. For example, it is possible Mr. Mizrahi engaged in his offense related behavior out of greed, or out of a general criminal orientation, that led him to focus on his own interests at the expense of the rights and interests of his victims. However, above summarized evidence is devoid of childhood examples of meanness or general aggressivity, or of examples of Mr. Mizrahi as an adult taking advantage of others. Both above summarized information and the unique and unusually large collection of letters written on his behalf speak to an adult history that is filled with examples of kindness and generosity to people he knew well, to people he hardly knew at all, and sometimes to total strangers. He has raised two daughters to early adulthood who both love him, and who both have benefitted from his actively involved parenting of them. This is not a typical story of an individual who is oriented towards greed or antisocial behavior.

I also want to draw attention to the findings from Mr. Schmitt and Dr. Berrill as particularly significant in regard to the dynamics that contributed to his current convictions. Mr. Schmitt pointed to important behavior patterns exhibited by Mr. Mizrahi in connection with his offense related behavior that do not fit the patterns he has observed in individuals typically convicted of the types of offenses involved in this case. Dr. Berrill concluded that Mr. Mizrahi, because of his interpersonal naïvete, was someone who could be more easily manipulated by those around him.

I view the dynamics associated with his above diagnosed autism spectrum disorder and the additional deterioration generated by his more recent physical and psychiatric difficulties following his traumatic encounter at the Cosmopolitan Hotel as truly meaningful mitigating factor in this case. Viewing these findings through the prism of an autism spectrum disorder allows us to better understand exactly how someone like Mr. Mizrahi could behave as he did in this case. It explains how he underestimated his above-described weaknesses, and how these particular weaknesses, directly flowing from his autism spectrum disorder, seriously interfered with his ability to recognize and appreciate the increasingly dangerous situation he was in, as he continued to trust Mr. Zubaid when almost anyone else would have seen this trust was being misplaced.

Martin Mizrahi                                                                July 18, 2024
Case No. S2 22CR00650-004 (JPO)                                    Page 28 of 28

Current Treatment Needs

Given the above summarized findings, I believe Mr. Mizrahi is in need of a more comprehensive assessment of his autism spectrum disorder, by a program or individual who specializes in this area of assessment.  It is important to note that our knowledge and understanding of this disorder is rapidly improving and evolving at this time, making it especially important to take advantage of the most recent developments in both diagnosis and treatment currently available.  Based on the findings of this specialized assessment, I believe he would benefit from involvement in a comprehensive treatment plan aimed at addressing his identified weaknesses.  This treatment needs to begin with helping him to understand and appreciate the significance of the diagnosis, and the particular weaknesses created by it.  It is worth noting Mr. Mizrahi has over the course of his life developed a considerable number of unusually effective coping strategies for this condition, though he has struggled the most when making decisions about whether or not to trust someone in some particular business or interpersonal context.  I believe this should be a central focus of treatment in addition to whatever other issues emerge from the above noted evaluation.

Some Final Thoughts

The following thoughts are my own personal thoughts, and are being offered respectfully to the Court.  They are being offered as I enter my fortieth year of practice as a forensic psychologist, who has evaluated approximately 3000 defendants ranging from homeless individuals who stole food to individuals involved in death penalty cases.  I am aware of the seriousness and importance Courts attach to guilty verdicts, especially when made by a jury.  It is also my personal experience that in almost all cases, a guilty verdict is the product of an accurate assessment of that guilt.  However, occasionally a guilty verdict, even by a jury, can be in error. Based on my evaluation of Mr. Martin Mizrahi, as summarized in this report, and for all of the reasons summarized in this report, I believe consideration should be given to the possibility this guilty verdict may be one of those rare ones made in error.  I have never before written a paragraph like this, as I have never before been as concerned about the possibility of this type of error in an evaluation I have personally conducted.  I also want to note I have not been asked to provide this final paragraph, and the thoughts contained in it on my own, and should not be held against anyone other than me.

I hope the above information is helpful to you.  If you have any further questions, or if I can be of any further assistance please feel free to call or write.

Respectfully Submitted,


Richard I. Romanoff, Ph.D.
Licensed Psychologist

RIR

## CURRICULUM VITA

**Name:**                    RICHARD ROMANOFF, Ph.D.

**Office Address:**          10780 Santa Monica Boulevard, Suite 460, Los Angeles, CA 90025-4749

**Office Telephone:**        (310) 443-1570

**Office Facsimile:**        (310) 443-1569

**Date and Place of Birth:** May 5, 1956, New York City

**California License Number:**   PSY  9589

**Academic Degrees**

Ph.D.                University of Illinois at Chicago; Clinical and Cognitive Psychology, 1981-1984. NIMH Clinical Traineeship Grant

M.S.                 University of Illinois at Chicago; Clinical and Cognitive Psychology, 1978-1981. NIMH Clinical Traineeship Grant

B.A.                 State University at New York at Stony Brook; Psychology and Biology, 1974-1978.

**Positions**

1988-present         **Clinical and Forensic Psychologist**; Private Practice, Los Angeles, CA.
                     Responsibilities: Forensic psychological assessments in criminal and civil matters. Member Los Angeles County Superior Court Psychiatric/Psychological Panel, Member California Department of Mental Health, Sexually Violent Predator Panel (1997-2013). Expert Testimony.  Individual psychotherapy.

1987-2017            **Associate Clinical Professor**; Department of Psychology, University of California at Los Angeles, Los Angeles, CA.
                     Responsibilities:  Supervision and teaching of trainees in Clinical Psychology.

1988-2000            **Director, Student Counseling Service**; University of Judaism, Los Angeles, CA.
                     Responsibilities: Coordination of all psychological services to undergraduate and graduate students; consultation with administration, faculty and students on issues related to mental health; provision of direct psychological services.

RICHARD ROMANOFF, Ph.D.                                                    Page 2

1987-1988          **Clinical Psychologist**; Family and Child Therapeutic Services, Torrance, CA.
                   <u>Responsibilities:</u> Inpatient and outpatient individual, family and group psychotherapy for
                   adult and adolescent patients; psychological assessment.

1985-1987          **Community Mental Health Psychologist**; Conditional Release Program, Los Angeles,
                   County Department of Mental Health, Los Angeles, CA.
                   <u>Responsibilities:</u> Evaluation of adults found to be Incompetent to Stand Trial, Not Guilty
                   by Reason of Insanity and Mentally Disordered Sex Offenders; court testimony as expert
                   witness.

1986-1987          **Computer Consultant**; Los Angeles, County Department of Mental Health, Los Angeles,
                   CA.
                   <u>Responsibilities:</u> Development and implementation of multiple data base management and
                   word processing applications on microcomputers.  Staff training.

1983-1984          **Postdoctoral Fellow in Clinical Psychology**; Harbor/UCLA Medical Center, Department
                   of Psychiatry.
                   <u>Responsibilities:</u> Assessment, diagnosis and treatment of adults in an acute care inpatient
                   unit; adult, family, group and child outpatient psychotherapy; psychological assessment;
                   consultation/liaison to medical clinics.

1982-1983          **Predoctoral Resident in Clinical Psychology**; Northwestern University Medical Center,
                   Chicago, IL.  Full APA Approval.
                   <u>Responsibilities:</u> Individual, family and group outpatient psychotherapy; individual and
                   group therapy in the Northwestern Memorial Hospital Partial Hospitalization Program;
                   psychological assessment; psychotherapy supervision.

1981-1982          **Psychotherapy Trainee**; University of Illinois Student Counseling Service, University of
                   Illinois at Chicago, Chicago, IL.
                   <u>Responsibilities:</u> Individual and couples psychotherapy; academic counseling.

1980-1982          **Research Assistant**; University of Illinois at Chicago, Chicago, IL.
                   <u>Responsibilities:</u> Development and administration of materials and analysis of data in a
                   twenty-year follow-up study on the development of aggression.

1980-1981          **Psychology Trainee**; Michael Reese Medical Center, Chicago, IL.
                   <u>Responsibilities:</u> Individual and group psychotherapy; psychological assessment.

1980               **Teaching Assistant**; University of Illinois at Chicago, Chicago, IL.
                   <u>Responsibilities:</u> Planning and teaching of undergraduate course titled, "Introduction to
                   Psychometrics."

1979-1980          **Psychology Trainee**; Illinois Masonic Medical Center, Chicago, IL.
                   <u>Responsibilities:</u> Psychological assessment of adults and children.

RICHARD ROMANOFF, Ph.D.                                                                 Page 3

| | |
|---|---|
| 1979-1980 | **NIMH Clinical Trainee**; Illinois Institute for Developmental Disabilities, Chicago, IL. Responsibilities: Psychological assessment of adults and children. |
| 1979-1980 | **Research Assistant**; University of Illinois at Chicago, Chicago, IL. <u>Responsibilities:</u> Administration of materials and analysis of data in a six-nation cross-cultural study on the development of aggression. |

## Organizational Memberships

American Psychological Association (member Division 41)
National Register of Health Service Providers in Psychology
Past Member California Psychological Association (Past Vice-Chair, Ethics Committee)

## Professional Activities

| | |
|---|---|
| February 2002 | **Presenter**:  <u>What Does the Mental Health Expert Need to Conduct an Evaluation in a Capital Case and What Do we Give Him or Her?</u>  Presented at the CACJ/CPDA Capital Case Defense Seminar, Monterey, CA |
| March 1998 | **Presenter**:  <u>The Role of Skepticism in Reconstructing Mental States.</u>  Presented at the California Psychological Association Annual Convention, Pasadena, CA |
| April 1997 | **Presenter**:  <u>Ethical Issues in Criminal Forensic Evaluations.</u>  Presented at the California Psychological Association Annual Convention, San Jose, CA. |
| March 1997 | **Invited Workshop**: <u>Introduction to the MMPI-2; Basic Interpretation Issues.</u>  Presented at the Office of the State Bar of California, Los Angeles, CA. |
| March 1996 | **Presenter**:  <u>Avoiding Ethical Errors in Forensic Psychology: Can a Forensic Psychologist Ever "Tell It Like It Really Is?"</u>   Presented at the California Psychological Association Annual Convention, San Diego, CA. |
| August 1995 | **Workshop Leader**: <u>Guidelines for Assessment and Evaluation in Cases of Abuse and Neglect.</u>  Presented at the American Psychological Association Convention, New York, NY. |
| February 1995 | **Invited Address**: <u>The Psychotherapist as Percipient Witness.</u>  Presented at the California Psychological Association Annual Convention, La Jolla, CA. |
| June 1993 | **Presenter**:  <u>Understanding Child Psychological Testing.</u>  Presented at the Eighteenth Annual Review in Child and Adolescent Psychiatry for the American Academy of Child and Adolescent Psychiatry, Beverly Hills, CA |

RICHARD ROMANOFF, Ph.D.                                                                    Page 4

| | |
|---|---|
| 1986-1993 | **Lecturer**: Lectures and advanced training of the evaluation and treatment of child sex-offenders.  Audiences include psychiatrists, psychologists and social workers in various clinical settings. |
| January 1987 | **Workshop Leader**: Confrontive Psychotherapy with Character Disordered Patients. Presented at Gateways Satellite Mentally Disordered Offender's Program, Los Angeles, CA. |
| September 1986 | **Workshop Leader**: Interpretation of the MMPI with Forensic Populations.  Presented at the Conditional Release Program, Los Angeles County. |

**Publications**

Romanoff, R. (In Press) Criminal Forensic Assessment.  In S.F. Bucky (Ed.)  The Comprehensive Textbook of Ethics and Law in the Practice of Psychology.  New York: Plenum Publishing

Romanoff, R.  (1995) Telephone Therapy.  The California Psychologist, 28 (10), 10.

Eron, L.D., Huesmann, L.R., Dubow, E., Romanoff, R., & Warnick-Yarmell, P.  (1987) Aggression and its correlates over 22 years.  In D.H. Crowell, I.M. Evans, & C.R. O'Donnell (Eds.), Childhood Aggression and Violence; Sources of Influence, Prevention and Control.  New York: Plenum Publishing.

**Areas of Specialization**

1) The evaluation and treatment of adults who manifest disturbances in effective impulse control and that often involve the abuse of alcohol and drugs, involvement in antisocial activities, interpersonal conflict, and frequent life crises.

2) Forensic evaluations and expert testimony in court (e.g., assessment of current and past mental states in criminal and civil matters, assessment of dangerousness, applications of psychological expertise to the legal setting).