

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*50 Main Street, Suite 1100*
*White Plains, New York 10606*

August 27, 2024

**BY ECF**
The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    **Re:**    *United States v. Martin Mizrahi*, **S2 22 Cr. 650 (JPO)**

Dear Judge Oetken:

    The Government respectfully submits this letter in advance of sentencing of the defendant, Martin Mizrahi. Mizrahi was convicted after trial of seven counts charged in the captioned superseding indictment, including: (i) conspiracy to commit wire fraud and bank fraud, in violation of Title 18, United States Code, Section 1349; (ii) wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2; (iii) bank fraud, in violation of Title 18, United States Code, Sections 1344 and 2; (iv) conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h); (v) money laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(b)(i); (vi) aggravated identity theft, in violation of Title 18, United States Code, Sections 1028A and 2; and (vii) conspiracy to operate an unlicensed money transmitting business, in violation of Title 18, United States Code, Section 371.[1]

    Mizrahi's convictions arose from his participation in a conspiracy to defraud corporations, banks, credit card companies, and other entities, and to launder fraud proceeds as well as bulk cash proceeds derived from narcotics trafficking. *See* Presentence Investigation Report ("PSR") ¶ 16.

---

[1]    Mizrahi suggests, in a footnote, that there may have been an issue with the jury verdict. *See* Def. Sub. at 3 n.2. It is impossible to tell, however, from the accompanying messages, who Ms. Davis was communicating with, whether it was a juror, or, if so, which one. Regardless, it is well established that a juror's post-conviction regret regarding a decision, which is all the message exchange appears to reflect, is not a basis for challenging a verdict. *See, e.g.*, *United States v. Stasiv*, No. 18-CR-259 (PKC), 2019 WL 4071786, at *4 (S.D.N.Y. Aug. 29, 2019), *aff'd*, No. 19-4286, 2021 WL 4888865 (2d Cir. Oct. 20, 2021) (undoubtedly sincere statement of regret does not provide a basis to set aside the verdict); *United States v. Casiano*, 2007 WL 1692125, at *2–4 (D. Conn. June 7, 2007) (denying a motion for a post-verdict inquiry based on a letter from a juror expressing regret at the verdict reached and doubt as to the sufficiency of the government's evidence). The Government is not aware of any other evidence of potential juror misconduct.

The Government and the United States Probation Office calculate the applicable Guidelines range for Counts One through Five and Seven as 235 to 293 months' imprisonment, to be followed by a mandatory minimum consecutive sentence of 24 months' imprisonment for Count Six (aggravated identity theft). The Probation Office recommended a Guidelines sentence of 235 months' imprisonment for Counts One through Five and Seven, to be followed by a sentence of 24 months' imprisonment for Count Six. For the reasons below, the Government believes, consistent with the Probation Office, that a substantial term of imprisonment is warranted in this case, and requests that the Court impose a sentence of at least 144 months' imprisonment, including at least 120 months' imprisonment for Counts One through Five and Seven to be followed by a mandatory minimum consecutive sentence of 24 months' imprisonment for Count Six. Such a sentence would be sufficient but not greater than necessary to reflect the legitimate purposes of sentencing, including the need to reflect the seriousness of the offense, promote respect for the law, ensure adequate deterrence, and avoid unwarranted sentencing disparities.

## I.    Factual Background

At trial, the Government proved beyond a reasonable doubt that, from in or about February 2021 to in or about June 2021, Mizrahi participated in the following schemes:

### Laundering Bulk Cash Narcotics Proceeds

Overwhelming evidence showed that, from in or about February to in or about May 2021, Mizrahi and multiple co-conspirators participated in a scheme to launder at least approximately $3,855,704 million in bulk cash narcotics proceeds by converting those proceeds into cryptocurrency—specifically, Bitcoin. PSR ¶¶ 17-26.

As part of the scheme, Mizrahi's co-conspirator, Joel Zubaid, at times accompanied by another co-conspirator, David Goran, picked up tens or hundreds of thousands of dollars at a time in bulk cash narcotics proceeds from sources associated with a Mexican drug cartel. PSR ¶ 18. Zubaid then gave that cash to Mizrahi, among others, for conversion into cryptocurrency. *Id.*

Zubaid gave drug proceeds to Mizrahi in two ways. PSR ¶ 19. *First*, Zubaid, at times with Goran, drove the cash from California to Las Vegas to deliver it to Mizrahi at various locations, including Mizrahi's home, his business, his warehouses, and in casino parking lots. *Id.*; Tr. 159:18-21. *Second*, he deposited the cash into bank accounts and transferred money to Mizrahi electronically, including to Mizrahi's personal and business accounts. *Id.*; Tr. 188:23-189-10.

At trial, the Government introduced substantial evidence relating to Mizrahi's purposeful laundering of drug proceeds, including numerous photographs of bulk cash that Zubaid delivered to Mizrahi's home. *See* PSR ¶ 20. Government Exhibit 237A, for example, showed the following pyramid of cash, with a picture of Mizrahi visible in the background, taken on April 11, 2021, in Mizrahi's kitchen:



The Government also introduced scores of emails and other communications between Zubaid and Mizrahi relating to the delivery of bulk cash for conversion to Bitcoin. *See, e.g.*, GX 902 (April 9, 2021 email from Zubaid to Mizrahi about "200 k btc," including Bitcoin wallet); GX 169 (May 28, 2021 email from Zubaid to Mizrahi about "cash for BTC" attaching picture of money). These messages made crystal clear that Mizrahi understood that Zubaid was bringing him cash for third parties, including a source named "Negra." *See, e.g.*, GX 197 (April 7, 2021 email attaching screenshot of communications with Negra); GX 198 (April 4, 2021 email from Zubaid to Mizrahi asking about "100k btc," explaining "Negra just texted me inquiring about it).

The extensive communications about cash for Bitcoin were also supported by financial records. For example, the Government introduced bank records showing that, as Zubaid brought Mizrahi bulk cash, Mizrahi took millions of dollars out of his company, LV Net, and sent it to his personal account. PSR ¶ 22; GX 702 (showing Mizrahi take $5,295,000 from LV Net over less than three months). The Government also introduced records showing that, once Mizrahi had cash in the banking system, he transferred it from his personal account to Coinbase, and then on from Coinbase to cryptocurrency wallets supplied by Zubaid. *Id.*, GX 702; *see also* GX 703

(summarizing Coinbase records showing 29 transfers, totaling $3,855,704.30, from Mizrahi's Coinbase wallet to four cryptocurrency wallets associated with Negra).[2]

Consistent with the pictures, emails, bank records, and cryptocurrency records, both Zubaid and Goran testified at length about Mizrahi's participation in the scheme, including specifically that Mizrahi knew that the millions in cash that he was converting into Bitcoin had come from selling drugs. PSR ¶ 21; *see also, e.g.*, Tr. 161:6-19 (Zubaid direct) ("I said that [Negra's] also connected to the cartel and that this money is also from the source of selling drugs"); Tr. 512:7-11 (Zubaid cross) (Q. "Mr. Zubaid, yes or no; you were telling Mr. Mizrahi that you had a legitimate business and these were legitimate funds, not cartel funds?" A. "I did not say that, sir. Mr. Mizrahi knew that it's money coming from the cartel by selling the drugs over here."); Tr. 1050:18-1051:4 (Goran direct) (Q. "What did you hear Mr. Zubaid tell Mizrahi about the pallets of cash?" A. "That he could bring large sums of cash or there was pallets of cash that he had access to." Q. "Did you hear talk with Mr. Mizrahi about the fact that the cash was coming from the cartels?" A. "Yes.").

Notably, consistent with the illegitimate source of this money, Zubaid and Goran also both testified—again supported by substantial documentary evidence—that Mizrahi agreed on two occasions to help Zubaid recover bulk cash that had been stolen from him. PSR ¶¶ 25-26.

*First*, in late January 2021, Zubaid, Sergio Knight, Sam Qadir and others deposited roughly $291,000 into an account controlled by Andrew Demaio, another Las Vegas businessman. Tr. 144:19-149:12. Demaio failed to send the Bitcoin and began ignoring Zubaid's calls. *Id.* Having lost the cash, and fearing for their safety, Zubaid, Knight, and Qadir went to Las Vegas to look for Demaio, and, at a certain point, contacted Mizrahi, who agreed to help collect the money. Tr. 149:20-150:11. Zubaid's testimony about these issues was corroborated by multiple documents, including a deposit ticket showing the money that had been deposited into Demaio's account, and numerous emails from Zubaid to Mizrahi about Demaio, including messages where Zubaid sent Mizrahi a photo of Demaio and his address. *See, e.g.*, GX 958 (email chain between Zubaid and Mizrahi regarding "Andrew's account info"); GX 973 (January 30, 2021 email from Zubaid asking Mizrahi to "check out" Demaio); GX 960 (February 3, 2021 email from Zubaid sending Mizrahi possible address for Demaio). The documents also showed that Mizrahi tried to contact Demaio to arrange a meeting, *see* GX 965, which Zubaid explained at trial was part of a plan to collect the

---

[2]     At trial, Mizrahi portrayed himself as a "Bitcoin miner," suggesting that he had access to excess Bitcoin. *See, e.g.*, Tr. 1729:16-25 (Mizrahi direct) (discussing work on Bitcoin ATMs, and saying: "I was a miner, and when you mine Bitcoins you basically create them, so you have them."). As the evidence showed, however, Mizrahi was not selling Zubaid Bitcoin that he mined; rather, he took cash from Zubaid, hid the source of the funds by pulling parallel amounts out of LV Net, sent the money to Coinbase, bought Bitcoin, and then sent the Bitcoin to wallets supplied by Zubaid in exchange for a substantial commission. *See, e.g.*, Tr. 161:23-25 (Zubaid direct) (Q. "And what would [Mizrahi] get in exchange for converting the cash into Bitcoin?" A. "He was getting a commission of 7 percent."); DX RRR at 80 (May 31, 2021 message from Zubaid: "Marty any word on the Btc"; Mizrahi: "OK I got 37000. Cost is 40500").

money, including potentially through force, Tr. 156:2-21. Zubaid testified that he did not know whether Mizrahi was ever ultimately able to collect anything from Demaio. Tr. 158:5-8.

*Second*, after Mizrahi began taking cash from Zubaid, he agreed to help Zubaid recover about half a million dollars that had been stolen from Zubaid by a man named Anthony, one of Mizrahi's own associates. PSR ¶ 26. This theft occurred after Zubaid brought an individual named Eduardo to Mizrahi's home to convert a large sum of money into Bitcoin. Tr. 163:24-174:13. When Mizrahi could only convert a portion of the cash, Anthony, who Zubaid met in Mizrahi's home, offered to convert the remainder of the money into Bitcoin for Zubaid and Eduardo. *Id.* Zubaid and Eduardo eventually met Anthony at the Bellagio Hotel. *Id.* During the meeting, Anthony stole the cash and failed to send the promised Bitcoin. *Id.* Zubaid again went to Mizrahi, who agreed to collect the stolen money for a fee. *Id.* Mizrahi later told Zubaid—and admitted at trial—that he had collected approximately $380,000 from Anthony. *Id.*[3]

Notably, in exchanging messages with Mizrahi about Anthony, Zubaid later told Mizrahi—without prompting any questions or pushback—that he had "protected" Mizrahi after the theft because Anthony had "solicited in [Mizrahi's] home." GX 1365. At trial, Zubaid explained that he thought Mizrahi could be held responsible for this loss by the cartel associates whose money had been stolen, and that he had protected Mizrahi by paying down the debt. Tr. 308:1-18.

## Laundering Fraud Proceeds

While he was taking millions in bulk cash from Zubaid, Mizrahi also laundered hundreds of thousands of dollars in fraud proceeds stolen from a nonprofit organization. PSR ¶¶ 27-31.

At trial, the Government proved that, in or about early 2021, fraudsters compromised the business email account of the Chief Financial Officer of Brownsville Community Development Corporation, a healthcare center that provides services to indigent people in this city. PSR ¶ 28; Tr. 101:12-19. Using the compromised email, the fraudsters contacted Brownsville's bank, Carver Federal Savings Bank, and added new credentials to Brownsville's accounts. *Id.*; Tr. 100:1-113:17 From May 12 to June 1, 2021, those credentials were used to send 10 fraudulent wires, totaling approximately $3.488 million, to third parties at different financial institutions, including $1.57 million to a Bank of America account controlled by Zubaid and Goran. PSR ¶ 29; Tr. 62:17-80:3.

After receiving the fraudulent wires from Brownsville, from May 12 to May 14, 2021, Zubaid and Goran sent on $690,000 of the fraud money to Mizrahi to convert into Bitcoin. PSR

---

[3]    At trial, Mizrahi claimed that he gave the money that he collected from Anthony "back to Joel." Tr. 1901:4. That assertion, however, is directly contradicted by both Zubaid's testimony and Mizrahi's own WhatsApp messages to Zubaid after the scheme unraveled, which clearly show that Mizrahi kept the cash. *See* GX 1365 (Zubaid: "You even got the money from the guy who stole 500 and kept it and plus he gave you another 500k worth of the alt coin he gave you"; Mizrahi "No alt coins and he only gave me 380"); Tr. 174:11-13 (Q. "Did Mizrahi give you any of the money that he said he'd gotten from Anthony?"  A. "No, sir.").

¶ 30; GX 702 at 6.  After getting the money, in exchange for a fee, Mizrahi sent about $676,679.18 worth of Bitcoin to three cryptocurrency wallets supplied by Zubaid.  PSR ¶ 30; GX 702 at 6.

Here again, substantial evidence showed that Mizrahi knew that the funds he was laundering were stolen.  For one thing, Zubaid testified that he discussed the source of the money with Mizrahi, including that it had been stolen and had to be moved fast or the wires could be reversed.  Tr. 214:1-12.  That testimony was corroborated by WhatsApp messages Zubaid exchanged with "Omar Lucas"—one of the individuals sending the Brownsville money—about Mizrahi, including messages where Lucas asked to "put Marty on the line."  GX 224A.  The WhatsApp messages similarly showed that, after Zubaid's account was frozen by Bank of America, he sent Lucas wiring instructions for LV Net, which Zubaid explained would allow Lucas to send the money directly to Mizrahi for future transactions.  See GX 225A; Tr. 222:14-24.

The documents and testimony also showed how, after the Brownsville fraud was uncovered, Mizrahi lied to Bank of America to try to cover up the purpose of the transfers from Zubaid.  PSR ¶ 31.  In particular, in July 2021, Mizrahi was contacted by a Bank of America representative asking for more information about the four wires he had gotten tied to the Brownsville fraud.  Tr. 806:13-811:21.  In response, Mizrahi lied—falsely claiming that the wires had been payment for legitimate LV Net services, telling the Bank of America representative: "We sold OB Marketing & Research LV.Net Hosting services and they paid us for them."  GX 319.  As established at trial, Mizrahi did not provide any "hosting services" to OB Marketing for this money; he just took a cut and sent Bitcoin to three wallets supplied by Zubaid.  GX 702 at 6.

## Credit Card Fraud

At trial, the Government also introduced overwhelming evidence showing Mizrahi's participation in a third, especially brazen scheme—a credit card fraud involving at least $7,982,450 in fraudulent charges, spanning from April 2021 to June 2021, as the money laundering schemes were ongoing.  PSR ¶¶ 32-39.

As part of the scheme, another co-conspirator, Gazi Khan, sent Zubaid pictures of credit cards and other documents, claiming these cards had been pre-loaded with stolen money that could be drawn down by charging the cards and entering a six-digit preauthorization code.  PSR ¶ 33.[4] Zubaid sent the information to Mizrahi, who used LV Net to charge the cards for tens or hundreds

---

[4]    In his submission, Mizrahi argues that self-serving texts he sent to Zubaid after the fraud unraveled are inconsistent with his guilt.  See Def. Sub. 13.  All these messages show, however, is that Mizrahi lost money and was upset about the unravelling of the fraud scheme, which he had believed would be successful.  In particular, the evidence showed that Mizrahi gave Zubaid cash to pay Khan his cut.  See GX 1034.  When the charges were disputed, the amounts were clawed back in full and Mizrahi was out of pocket by the amount paid out to Khan.  That is why Mizrahi repeatedly messaged Zubaid about getting his money back.  E.g., DX RRR at 89 ("I need all my money u owe me back ASAP."); id. at 90 ("Where is my money"); id. at 92 ("Where is the money u gave for the cc's.  Get that cash back").  To the extent Mizrahi and Zubaid both described themselves as having been "conned," the messages reflect the simple truth that they were both convinced, based on what Khan had told them, that the scheme would work.

of thousands of dollars at a time. PSR ¶ 33. LV Net did not provide any goods or services in connection with these charges; rather, Mizrahi, Zubaid, and Khan simply agreed to split up the money. PSR ¶ 33. As part of the scheme, between April 29 and June 11, 2021, Mizrahi ran at least forty fraudulent credit card charges, totaling $7,982,450. PSR ¶ 34; GX 705 at 48.

Both Zubaid and Goran testified about Mizrahi's knowing and willful participation in the scheme. Zubaid explained that Mizrahi initially asked for a 7% cut of the amounts charged, and later began saying he wanted more money as he was "taking all the risk." Tr. 225:23-226:8. Goran likewise testified that Mizrahi, Khan, and Zubaid were simply cutting up the proceeds of the fraud. Tr. 1101:2-1102:22. Goran recalled that he was also present for discussions where Mizrahi expressed concerns about Khan's cut—saying that he wanted to wait some time before paying Khan because he was worried the fraudulent charges could be reversed. Tr. 1108:6-1109:8.

The testimony of these witnesses was again supported by substantial documentary evidence. The Government introduced, for example, dozens of emails between Zubaid and Mizrahi relating to the scheme, including many emails in which Zubaid sent Mizrahi pictures of credit cards, identification documents, and six-digit codes. *See, e.g.*, GX 995 (May 6, 2021 email from Zubaid to Mizrahi attaching Amex for Scott Walker); GX 1001 (May 8, 2021 email from Zubaid to Mizrahi attaching Mastercard and license for Yaser Hamada). Financial records similarly showed that Mizrahi, though LV Net, charged tens or hundreds of thousands of dollars at a time to the cards supplied by Zubaid. *See* GX 705 at 48 (summarizing charges per cardholder).

The documents also showed how Mizrahi kept going with the scheme, even after charges were rejected or disputed—simply swapping out compromised cards for replacements and making millions more in fraudulent charges. *See, e.g.*, GX 1025 (May 18, 2021 email from Zubaid forwarding Mizrahi message "from Gazi" that they would do "replacement for any returns"); GX 1041 (May 19, 2021 message from Mizrahi saying that two charges, for $89,140 and $92,350, were rejected because "Required Authorization Not Obtained"); GX 1044 (May 19, 2021 email forwarding Mizrahi message "From Gazi" that the best "option" after chargebacks was "just change to fresh card new transactions and return the disputed funds").

The documents also showed how Mizrahi ran charges even after receiving documents that were clearly fraudulent. For example, in June 2021, Zubaid sent Mizrahi an "Authorsiation Letter" in the name "Melton Kirk Tishcler," purporting to permit whoever held the letter to charge "not less than *Dollars 500,000,000.00 (Five Hundred Million Dollars)*" to the card. GX 1075 (emphasis added). As even a defense witness admitted at trial, on its face, the document is plainly fraudulent. *See* Tr. 1470:16-1471:15 (Q. "This is not a legitimate document, right?" A. "I would say no, it's not."). Nonetheless, after getting it from Zubaid, Mizrahi quickly charged the card for more than half a million dollars. GX 1315, 1122.

Notably, the evidence at trial showed that Mizrahi did not merely miss "red flags"—instead, he himself created multiple fake documents as part of the scheme. For example, when Mizrahi began running the fraudulent charges, he was told that LV Net had a transaction limit of $99,999. *See* GX 1375, 999 (texts between Mizrahi and Pyatkov about charges failing to go through and raising transaction limits). As a result, Mizrahi quickly directed the creation of a fake contract for more than $1.2 million to send to the credit card companies to raise LV Net's limits.

GX 996.  As Sergey Pyatkov, LV Net's controller, testified at trial, the contract had nothing to do with "building a data center" or a "cryptocurrency project"—the core of what Mizrahi said he was doing with Zubaid; rather, it claimed that a man named "Scott Walker" had supposedly agreed to pay over a million dollars for LV Net to bring microwave internet to some unspecified mountaintop.  Tr. 876:10-18.  During his testimony, Pyatkov admitted that, even though this would have been one of the largest contracts in LV Net history, the purported contract lacked standard details (like the specific location to be served), and Pyatkov saw no evidence that any of the work it described was done.  Instead, after getting this fake contract signed, Mizrahi just sent it on to First Data, asking to have LV Net's "transaction limits increased."  GX 1002, 475.[5]

As the scheme went on, Mizrahi continued creating fake paperwork.  For example, on May 8, 2021, Zubaid sent Mizrahi a credit card for "Yaser Hamada."  GX 1001.  Shortly after getting the card, Mizrahi created a sham invoice billing Hamada $283,000 a month for "Colocation" services in April, May, and June 2021—meaning that Mizrahi was claiming that LV Net had somehow already been providing services to Hamada for more than a month before he even got Hamada's card from Zubaid.  See GX 1017.  As Pyatkov testified at trial, the information in the Hamada invoice came straight from Mizrahi.  Tr. 880:20-881:3.  And here again, Pyatkov saw no evidence that any colocation services were provided to Hamada in April (or any subsequent months).  See Tr. 881:4-883:8. Pyatkov also explained that $283,000 a month for colocation services would have been multiples larger than the largest such bill in LV Net history.  Id.

When the Hamada charges were disputed, Mizrahi continued to dissemble.  See GX 1041 (May 19, 2021 email from Mizrahi to Zubaid sending chargebacks for Hamada).  A few days after sending Mizrahi chargebacks relating to Hamada, LV Net's credit card processor contacted Mizrahi, explaining that its risk team had "identified an increase in chargeback activity" and asking for more information.  See GX 1046 (May 25, 2021 email from Mizrahi to Zubaid forwarding risk monitoring questions).  In response, Mizrahi told the credit card processor that these charges had been "based on a hosting project," and that the cardholder had "change[d] his mind" leading to the dispute.  GX 1047.  While he had created an invoice days earlier saying that Hamada had received $283,000 in "Colocation" services in April and May, he told the risk monitoring team that LV Net had not "provided the product/service," claiming "[i]t was too soon.  Still in the beginning stage.  This was only part of the deposit."  GX 1047.  Rather than drawing further attention, Mizrahi also told the risk team that he did not plan to fight the chargeback, as "[t]he customer doesn't want to go through with the project and I didn't lose anything at this point."  Id.[6]  Mizrahi then continued to run dozens of charges for millions of dollars on new cards supplied by Khan.  See GX 705.

---

[5]    A contemporaneous voice message from Zubaid to Khan neatly summarized why the Walker contract was actually created.  See GX 223T.  As Zubaid explained to Khan, Mizrahi wanted the contract "so he can send it to AMEX and they will increase his limit to [a] million right away." Id.  Far from running internet to a mountaintop, Mizrahi wanted a contract in place so he could run charges "every so often – meaning – every day – every other day, however [Gazi] want[ed] him to do it.  That's what he wants … and that is the reason he made the invoice for 1.2 Million." Id.

[6]    Zubaid sent Mizrahi an initial draft of the responses for the credit card companies.  See GX 1048.  While Mizrahi argued at trial, and similarly claims in his submission, that he has significant difficulties reading and writing, these documents appear to show that, before sending the responses on to the risk team, Mizrahi cleaned up the draft from Zubaid by fixing typos, tightening the

In addition to asking about the nature of the services, LV Net's new credit card processor asked for a "Contract/ invoice" to support the enormous charges Mizrahi was running. *See* GX 1082. Faced with this request, Mizrahi quickly generated multiple fake contracts, supposedly worth tens of millions of dollars, to try to paper the fraudulent charges. *See, e.g.*, GX 1088 ($2.1 million invoice for "Hosting and servers" for Andrea Pinto Zubaid); GX 1094 ($24.6 million invoice for "Hosting and servers" for "Melton Tischler"); GX 1118 ($4.2 million invoice for "Hosting and servers" for Shahvand Aryana); GX 1110 ($6.8 million invoice for "Hosting and servers" for Edi Rivera). As far as the Government is aware, nothing in the documentary record suggests that the eye-popping, multi-million-dollar figures listed in these contracts came from Zubaid or Khan; rather, Mizrahi appears to have pulled these numbers out of thin air.[7]

After the fraud began to unravel, Mizrahi continued to lie. For example, after LV Net received disputes relating to the fraudulent charges in late June 2021, Mizrahi told Pyatkov to "fight whatever we can," despite having done nothing for the money. GX 1375. When Pyatkov sent Mizrahi a proposed response to the credit card companies, Mizrahi added the following: "The customer used our services in June 2021. The charge-back should be denied and LV Net should get paid." GX 1375; Tr. 932:19-933:17. As Pyatkov explained, despite being LV Net's controller, he had not "see[n] any evidence that LV.Net provided [this claimed] service." Tr. 933:21-22. Instead, this was yet another lie to support the scheme. *See also* GX 1378 (LV Net dispute response claiming to have done work for Shahvand Aryana "in June and July 2021"); Tr. 935.24-25 (Pyatkov direct) (testifying that Mizrahi gave him the language claiming that LV Net did work for Aryana, and that Pyatkov again had not "see[n] any evidence that LV.Net provided the service").

## II. Procedural History

On December 2, 2022, Indictment 22 Cr. 650 (JPO) was filed charging Mizrahi with: (i) conspiracy to commit wire and bank fraud; (ii) bank fraud; (iii) wire fraud; (iv) conspiracy to commit money laundering; (v) money laundering; and (vi) aggravated identity theft. *See* Dkt. 2.

On December 9, 2022, Mizrahi was arrested in the District of Nevada and presented pursuant to Rule 5(c)(3). *See* Dkt. 23. On January 25, 2023, the defendant was presented in this District and released on bail, subject to certain conditions. *See* Dkt. 30.

---

language, and removing references to obvious red flags, including taking out all references to "Crypto currency" and removing a reference to the deal supposedly being brokered by an "intermediary from Jordan." *Compare* GX 1048 with GX 1047.

[7]     At trial, senior LV Net witnesses testified that they had no idea in 2021 that LV Net had purportedly entered into contracts supposedly worth tens of millions of dollars. *See, e.g.*, Tr. 1464:23-1468:23 (Peoples cross) (testifying that, despite being LV Net's Chief Operating Officer, he had no idea that the company was running millions in credit card charges in 2021, and that he first saw a $24.6 million invoice for Tischler—which would have multiples larger than any contract in LV Net's history—the day before he testified); Tr. 1554:8-25 (Cook cross) (testifying that he was not aware in mid-2021 that LV Net had run about $8 million in credit card charges, that he was not involved in running those charges, and that he did not know anything about them).

On December 19, 2023, a superseding indictment was filed against Mizrahi and others. *See* Dkt. 62. The superseding indictment retained the charges in the original indictment and added allegations relating to laundering drug proceeds, as well as a count for conspiring to operate an unlicensed money transmitting business. *Id.*

Trial was held from February 14 to March 1, 2024. On March 4, 2024, the jury returned a verdict finding Mizrahi guilty on all seven counts charged in the superseding indictment.

## III.    The Guidelines Calculation and Probation's Recommendation

The Guidelines apply to Mizrahi's crimes of conviction as follows:

### A. Offense Level

1.  The November 1, 2023 edition of the Guidelines Manual is applicable to the defendant's offenses.

2.  Counts One Two, and Three (the "Fraud Group") are grouped because the offense level is determined largely on the basis of the total amount of harm or loss, while Counts Four, Five, and Seven (the "Money Laundering Group") are grouped because the offense level is determinedly largely on the basis of the value of the laundered funds. U.S.S.G. § 3D1.2(d).[8]

3.  The offense level for the Fraud Group is calculated as follows:

    a.  U.S.S.G. § 2X1.1 applies to the offense of conspiracy to commit wire fraud and bank fraud, and U.S.S.G. § 2B1.1 applies to the offenses of wire fraud and bank fraud.

    b.  Pursuant to U.S.S.G. § 2X1.1, the applicable base offense level is determined by looking to U.S.S.G. § 2B1.1, the guideline for the substantive offense, and no downward adjustment is necessary because the defendant completed all of the acts necessary for the successful completion of the substantive offense.

---

[8]    The Government believes the PSR mistakenly groups the Fraud Group with the Money Laundering Group pursuant to U.S.S.G. § 3D1.2(c). PSR ¶ 50. The funds the defendant laundered, however, were different from those involved in the fraud offenses—*i.e.*, Mizrahi ran approximately $7.9 million in fraudulent credit card charges, while he also laundered an additional $690,000 in fraud proceeds stolen from Brownsville and at least another $3.86 million in bulk cash narcotics proceeds sent to Negra. As a result, the fraud loss is not accounted for at all in the § 2S1.1 money laundering guideline analysis. The outcome of our calculation, however, is ultimately the same as the PSR, with a final offense level of 38. Notably, if the money from the fraud and money laundering offenses is aggregated, as would be required if all of the counts were grouped (*see* U.S.S.G. §§ 3D1.3(b)), the total intended loss would be more than $9.5 million, resulting in a total offense level of 40, two levels higher.

    c.  Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is 7.

    d.  Pursuant to U.S.S.G. § 2B1.1(b)(1)(J), because the intended loss was more than $3,500,000 but less than $9,500,000, an 18-level enhancement applies.[9]

    e.  Pursuant to U.S.S.G. § 2B1.1(b)(10), because the offense involved sophisticated means, including through the creation of fraudulent invoices and documentation, a 2-level enhancement applies.

    f.  The total offense level for the Fraud Group is thus 27.

4.  The offense level for the Money Laundering Group is calculated as follows:

    a.  U.S.S.G. § 2S1.1 applies to the offenses of conspiracy to commit money laundering, money laundering, and conspiring to operate an unlicensed money transmitting business as defined in 18 U.S.C. § 1960(b)(1)(C).

    b.  Pursuant to U.S.S.G. §§ 2S1.1(a)(2) and 2B1.1(b)(1)(J), the base offense level is 26, because the value of the funds laundered was more than $3,500,000 but less than $9,500,000.

    c.  Pursuant to U.S.S.G. § 2S1.1(b)(1), a six-level enhancement applies because the defendant knew or believed that a portion of the funds were derived from an offense involving the distribution of a controlled substance.

    d.  Pursuant to U.S.S.G. § 2S1.1(b)(1), a four-level enhancement applies because the defendant was in the business of laundering funds.

---

[9]   Mizrahi argues in a footnote that actual loss, not intended loss, would be the appropriate measure of loss, relying on the Third Circuit's decision in *United States v. Banks*, 55 F.4th 246 (3d Cir. 2022). *See* Def. Sub. at 5 n.6. *Banks*, however, did not address a conspiracy offense. Because Mizrahi was convicted of conspiracy, this case involves the application of § 2X1.1, which was not at issue in *Banks*. And § 2X1.1 plainly states that the Guidelines calculation should include "any *intended* offense conduct that can be established with reasonable certainty." U.S.S.G. § 2X1.1 (emphasis added); *United States v. Walker*, 89 F.4th 173 (1st Cir. 2023). Accordingly, neither *Banks* nor the Supreme Court's recent decision in *Loper Bright Enterp. v. Raimondo*, about deference to agency interpretations favors rejecting an intended loss measure for actual loss. *See also Stinson v. United States*, 508 U.S. 36, 44 (1993) (finding *Chevron* "inapposite" in evaluating Guidelines commentary). Regardless, the Second Circuit and districts courts in this Circuit have consistently applied intended loss when calculating the Guidelines range under § 2B1.1 as the more accurate measure of the defendant's culpability. *See, e.g.*, *United States v. Powell*, 831 F. App'x 24, 25 (2d Cir. 2020); *United States v. Lacey*, 699 F.3d 710 (2d Cir. 2010). That is certainly true here, where Mizrahi and his co-conspirators intended to obtain the full amount of the funds that they fraudulently charged through the credit cards and were stopped from doing so only because the credit companies identified the fraud and froze or clawed back the money.

    e.   The total offense level for the Money Laundering Group is thus 36.

5. Pursuant to U.S.S.G. § 3D1.4, the Fraud Group is disregarded because it has an offense level that is nine or more levels less serious than the Money Laundering Group. Accordingly, the combined offense level is 36.

6. Pursuant to U.S.S.G. § 3C1.1, two levels are added because the defendant willfully attempted to obstruct or impede the administration of justice with respect to the prosecution of the offenses of conviction.

7. Pursuant to U.S.S.G. § 2B1.6, the Guidelines sentence for Count Six is the 24-month term of imprisonment required by 18 U.S.C. § 1028A, to be served consecutively to any term of imprisonment imposed on Counts One, Two, Three, Four, Five, and Seven.

In accordance with the foregoing calculations, the applicable offense level is 38.

### B. Criminal History Category

Mizrahi has three prior criminal convictions:

- On or about January 31, 1989, Mizrahi was convicted of burglary, in violation of Section 459 of the California Penal Code, Possession of an identification document with intent to commit fraud or forgery, in violation of Section 470 B of the California Penal Code, and Use of False Information, in violation of Section 20 of the California Vehicle Code, and was sentenced to a wardship misdemeanor. *See* PSR ¶ 64. Pursuant to U.S.S.G. § 4A1.2(e)(2), this sentence results in zero criminal history points.

- On or about November 22, 1989, Mizrahi was convicted of forging a name on an access card, in violation of Section 484F(2) of the California Penal Code and sentenced to a term of 27 days' imprisonment and 36 months' probation. *See* PSR ¶ 65. Pursuant to U.S.S.G. § 4A1.2(e)(2), this sentence results in zero criminal history points.

- On or about July 29, 1990, Mizrahi was convicted of forging a name on an access card, in violation of Section 484F(2) of the California Penal Code, and knowingly receiving stolen property, in violation of Section 496 of the California Penal Code, and sentenced to a term of 365 days' imprisonment and 36 months' probation. *See* PSR ¶ 66. Pursuant to U.S.S.G. § 4A1.2(e)(2), this sentence results in zero criminal history points.

In accordance with the foregoing, Mizrahi's Criminal History Category is I.

*       *       *

With a total offense level of 38 and a Criminal History Category of I, the applicable Guidelines range for Counts One through Five and Seven is 235 to 293 months' imprisonment, to

be followed by a mandatory minimum consecutive term of 24 months' imprisonment on Count Six, for an overall Guidelines range of 259 to 317 months' imprisonment.

## C.  Recommendation of the Probation Office

After taking into account the factors set forth in 18 U.S.C. § 3553(a), the Probation Office recommended that the Court impose a within-Guidelines sentence of 235 months' imprisonment for Counts One through Five and Seven, to be followed by a mandatory minimum consecutive term of 24 months' imprisonment on Count Six.  *See* PSR at pp. 35-43.  As the PSR highlights, this offense reflects Mizrahi's fourth conviction, and he has multiple prior convictions relating to fraud.  *Id.*  As part of this case, Mizrahi participated in a wide-ranging scheme, encompassing a broad array of misconduct, including through the use of sophisticated means.  *Id.*  Moreover, as further discussed below, Mizrahi still, to date, has refused to accept responsibility.  *Id.*

## D.  Mizrahi's Guidelines Objections Are Without Merit

In his submission, Mizrahi raises several objections to the calculation of the Guidelines in the PSR.  *See* Def. Sub. at 6-22.  None has merit.

### 1.  The Second Circuit has Rejected Mizrahi's Constitutional Claim

Mizrahi first argues that the PSR's  recommended sentence violates the Fifth and Sixth Amendments because his offense level depends in part on facts that this Court, not the jury, would need to find.  *See* Def. Sub. 6-9.  But this argument has been squarely rejected by the Second Circuit, which has consistently held that a district court's finding of facts by a preponderance of the evidence at sentencing does not violate a defendant's constitutional rights.  *See, e.g.*, *United States v. Dorney*, 201 F. App'x 30, 32 (2d Cir. 2006) (rejecting as "without foundation" argument that defendant's "Fifth and Sixth Amendment rights were violated when a sixteen-level Guidelines enhancement was  imposed pursuant to  U.S.S.G.  § 2L1.2(b)(1)(A)(i) without requiring a  fact necessary for imposition of the enhancement to be pled in the indictment and proven to a jury or admitted by him"); *United States v. Saunders*, 852 F. App'x 46, 47 (2d Cir. 2021) (affirming 228 month sentence and rejecting assertion that court "violated [defendant's] rights under the Fifth and Sixth Amendments … by applying an enhanced Guidelines sentencing range based on alleged facts neither admitted by Saunders nor found by a jury"); *United States v. Bliss*, 566 F. App'x 49, 51 (2d Cir. 2014) (rejecting assertion that "court violated … Sixth Amendment right … by calculating the … Guidelines … using facts found by a preponderance").

Indeed, it is routine for courts to find facts at sentencing, and such findings are commonly made in the context of disputed Guidelines calculations.  As the Second Circuit has explained, post-*Booker*, a constitutional objection to such findings makes little sense, as the Guidelines are now "*advisory* and therefore do not legally mandate the imposition of a sentence within any particular range." *Saunders*, 852 Fed. App'x at 47.  Thus, while "the Guidelines provide helpful benchmarks in determining the reasonableness of sentences," this function does not "undermine[] the sentencing judge's traditional 'authority to find facts relevant to sentencing by a preponderance of the evidence.'"  *Id.* (quoting *United States v. Garcia*, 413 F. 3d 201, 220 n.15 (2d Cir. 2005)).

### 2.  The PSR Properly Applies the Six-Level Enhancement for Laundering Narcotics Proceeds

Mizrahi next objects to the six-level increase, pursuant to U.S.S.G. § 2S1.1(b)(1), because he knew or believed that a portion of the funds he laundered were from the sale of controlled substances.  *See* Def. Sub. at 9.[10]  He argues that "no evidence was offered at trial (or since then) that any of the money involved in this case was derived from illicit drug sales." *Id.*  Mizrahi is wrong.  As this Court explained when it denied Mizrahi's Rule 29 and 33 motions, "[t]he evidence established that the money laundered by Mizrahi comprised proceeds of two specified unlawful activities:  drug sales and wire fraud."  Dkt. 164 at 4.

#### a.  Substantial Evidence Showed that Mizrahi Was Laundering Drug Money

At trial, substantial evidence showed that the bulk cash that Mizrahi was laundering had come from selling drugs.  Most directly, both Zubaid and Goran testified that they understood this to be the source of the money—that it was cash proceeds of drug sales in the United States being turned into Bitcoin and sent back to Mexico.  *E.g.*, Tr. 142, 145, 159, 361, 1022, 1036.  Indeed, their testimony about the steps they took to obtain and launder the source of cash directly mirrored the testimony of Inspector Hernandez about the typical methods used by cartels to launder drug money.  Tr. 654:5-665:11-21; Tr. 146:2-14.  As this Court recognized, moreover, their testimony was supported by "extensive corroborating evidence," Dkt. 164 at 6, including, among other things, screenshots Zubaid sent Mizrahi of texts with a cartel representative, and threats of violence directed at Zubaid and others when some of the money was stolen, Dkt. 164 at 3, 4.[11]

Nonetheless, Mizrahi asks this Court to reject the testimony of Zubaid and Goran in favor of his own self-serving account, asserting that Zubaid and Goran are "seasoned con men," who "simply lied about the involvement of a drug cartel after they were caught to make their cooperation appear more meaningful." Def. Sub. 10.  But that argument was already made to, and rejected by, both the jury and this Court.  And there is even more evidence, beyond just what was introduced at trial, further corroborating the testimony of Zubaid and Goran, all of which was produced to Mizrahi in discovery.  That includes multiple contemporaneous messages, screenshots, and pictures evidencing the involvement of a violent Mexican cartel.

---

[10]  Although, as discussed below, it is unnecessary here given the clear evidence of knowledge, the Second Circuit has repeatedly held that "conscious avoidance" is a sufficient basis for inferring knowledge that money comes from narcotics trafficking and imposing the Guidelines enhancement in U.S.S.G. § 2S1.1(b).  *See United States v. Finkelstein*, 229 F.3d 90, 97 (2d Cir. 2000).

[11]  In his papers, Mizrahi suggests that the Government thought it could not prove a charge predicated on his laundering of narcotics proceeds, saying "[t]here was no substantive money laundering charge for laundering drug trafficking proceeds, presumably because the government knew it could not prove that had occurred." Def. Sub. 11.  But Mizrahi misreads the indictment.  Count Five clearly charged him with laundering proceeds of "the wire fraud and bank fraud charged in Counts Two and Three of this Indictment, *and the sale and distribution of narcotics*, *in violation of Title 21, United States Code, Section 841*." Dkt. 62 at 10 (emphasis added).

These documents show, for example, that at the time Zubaid first approached Mizrahi about recovering the money stolen by Demaio, he was in fear for his life. In particular, on February 8, 2021, within days of when he approached Mizrahi, Zubaid messaged Qadir, another participant in the Demaio transaction, summarizing the transaction that had gone awry and saying it "might be the last day of my life":



A few weeks later, on April 19, Zubaid sent Knight, another participant in the Demaio transaction a phone number, followed by a message about having received threats:



There is, moreover, strong support for Zubaid's testimony about the involvement of individuals from Mexico, where he understood the cartel to be located. For example, on July 27, after the theft by Mizrahi's associate Anthony, Zubaid sent Knight a screenshot of a message with a Mexican phone number about a $450,000 debt:



Similarly, on August 12, Zubaid promised Knight that he would "have some cash for the friends across the boarder [sic]":



And as the Court is aware, Zubaid's communications show that actual violence was subsequently used against one of his co-conspirators. In particular, on February 19, 2022, Knight's phone was used to message Zubaid "911 answer pl." Two minutes later, the following photos were sent to Zubaid, the second of which appears to be of Knight:

 

As these documents highlight, the testimony of Zubaid and Goran—including about the involvement of associates of a Mexican cartel, and the risk of violence that Zubaid faced after money was stolen—was well supported by independent evidence.[12]

---

[12]  Mizrahi's other arguments about why Zubaid and Goran's testimony should be disregarded are similarly unpersuasive. For example, Mizrahi argues that the testimony is somehow insufficient because Zubaid and Goran never "claimed to have witnessed any drug sales … or otherwise had any first-hand knowledge of how the money was generated." Def. Sub. at 11. But there is no requirement that a money launderer have personally seen money coming from specific drug sales. *See, e.g.*, *United States v. Fares*, 95 F. App'x 379, 383 (2d Cir. 2004). Indeed, as Inspector Hernandez testified, cartels hire specialized middlemen to send drug money back to Mexico, and those middlemen are rarely themselves directly involved in the narcotics transactions. *See, e.g.*, Tr. 655. In a similar vein, Mizrahi argues that the testimony of Zubaid and Goran was not offered for its truth. Def. Sub. at 11. But he is wrong. Their testimony was based on their personal observations or recollections of what they were told by other co-conspirators. As such, it was admissible for the truth. *E.g.*, *United States v. Lita*, 800 F. App'x 8, 11 (2d Cir. 2020).

b.  <u>Substantial Evidence Shows that Mizrahi Knew It Was Drug Money</u>

The evidence also firmly established that Mizrahi was well aware that he was laundering drug money.  Not only did Zubaid and Goran testify that they were involved in discussions with Mizrahi about the source of these funds, *see, e.g.*, Tr. 161, 512, 1050, but there was a wealth of circumstantial evidence regarding Mizrahi's knowledge.  For example:

- Zubaid (at times with Goran) brought Mizrahi virtually limitless amounts of cash, tens or hundreds of thousands of dollars at a time, multiple times a week, in varying denominations;

- Zubaid sent Mizrahi communications containing screenshots of his messages with "Negra," one of the cartel representatives;

- Mizrahi was told that Zubaid was robbed of hundreds of thousands of dollars on multiple occasions and was aware that Zubaid was unable to go to law enforcement in connection with those thefts; and

- Zubaid told Mizrahi that he was faced with threats of violence in connection with these robberies, including telling Mizrahi by text that he "protected" him.

All of this evidence firmly supports the testimony of Zubaid and Goran that Mizrahi knew the money he was laundering had come from selling drugs.  *See, e.g.*, *Fares*, 95 F. App'x 379, 383 (affirming money laundering conviction of person accepting cash as part of "Black Market Peso Exchange"); *United States v. Maher*, 108 F.3d 1513, 1519 (2d Cir. 1997) (affirming district court's finding that a "rational juror would have been hard pressed to avoid finding that the money [defendant] carried to Hong Kong was proceeds from narcotics trafficking" where, among other things, defendant transported $7 million in cash to Hong Kong over 14 trips); *United States v. DeSantis*, 779 F. App'x 820, 821 (2d Cir. 2019) (affirming sentencing enhancement for knowingly laundering drug money where defendant exchanged large amounts of cash on two occasions with unknown individuals who used a pre-arranged code, the cash was stored in heat-sealed vacuum bags, the defendant admitted that he knew the money was for some illegal purpose, and the defendant was familiar with the drug trade through three prior transactions).[13]

---

[13]  In his submission, Mizrahi claims that his reporting of Bitcoin transactions on his taxes are somehow inconsistent with illegally laundering drug money.  *See* Def. Sub. at 13.  He presented this same argument to the jury, which convicted on all counts.  He ignores, moreover, that his taxes were prepared after the credit card fraud had already unraveled, the Brownsville wires had been frozen, and the Government had seized $690,000 from his account.

### 3. The PSR Correctly Applies an Eighteen-Level Enhancement Based on the Value of the Funds Laundered

Mizrahi also objects, in part, to the eighteen-level increase, pursuant to U.S.S.G. §§ 2S1.1(a)(2) and 2B1.1(b)(1)(J), because the value of the funds laundered was between $3,500,000 and $9,500,000, arguing that the source of the bulk cash is "unknown," and that if this Court looks only to the $690,000 in wire fraud proceeds that he laundered, a fourteen-level enhancement would apply. *See* Def. Sub. at 15-16. But as set forth above, and as found by this Court, the Government established at trial that the cash Mizrahi laundered had come from "drug sales," and was thus illicit proceeds. Dkt. 164 at 4. Indeed, for purposes of this enhancement, it is irrelevant whether the illicit funds came from narcotics activity or wire fraud. All that matters is that Zubaid brought Mizrahi millions in plainly illicit bulk cash, which Mizrahi then laundered. Indeed, the evidence showed that Mizrahi made at least $3,855,705 in Bitcoin transfers from his Coinbase account to cryptocurrency wallets associated with "Negra." GX 703. And this is only part of the Bitcoin that he transferred for Zubaid, as evidenced by the more than $5.2 million in transfers Mizrahi made from his personal account to Coinbase. PSR ¶ 22. These transactions plainly establish that the value of the laundered funds substantially exceeded $3.5 million.

### 4. The PSR Correctly Applies a Four-Level Enhancement Because the Defendant was in the Business of Laundering Funds

The four-level enhancement for being in the business of laundering funds likewise applies. Mizrahi engaged in the laundering of millions of dollars, over dozens of transactions and the course of at least five months between February and June 2021, for which he charged substantial fees, and where he was aware that the money was coming from multiple sources. First, on top of the almost 30 money laundering transactions conducted for "Negra" for a total of more than $3.8 million, GX 703, Zubaid testified that the laundered cash also included drug proceeds obtained from individuals named Eduardo and Chino, and that he brought Eduardo to meet with Mizrahi. Tr. 144-45, 164-65.[14] In other words, there were multiple sources just with respect to the narcotics proceeds. The money being received via wire transfers to be laundered, moreover, came from yet

---

[14]    In his submission, Mizrahi makes light of Zubaid's testimony about getting money from "Chino," citing his inability to name a cartel. *See* Def. Sub. at 12. But Zubaid made clear that "Chino" was a person—the man who gave him $316,000 for the Demaio transaction. Tr. 361:11-18. And that is directly supported by a January 12, 2022 message, produced in discovery, that Zubaid sent to Knight, providing a list of payments made to "Chino" against the $316,000 debt:



another independent source—Omar Lucas.  Zubaid testified that not only did he tell Mizrahi about Lucas, but that Mizrahi actually spoke to Lucas about those transactions.  Tr. 214, 220.  Text communications between Zubaid and Mizrahi corroborate that Mizrahi was well aware that funds being laundered came from Lucas in addition to Negra and others, as Zubaid sent Mizrahi, on multiple occasions, screenshots of text messages with and missed calls from Lucas.  DX RRR at 73, 90.  Zubaid also testified that Mizrahi was generally making a commission of approximately seven percent, Tr. 183, 190-91, 214, which would mean Mizrahi made profits in excess of $300,000 just from the Brownsville and Negra transactions.

For all of these reasons, the enhancement for being in the business of laundering funds should apply.  *See* U.S.S.G. § 2S1.1, Application Note 4; *United States v. Lazo*, 2012 WL 4857021, at *943 (11th Cir. 2012) (affirming enhancement for defendant who engaged in 64 transactions during 4-month time period, kept a ten percent cut, and funds came from multiple sources); *United States v. Pendleton*, 761 F. App'x 339, 355 (5th Cir. 2019) (defendant laundered funds from "several drug dealers" and made "a substantial amount of money"); *United States v. Ramirez*, 2024 WL 1090720, at *2 (11th Cir. 2024) (affirming enhancement for defendant who made approximately $34,300 cashing checks several times a week); *compare with United States v. Quarshie*, 2007 WL 107754, at *3 (S.D.N.Y. Jan. 16, 2007) (enhancement not applied where knowledge of illicit source only established for a single transaction).[15]

### 5.    The PSR Correctly Applies a Two-Level Obstruction Enhancement

The defendant also objects to the PSR's application of a two-level enhancement for Mizrahi's obstruction of justice, claiming that, while the jury "must have concluded that some of his testimony was inaccurate, that does not mean that this Court should find that he lied."  Def. Sub. at 17-18.  In support of this claim, he argues that because this Court gave a "conscious avoidance instruction," the jury could have convicted him "without finding that [he] had lied in maintaining that he did not knowingly engage in wrongdoing." Def. Sub. at 18.  Mizrahi is wrong.

As an initial matter, Mizrahi misapprehends the import of this Court's conscious avoidance instruction.  As the Court explained to the jury, conscious avoidance is simply a way of finding "knowledge."  Tr. 2256:13-19.  When it convicted Mizrahi, however, the jury was required to find that Mizrahi acted with more than mere "knowledge"—because he was charged with specific intent crimes, the jury was required to find that he acted both "knowingly" *and* "willfully"; that is, "with an intent to do something the law forbids."  Tr. 2218-1-2  *E.g.*, Tr. 2216:6-8 (wire fraud requires finding that the defendant devised or participated in the fraudulent scheme knowingly, *willfully, and with the specific intent to defraud*); Tr. 2223:16-20 (same for bank fraud); Tr. 2226:14-15 & 2251:2-10 (same for conspiracy); Tr. 2236:10-12 (money laundering requires intent to conceal).  The jury's finding that Mizrahi acted "willfully" eviscerates his contention that it

---

[15]  If the Court determines that this four-level enhancement does not apply, the two-level enhancement pursuant to U.S.S.G. § 2S1.1(b)(2)(B) would be applicable because Mizrahi was convicted under 18 U.S.C. § 1956.  Thus only a two-level offense reduction would result.

could have somehow also accepted his testimony that he did not intentionally do anything wrong.

As the Court is aware, at trial, Mizrahi repeatedly denied engaging in any intentional wrongdoing, instead maintaining at all times that he was tricked by Zubaid and Goran. *E.g.*, Tr. 1772:18-19 ("Call me dumb. I feel embarrassed, but I was trusting him."); Tr. 1850:19 ("I got conned"). As to the millions in cash, Mizrahi testified that he had no idea that the money was connected to drugs or illicit in any way. *E.g.*, Tr. 1737:19 ("No. No, I had no idea there was any cartel."); Tr. 1851:1 ("No, I had no idea of any illegal money"). As to the Brownville wires, he testified that he had no idea that the money had come from fraud. *E.g.*, Tr. 1773:10-11 ("I didn't know that it was a product of the Brownsville theft."); Tr. 1773:22-23 ("I would have canceled the wires, and I would have never sent him the Bitcoin"). And as to the credit card charges, he testified that he believed the money was from legitimate investors and did not know it was a scam. *E.g.*, Tr. 1755:7-16 (Q. "Did he tell you that this was a scam?" A. "No." Q. "Did he tell you that they were fake?" A. "No."). All of this testimony is contrary to the jury's finding that Mizrahi acted with specific intent in engaging in fraud and money laundering; "that is to say, [that he acted] with [a] bad purpose either to disobey or to disregard the law." Tr. 2218-1-2.[16]

Consistent with the jury's finding of guilt beyond a reasonable doubt, this Court should clearly find—applying the lower preponderance standard—that the defendant committed perjury during his testimony and, in calculating his Guidelines, apply the two-point obstruction enhancement in U.S.S.G. § 3C1.1. Indeed, Mizrahi's testimony that he was unwittingly duped by Zubaid and Goran goes to the heart of the charges in this case, was rejected by the jury, and is contradicted by a mountain of evidence showing his willful participation in these schemes. *See United States v. Rosario*, No. 21-680, 2024 WL 2151116, at *1 (2d Cir. May 14, 2024) ("Before applying a section 3C1.1 enhancement based on perjury, the sentencing court must find by a preponderance of the evidence that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter.").[17]

---

[16]  Nor should this Court credit Mizrahi's argument that he lied because he was "flustered and stressed when he took the witness stand." Def. Sub. 18. The Court saw Mizrahi testify for numerous hours over two days. He presented as calm and collected, particularly during his direct examination, and he gave answers that appeared to have been thought out well in advance of his testimony. Indeed, far from being flustered, at times, Mizrahi appeared to chide defense counsel for deviating from the planned script. *E.g.*, Tr. 1722:1-3 (Q. "And do you know if he commonly drove himself or something else?" A. "Well, you're fast forwarding, I think, a little bit?").

[17]  For the same reason, Mizrahi's claim that there was somehow a miscarriage of justice in this case because there was a failure to introduce evidence that he was susceptible to being taken advantage of is meritless. *See* Def. Sub. at 3 n.3. The entire defense at trial was that Mizrahi was overly trusting, had been deceived on prior occasions, and had been, once again, duped by Zubaid. Mizrahi called multiple LV Net employees to support that that theory, and he testified to it in his own defense. In short, he fully developed the theme that he was overly trusting, does handshake deals, and has been taken advantage of in the past, but the jury rightly rejected that theory. Mizrahi has no legitimate claim that his defense was not adequately presented.

While the jury clearly rejected the core of Mizrahi's testimony, there were, moreover, additional aspects of his testimony that were clearly and materially false and thus further support the application of the obstruction enhancement in this case. For example:

a. <u>Not Knowing About Khan's Cut</u>. Significantly, Mizrahi testified at trial that he did not know, until May 19, 2021, that Khan was receiving hundreds of thousands of dollars in connection with the credit card scheme. This issue goes to the heart of Mizrahi's defense, since evidence showing that he knew that Khan was getting roughly half the money from the fraudulent credit card charges would be (and is) glaringly inconsistent with Mizrahi's claim that he thought these charges were for legitimate investments.

In crafting his testimony, Mizrahi was required to contend with a spreadsheet that he himself created and sent to Zubaid on May 19, 2021, listing numerous payments to Khan:

| | | | | |
|---|---|---|---|---|
| | $ 1,577,907 | $ 137,081 | $ 586,981 | $ 880,472 |
| 5/7/2021 gave cash  paid gazi | | | | -80000 |
| 5/10/2021     paid gazi | | | | -160000 |
| 5/13/2021     paid gazi | | | | -85000 |
| 5/13/2021     paid gazi | | | | -150000 |
| 5/15/2021 | | | | -100000 |
| 5/17/2021 | | | | -200000 |
| 5/18/2021 | | | | -100000 |
| 5/19/2021 | | | | -79000 |
| balance owed | | | | $ (73,528) if negative he owes us |

GX 1034 at 2. Given this document, Mizrahi testified that he first learned about these payments at the very moment that he created the spreadsheet, claiming that Zubaid first told him, during a discussion on May 19, that he had "g[i]ve[n] Gazi Khan some cash," Tr. 1750:24-25, and that these payments were "commissions for bringing some of the investors to LV.Net for the CREIT." Tr. 1751:8-9. Mizrahi suggested that he was surprised by this revelation, telling Zubaid that "[t]here's no commissions due yet" and that the "cardholders have up to six months to do a chargeback or a dispute." Tr. 1751:11-13. Mizrahi also claimed he told Zubaid "to get that money back," asking "why would you even give him that money"? Tr. 1751:25-1752:1.

The evidence, however, puts the lie to Mizrahi's testimony. In particular, Mizrahi's texts with Zubaid show that, on May 10, 2021, just as the credit card scheme was getting underway, Zubaid reported to Mizrahi that he had sent hundreds of thousands of dollars to Khan, saying: "Marty I gave the cc people 80k the other day and 160k today. Total so far I've given him 240k." DX RRR at 68. Notably, these dates and amounts (*i.e.*, $80,000 and $160,000), match precisely the figures that Mizrahi entered into the spreadsheet set forth above nine days later. As these messages make clear, contrary to his trial testimony, Mizrahi was not taken aback by some revelation that Zubaid had been sending hundreds of thousands of dollars to Khan. Instead, he was well aware from the outset of that Zubaid was paying Khan his cut, just as Zubaid testified.[18]

---

[18]   Mizrahi's decision to send Zubaid the May 19 spreadsheet appears to have been due to Mizrahi's receipt that same day of the initial disputes relating to the credit charges. *See* GX 1041.

b. <u>Not Reading Bad Documents</u>.  At trial, the Government introduced multiple obviously fraudulent documents that Mizrahi received as part of the credit card scheme.  Perhaps most egregious was a supposed "Authorsiation Letter," purporting to permit whoever held the letter to charge, for unspecified reasons, $500,000,000 to a nameless debit card.  GX 1075.  As even a defense witness admitted on cross examination, the document is obviously fraudulent.  *See* Tr. 1470:16-1471:15.  Because he could not explain it away, Mizrahi tried, in his testimony, to distance himself from this and other bad documents, claiming that he simply did not look at documents sent to him by Zubaid.  *See* Tr. 1820:18-1831:10 ("I don't look at these documents. I forward them to the accounting department, and they usually charge the cards and do whatever they do…. I was just forwarding them back and forth so I could just keep going on with my emails and my million things that I do every day."); Tr. 1944:7 (Q.  "You looked through all the attachments, and this didn't raise any red flags for you?"  A.  "I didn't see it.").

Here again, Mizrahi's testimony is facially incredible and contradicted by the evidence. As an initial matter, Pyatkov testified that no one was involved in these credit card transactions beyond himself and Mizrahi—in other words, nothing was being forwarded to an "accounting department" for processing.  It defies reason, moreover, to conclude that Mizrahi did not even open the three documents that Zubaid sent him relating to Tischler it they truly related to a $24.6 million invoice, which, by itself, would have virtually *doubled* LV Net's annual revenues.  *See* GX 1094.

This commonsense conclusion is supported by the evidence.  Specifically, the email that Zubaid sent to Mizrahi did not provide a full name for this individual, referring only to "Melton":



GX 1075.  Zubaid also attached three documents to his email:  (i) a nameless debit card; (ii) a passport; and (iii) the fraudulent "Authorsiation Letter."  *Id.*  Had he looked only at Zubaid's email, Mizrahi would have known only that the individual's name was "Melton."  And had he looked at his passport, he would have seen that the individual was named "Kirk Tischler Melton."  *Id.*  But

---

While the evidence showed that Mizrahi and Zubaid had already been sending substantial sums to Khan, the receipt of disputes now created risk that they would not be able to keep the money from the credit card charges.  Notably, the Government is not aware of any evidence of payments to Khan after Mizrahi began receiving disputes from the credit card companies on May 19.

the "Authorsiation Letter" contained a mistake—it reversed the names from the passport, and purported to be signed by "Melton Kirk Tischler." *Id.* When Mizrahi directed Pyatkov to prepare a fraudulent $24.6 million invoice for this person, he copied this mistake, telling Pyatkov to make an invoice for "Melton Tischler." GX 1094. In other words, Mizrahi appears to have copied this name straight from the "Authorsiation Letter" that he testified under oath he never read.[19]

### 6.    Mizrahi is Not Eligible for the Zero Point Offender Reduction

Mizrahi next contends that he is eligible for the two-level reduction for certain zero-point offenders set forth in U.S.S.G. § 4C1.1. That adjustment, however, is not available where the defendant "use[d] violence or credible threats of violence in connection with the offense." *Id.* As discussed above, there was substantial evidence regarding two separate instances in which Mizrahi agreed to help Zubaid collect cartel money that had been stolen from him. *See, supra,* at 4-5. Zubaid testified that he understood Mizrahi would potentially do so through force, Tr. 156, and Goran testified that Mizrahi told him, on both occasions, about how Mizrahi had in fact used violence or threats of violence to recover or attempt to recover the money. First, as to the Demaio transaction, Mizrahi said that "some associates of his g[o]t into the complex where Mr. Demaio was living" where "they were able to get ahold of him and get him to transfer the money back." Tr. 1034. Clearly there is a credible, if implicit, threat of violence when unknown individuals physically show up at someone's home seeking the return of cartel money. And with regard to the money stolen in the Anthony transaction, this is even clearer. Goran testified that he heard Mizrahi discuss how Mizrahi had "tracked down" someone who had stolen cartel money from Zubaid and "got [the] money back" by having "some of his associates kidnap[] either a family member or the guy and basically t[elling] him that you better send the money back." Tr. 1073. Goran's testimony, which Mizrahi wholly ignores, is corroborated by the undisputed evidence that Mizrahi called Demaio to set up a purported business meeting as a lure to get the money back, *see* GX 965, and that Mizrahi was in fact successful, at least in part, in getting the funds returned from Anthony.

The above provides a more than sufficient basis to find that Mizrahi used actual violence, or credible threats of violence, in connection with the narcotics money laundering activities he was pursuing. Accordingly, Mizrahi does not qualify for the two-level zero-point offender adjustment.

### 7.    A *Lauerson* Departure is Not Warranted

"[I]n some circumstances an accumulation of somewhat overlapping enhancements, even if not amounting to double counting, can justify a downward departure." *United States v. Jackson,* 346 F.3d 22, 26 (2d Cir. 2003). The Second Circuit, however, has recognized that "not many combinations of enhancements will be substantially overlapping" and "the extent of the departure can only diminish, and not eliminate, the added punishment caused by the overlapping

---

[19]    As shown at trial, other documents also clearly reflect that Mizrahi was reviewing the documents he got from Zubaid. For example, the documents show that Mizrahi corresponded with Zubaid about the contents of these documents, including telling Zubaid that he had failed to include Tischler's driver's license, Tr. 1942:14-1943:16, and that he needed a "real signature" (as opposed to an electronic one) on an invoice for a charge to Zubaid's wife, Tr. 1945:22-1946:17.

enhancements." *United States v. Abiodun*, 536 F.3d 162, 170 (2d Cir. 2008). The decision about whether to grant such a departure is, moreover, discretionary. *Id.*

The requested departure is unwarranted here because each of the applicable Guidelines enhancements serve a different purpose, reflecting different dimensions of the offenses—their scale (the 18-level loss amount enhancement); the unique harms and danger to the community caused by drug trafficking (the six-level narcotics enhancement); and the relative culpability of the defendant's intent and purposes in engaging in the crime (the four-level enhancement for business in the business of money laundering). *See, e.g.*, *United States v. Kilkenny*, 493 F.3d 122, 131 (2d Cir. 2007) (§ 2B1.1 loss amount enhancement and financial institution enhancement "do not constitute impermissible double-counting because the two enhancements serve different purposes"); *United States v. Campbell*, 967 F.2d 20, 25 (2d Cir. 1992) ("[D]ouble counting is legitimate where a single act is relevant to two dimensions of the Guidelines analysis."). Notably, Mizrahi does not identity a single case concluding that § 2S1.1's enhancements substantially overlap in a manner that would warrant a departure, and the Government is aware of none. *Cf. Abreu v. United States*, 2010 WL 2483993, at *8 (S.D.N.Y. June 15, 2010) (each of § 2S1.1's enhancements "were separately authorized by the … Guidelines").

## IV.    A Sentence of At Least 144 Months' Imprisonment is Warranted

### A.  Applicable Law

As the Court knows, the Sentencing Guidelines, while no longer mandatory, still provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), courts must treat them as the "starting point and the initial benchmark" for sentencing proceedings, *id.* at 49.

After calculating the Guidelines range, the Court must consider the factors outlined in Title 18, United States Code, Section 3553(a), which include: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See Gall v. United States*, 552 U.S. 32, 50 & n.6 (2007).

In determining the appropriate sentence, the statute directs the Court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B.  Discussion

At the outset, the Government recognizes that the Guidelines range of 235 to 293 months, which is largely driven by the substantial amounts of money laundered, overstates the defendant's conduct.  However, each of the relevant Guidelines enhancements appropriately capture distinct aspects of the defendant's criminal conduct, such as the significant scale of the misconduct, the direct tie to dangerous narcotics trafficking activity, and Mizrahi's obstruction of justice when he perjured himself the stand.  Moreover, as discussed further below, there is a significant need for specific deterrence in light of Mizrahi's demonstrated pattern of undeterred lies and fraud, which is not reflected in his criminal history category.  In light of these factors, and as set forth in more detail below, a substantial term, below the Guidelines range but of at least 144 months' imprisonment, is warranted and necessary based on the sentencing factors the Court must consider under 18 U.S.C. § 3553(a).[20]

### 1.  Seriousness of the Offense and Need for Just Punishment

A substantial sentence of imprisonment is necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.  18 U.S.C. § 3553(a)(2)(A).  There is no question that the defendant's crimes took course over a number of months and involved millions of dollars in both fraud and money laundering activity.  With respect to the laundering of the more than $3.8 million in drug proceeds, Mizrahi helped move those significant sums despite knowing that he was facilitating dangerous narcotics trafficking.  He made his internet service provider business, LV Net, available to criminals looking to conceal the source of narcotics proceeds.  His willingness to do so was particularly valuable to the narcotics traffics because they were able to use the legitimate portion of the business as camouflage for the illegal proceeds that were also being funneled through the company before being turned into cryptocurrency and sent back to cartel associates.  And Mizrahi profited by allowing them to do this; indeed, his only apparent motivation for engaging in the offenses is greed.

The seriousness of these crimes becomes only clearer when one turns to consider the fraud offenses.  There too, Mizrahi engaged in criminal conduct involving millions of dollars over the course of multiple months, making almost $8 million in fraudulent credit cards charges, again using LV Net as a front to conceal his illegal activity.  And he received money from the credit card companies in connection with some of these charges.  Although the credit card fraud scheme ultimately did not result in the credit card companies losing money, that was only because the scheme was identified by the compliance programs of relevant banks and credit card companies in a timely manner so that they were able to freeze or claw back the funds.  Even absent any direct losses, Mizrahi's scheme and others like it are enormously costly for such companies, which must

---

[20]     This reflects a sentence of at least 120 months imprisonment on Counts One through Five and Seven to be followed by a 24-month term of imprisonment on Count Six.

expend significant financial resources on compliance programs to protect the financial system and detect criminal actors. Indeed, even with such compliance programs in place, $690,000 of the millions stolen from Brownsville was laundered through LV Net before that particular wire fraud scheme was detected. Those millions would have been a significant loss for a non-profit entity with a mission of helping the indigent in our community. Mizrahi's callous disregard as to the source of the funds he was laundering risked serious harm to such victims.

The breadth of Mizrahi's misconduct is also serious and aggravating. As the trial evidence showed, Mizrahi was engaged in multiple continuing schemes for a sustained and overlapping period of time. He began taking drug money in February 2021. And he then quickly delved into credit card fraud. And he accepted multiple fraudulent wires. These were, moreover, only the completed schemes. As the Court saw, Mizrahi tried to engage in additional clearly fraudulent activity, including giving Zubaid control over Ashley Davis's Wells Fargo account and continuing to take money and wires from Zubaid when that account was frozen for fraud. The pervasiveness of this misconduct and sums of money involved further demonstrate the seriousness of his crimes.

As also discussed above, Mizrahi did not just engage in financial transactions, he repeatedly agreed to collect stolen cash, resorting to threats and intimidation to keep the laundering operation going. The evidence at trial showed that Mizrahi was, in fact, successful in collecting at least $380,000 in cash that had been stolen from Zubaid, which he promptly kept for himself (and lied about doing so in Court). And he did not collect hundreds of thousands of dollars in stolen cash by simply asking for it back; he told Goran that his methods included sending associates to someone's home to try and collect money and possibly engaging in an actual or threatened kidnapping. *See, supra*, at 24. Mizrahi's willingness to resort to violence—or, at a minimum, threats of violence—to collect stolen cash that could not be recovered through legitimate means further demonstrates the depth of his involvement and the seriousness of the offense conduct.

The sophistication of the offenses further underscores the seriousness of Mizrahi's conduct. As the jury's finding makes clear, Mizrahi purposefully took advantage of the façade provided by LV Net to hide his criminal activity, washing the credit card transactions through LV Net's books and using funds from LV Net to purchase the cryptocurrency needed to launder cash narcotics proceeds. Adding further layers of obfuscation, Mizrahi also personally directed Pyatkov, LV Net's controller, to create millions of dollars worth of fake contracts and sham invoices, which he used in an attempt to deceive banks and credit card companies about both the types of services LV Net was purportedly being paid for and whether any services were provided. For all of these reasons, a sentence including a substantial term of imprisonment is warranted.

## 2. The Need to Afford Adequate Deterrence to Criminal Conduct

Mizrahi's actions during the course of the charged offenses, as well as his actions since he was arrested, further demonstrate that a substantial sentence is necessary in order to protect the public from additional crimes of the defendant. *See* 18 U.S.C. § 3553(a)(2)(C). As an initial matter, Mizrahi was undeterred from participating in the instant offense despite three prior convictions—two relating to forging names on credit cards and one for possession of someone else's driver's license with intent to commit forgery. While Mizrahi received no criminal history points because those offenses were sustained more than thirty years ago, they are directly relevant.

As the Probation Office points out, they demonstrate a pattern and propensity towards fraudulent behavior, specifically involving identity theft and credit card fraud. These prior convictions also make Mizrahi's claims that he was duped by Zubaid into participating in the credit card fraud scheme because of his own naivety, which were already contradicted by Zubaid's testimony and the other extensive evidence, appear even more absurd. Clearly Mizrahi knew he was doing something wrong when Zubaid drove hours a day, day after day, to bring him duffle bags of cash at houses and in parking lots, and when he sent him pictures of licenses and credit cards in the names of people Mizrahi had no business dealings with and had never met to charge for millions of dollars—charges that, on their face, have no possible legitimate purpose.

Those were not, moreover, the only occasions on which Mizrahi has been found to have engaged in fraudulent behavior. In August 2023, a federal court in Nevada found, after a 21-day civil bench trial during which Mizrahi testified, that Mizrahi had engaged in "oppressive, malicious, and fraudulent" conduct. *Cheetah Wireless Technologies, Inc. v. Lasvegasnet, LLC*, 2023 WL 6878455, at *24 (D. Nev. Aug. 14, 2023). Mizrahi was found liable for approximately $1.5 million in compensatory and punitive damages for breach of contract, unjust enrichment, breach of the covenant of good faith and fair dealing, conversion, breach of fiduciary duty, and *fraud*. In making that finding, the court concluded that Mizrahi had abused his position to retroactively change the terms of a negotiated business agreement, defrauding his partner of its rightful profits. Among other things, the court found that Mizrahi "made numerous misrepresentations" to induce his business partner to enter into the contract, *id.* at *25; denied his business partner proper access to LV Net's books and records, *id.*; exercised control using pressure tactics, including "veiled threats" of litigation and other serious financial consequences, *id.*; and "retroactively revised" financials in a fraudulent manner so that his business partner "bore all losses and costs," *id.* In awarding punitive damages, the court specifically cited, among other things, Mizrahi's "creative revisions to the spreadsheets" and "attempted extortion" of investors." *Id.* at *24. As this finding yet again demonstrates, Mizrahi has engaged in a pattern of deceptive conduct from which he has yet to be deterred.

Mizrahi's decision to get on the stand and commit perjury further demonstrates the need for deterrence and how he views himself as above the law. As the Court saw, he lied about multiple distinct and material matters. Even in his sentencing submission, Mizrahi relies on facts that are flatly false and disproven. This is true, for example, in his continued insistence that he was duped by Zubaid into engaging in the fraud and money laundering schemes. But there are also other factual claims in his submission that are clearly wrong. He relies, for example, on a claim that he "set up another company called Core Scientific with a business partner." Def. Sub. at 39. But multiple LV Net employees testified at trial that Core Scientific was not something Mizrahi founded, but rather a client of LV Net with which Mizrahi pursued a particular data center project—a project that never got off the ground because the equipment was stolen. Tr. at 846, 950, 969-70, 1428-29, 1520. Mizrahi also blames his involvement in the offense, at least in part, on purported PTSD that he was suffering after casino security guards "choked him out" in October 2020. Def. Sub. at 27. But surveillance video of the incident (submitted as Exhibit A) shows that this is a gross exaggeration—while Mizrahi (wearing a lime green shirt) was handcuffed and detained, he was not choked or put in a choke hold at any point, much less "choked out" to the point of loss of consciousness. While the Government cannot speak to the psychological impact of this incident on Mizrahi, it is telling that he continues, even now, to mischaracterize facts to this

Court.  His willingness to continue his pattern of deception when on the stand under oath and even after a jury conviction shows that a substantial sentence is necessary to deter Mizrahi from committing similar crimes in the future.

A substantial term of imprisonment is also necessary to adequately deter other sophisticated criminals like Mizrahi from similar criminal conduct.  *See* 18 U.S.C. § 3553(a)(2)(B).  As the Court is aware, detecting sophisticated fraud and money laundering operations like Mizrahi's is difficult.  The investigation and prosecution of these offenses requires significant time and resources, especially where the criminal conduct occurs alongside otherwise legitimate business activity.  This is particularly true for laundering drug money, where the launderers are rarely directly involved in the distribution of narcotics.  The use, for example, of LV Net as a sham front, the incorporation of money laundering transactions into LV Net's books, and the creation of fake documents purporting to have provided real services all made identifying, investigating, and prosecuting the conduct significantly more challenging.  Indeed, the evidence showed that Mizrahi repeatedly used LV Net's real business as an attempted cover for his crimes.  *See, e.g.*, GX 319 (Mizrahi email telling Bank of America: "We sold OB Marketing & Research LV.Net Hosting services and they paid us for them.").  For this reason, others similarly situated to Mizrahi may be convinced that the Government lacks the resources to prosecute their wrongdoing and that they will not face serious punishment for their crimes.  A substantial sentence is therefore necessary to send a powerful message about the consequences of making easy cash by using businesses as a cover for fraud and money laundering offenses.

### 3.  The Need to Avoid Unwarranted Sentencing Disparities

The requested sentence of 120 months' imprisonment will also prevent unwarranted sentencing disparities between Mizrahi and co-defendant Julian Rebiga, who was previously sentenced by this court to a sentence of 24 months' imprisonment.  As an initial matter, Mizrahi was involved in a far broader swath of criminal conduct than Rebiga.  Rebiga laundered funds from one business email compromise fraud and ran a relatively small number of fraudulent credit card charges; in contrast, Mizrahi laundered wire fraud proceeds, made almost $8 million in fraudulent credit card charges, and laundered millions in narcotics proceeds.  Mizrahi also met with cartel associates; spoke to Lucas, the source for the Brownsville fraud proceeds; and used violence or threats of violence to collect hundreds of thousands in stolen drug money.

Beyond their offense conduct, Rebiga, unlike Mizrahi, also fully accepted responsibility and had other mitigating factors not present here, including the additional time he was likely to face in custody from deportation, a period of detention that he had already served at the MDC, and certain health ailments and personal tragedies, including the recent death of his wife.  Further, unlike Mizrahi who has three prior criminal convictions, this case was Rebiga's first offense.

Their relative culpability is reflected by their disparate Guidelines ranges:  Rebiga's stipulated Guidelines range was 37 to 46 months' imprisonment, while Mizrahi's is 235 to 293 months' imprisonment, including a mandatory minimum consecutive term of 24 months' imprisonment.  Mizrahi's requested sentence of 24 months would accordingly result in

unwarranted disparities because it would fail to reflect Mizrahi's far greater culpability, obstruction of justice, and failure to accept responsibility.

### 4. History and Characteristics of the Defendant

Mizrahi's history and characteristics further support the requested sentence. Unlike many defendants who appear before this Court, Mizrahi came from a stable, loving, supportive family home, and has a substantial network of support. At the time of his criminal conduct, Mizrahi had at least one successful business, LV Net, that had dozens of employees and revenue of more than ten million a year. In other words, Mizrahi acted purely out of greed: there is no contention that Mizrahi engaged in the offense out of need, necessity, or lack of other options. Mizrahi could have chosen a path in which he directed his energies towards LV Net's legitimate activities and led a law-abiding life. Instead, Mizrahi chose, time and again, to take advantage of opportunities to further enrich himself by participating in extensive, sophisticated fraud and money laundering operations. Mizrahi's background thus provides no mitigation or excuse for his conduct.

### 5. Mizrahi's Section 3553(a) Arguments are Unpersuasive

The Court should also reject Mizrahi's remaining arguments for a maximum downward variance under the § 3553(a) factors. Mizrahi asks for a sentence of two years—a downward variance of almost twenty years from the bottom end of the Guidelines range—meaning he would serve the mandatory minimum sentence for his aggravated identity theft and no term of imprisonment for his other offenses. Such a sentence would not comport with society's understanding of just punishment, would create gross and unwarranted sentencing disparities, and would undermine respect for the law.

Mizrahi principally contends that a minimal sentence is warranted because, he says, he suffers from ASD, a condition that was first diagnosed, after the trial ended, by Dr. Romanoff. The Government does not dispute that a defendant's mental health or developmental disabilities, such as ASD, may be appropriately considered as a mitigating factor. But there are substantial concerns about the reliability of the diagnosis in this case. Notably, Dr. Romanoff met with the defendant only after trial and did not review any of the trial proceedings or evidence. The report is not corroborated by any pre-trial evaluations or pre-trial interviews with family members, friends, or other third parties. Rather, almost all of the material Dr. Romanoff relied upon, beyond his post-trial meetings with Mizrahi, were prepared specifically in anticipation of trial or sentencing—Dr. Berrill and Mr. Schmitt's expert disclosures and various character letters. The new diagnosis, accordingly, should be viewed with skepticism, particularly given that Mizrahi was, before trial, evaluated by two mental health professionals, Dr. Banafsheian and Dr. Berrill, who apparently never suggested that he had, or should be evaluated for, ASD. *See United States v. Qualls*, 25 F. Supp.3d 248, (E.D.N.Y. 2014) (rejecting expert's finding of limited capacity and noting that assessments "were made recently, during the sentencing phase, and relied upon self-serving statements of Defendant and his family members"); *United States v. Ramirez*, 154 F. Supp. 2d 774, 777 (S.D.N.Y. 2001) ("[A] post-trial application ... would have more bona fides if the court had been alerted to the issue [of defendant's purported cognitive deficits] during … trial").

Other evidence available to the Court, moreover, casts substantial doubt on Dr. Romanoff's findings. A tendency towards "rigid" behavior in terms of "follow[ing] the same rules of trusting others," *id.* at 26, simply cannot explain—much less excuse—the affirmative acts of deception and fraud that Mizrahi engaged in to facilitate the instant offenses, including collecting stolen drug money, creating fake documents, lying to multiple financial institutions, and committing perjury in this Court.[21] And Dr. Romanoff notes at least twice that his conclusion that Mizrahi's offense conduct resulted in part from his ASD relies upon the "noteworthy" absence of any "other example of an occasion when he lied or behaved dishonestly." Def. Sub., Ex. B at 26; *see also id.* at 28. Dr. Romanoff, however, does not appear to have been made aware of the significant evidence of fraudulent documents Mizrahi created during the instant offense. Nor does he appear to have been made aware of Mizrahi's prior convictions for fraud and identity theft offenses, or the judgment from the civil bench trial in which Mizrahi was found to have engaged in "oppressive, malicious, and fraudulent" conduct warranting almost $1.5 million in compensatory and punitive damages. As Dr. Romanoff himself wrote, facts like those would suggest that Mizrahi "engaged in his offense related behavior out of greed, or out of general criminal orientation," as opposed to it being "a significant departure from a lifetime of overwhelmingly prosocial behavior." *Id.* at 26, 28.

In sum, the Court should view Mizrahi's post-hoc, untested diagnosis of ASD with caution. Instead, it should rely on its own assessment of the defendant's mental acuity, capabilities, and culpability. *See United States v. Valdez*, 426 F.3d 178, 186 (2d Cir. 2005) ("[T]he court is not required to accept evidence concerning a defendant's mental and emotional state offered by the defendant's own expert, but rather may rely on the court's own assessment of defendant ... based on its observations."). The Court had the opportunity to observe Mizrahi in court over a number of pretrial proceedings and then extensively during the multi-week trial. He actively participated in his defense, conferring with counsel at every stage, and testified in his own defense for approximately a day, with extensive direct and cross examination. He had no trouble focusing, recalling events (particularly on direct examination), or engaging with the jurors. Nor did he blindly follow the directives of others; instead, taking forceful positions when confronted with inculpatory evidence. The Court may judge for itself, based on this experience, whether it believes that Mizrahi has a mental condition or developmental disability that would be mitigating as to his culpability or remotely justify the extreme variance that he now seeks.

Notably, to the extent Mizrahi has ASD, it does not appear to manifest in a way that would predispose him to significant issues while incarcerated. As the Court observed during trial, and as the many letters submitted on Mizrahi's behalf attest, Mizrahi has none of the "communication deficits associated with ASD [that] may hinder interactions with prison staff, security staff, and other inmates," nor does he have "difficulties making friendships" or engaging in other personal interactions. *See* Colleen M. Berryessa, Defendants with Autism Spectrum Disorder in Criminal Court: A Judges' Toolkit, 13 Drexel L. Rev. 841, at 848, 862 (2021). Rather, the letters submitted

---

[21]   Likewise, any limitations with regard to Mizrahi's reading comprehension or his ability to read or digest complex documents has little to no bearing on his culpability or the relationship between Mizrahi and Zubaid. *See* Def. Sub. at 24, 33. There is simply no evidence that Zubaid used, or attempted to use, complex or lengthy contracts or other documentation to induce Mizrahi's participation in the scheme. To the contrary, all of the fraudulent contracts and invoices were created by Mizrahi, or at his direction.

on his behalf describe him as "a people person," who is an "excellent listener" with an "ability to connect with people" and "extraordinary interpersonal skills." Def. Sub., Ex. A.[22] Any issues his ASD may cause can also be appropriately addressed by the BOP, as it does with many other inmates with similar diagnoses. *See United Staes v. Amadeo*, 2024 WL 37064, at *3-4 (D. Conn. Jan. 3, 2024) (crediting BOP procedures for treatment and care of inmates diagnosed with ASD).

Mizrahi also touts his devotion and financial support for his family, and he includes letters from a number of individuals proclaiming him to be a caring and generous friend. Def. Sub. at 38-42. These letters do not warrant the limited sentence Mizrahi requests for at least three reasons:

*First*, and perhaps most importantly, while many of the letters describe admirable acts, they suggest that family and friends were likely not fully aware of the side of Mizrahi displayed at trial and reflected in his above-discussed pattern of violent and deceptive conduct. Indeed, the trial testimony showed that LV Net employees were shocked to learn that Mizrahi had been using the company to run massive credit card charges and had no idea that he had created company invoices for tens of millions of dollars for purported LV Net business.

*Second*, as the owner and leader of a large company with significant ties to the community, it is unsurprising that Mizrahi was able to call on support from a broad network or has engaged in charitable acts. *See, e.g.*, *United States v. Barbera*, 2005 WL 2709112 at * 12-13 (S.D.N.Y. 2005); *United States v. McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003) (community involvement not out of the ordinary for high ranking businessmen; "[l]ikewise, excellent character references are not out of the ordinary [for white collar defendant]; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her"); *United States v. Kolbach*, 38 F.3d 832, 838 (6th Cir. 1994) ("[I]t is usual and ordinary, in the prosecution of white-collar crimes involving high-ranking corporate executives ... to find that a defendant was involved as a leader in community charities ... and church efforts"); *United States v. Haversat*, 22 F.3d 790, 796 (8th Cir. 1994) ("[H]igh-level business executives ... enjoy sufficient income and community status so that they have the opportunities to engage in charitable and benevolent activities").

*Third*, with regard to Mizrahi's family, this case is a far cry from those where compelling family circumstances might warrant a significant variance. Mizrahi is not the sole or primary caretaker of any young children. Nor should his incarceration cause significant financial hardship. His two children are adults. And the Government understands that the operations of LV Net are continuing under a different name and new management, which has been in place for some time. Indeed, as noted, Mizrahi's wealth and abundance of familial connections are aggravating factors in this case and in no way mitigate his conduct.

---

[22]    Indeed, even Dr. Romanoff found that Mizrahi "possess[es] ... coping strategies that are rarely found in individuals on the autism spectrum" and, unlike many others with ASD, never "withdrew ... from greater social contact" or "encounter[ed] persistent challenges in reciprocal social communication and social interaction." Def. Sub., Ex. B at 24.

## V.    Forfeiture

As a result of Mizrahi's convictions on Counts Four, Five, and Seven, Mizrahi must forfeit "any property, real or personal, involved in [the] offense." 18 U.S.C. § 982. The Government is accordingly seeking a forfeiture order for a money judgment of $3,855,704, reflecting the narcotics proceeds that Mizrahi laundered for Negra. The Government believes this is a reasonable and conservative estimate of the amount involved in the money laundering offenses, particularly given the evidence that Zubaid and Mizrahi were laundering additional drug proceeds for other cartel-associated individuals. *See* GX 702 (showing more than $5 million transferred from LV Net to Mizrahi, and Mizrahi transfers of more than $5 million to cryptocurrency exchanges).

In addition, as a result of Mizrahi's convictions on Counts One, Two, and Three, Mizrahi must be ordered to forfeit "any property, real or personal, which constitutes or is derived from proceeds traceable to" the offenses." 18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461(c). The Government is accordingly seeking a forfeiture order for the $690,000 stolen from Brownsville and transferred to Mizrahi, which was seized from the LV Net bank account in August 2021.[23]

## VI.    Conclusion

For the foregoing reasons, the Government respectfully requests that the Court impose on Mizrahi a sentence of at least 144 months' imprisonment, which would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by:    ___/s/_____
Benjamin Klein / Emily Deininger
Assistant United States Attorneys
(914) 993-1908 / (212) 637-2472

cc:    All counsel of record (by ECF)

---

[23]    The Government will submit a proposed forfeiture order in advance of the sentencing hearing.