IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| United States of America, | : | |
| | : | No. 22-cr-650 (JPO) |
| v. | : | Judge J. Paul Oetken |
| Martin Mizrahi, | : | |
| Defendant. | : | |

# MARTIN MIZRAHI'S RESPONSE TO THE PROSECUTION'S SENTENCING MEMORANDUM

Richard A. Portale
Chad Mair
PORTALE RANDAZZO LLP
245 Main Street, Suite 605
White Plains, N.Y. 10601
rportale@portalerandazzo.com
cmair@portalerandazzo.com
(914) 359-2400

Richard Weber
WINSTON & STRAWN LLP
200 Park Avenue
New York, N.Y. 10166
rweber@winston.com
(212) 294-1718

Christopher D. Man (*pro hac vice pending*)
WINSTON & STRAWN LLP
1901 L Street, N.W.
Washington, D.C. 20036
cman@winston.com
(202) 282-5622

*Counsel for Martin Mizrahi*

Mr. Mizrahi would like to respond briefly to a few of the new points raised in the government's August 27, 2024 letter to the Court ("Sentencing Letter").

**The Government's Sentencing Recommendation Is Still Too High**

Although the government almost always argues for a sentence within the Sentencing Guideline range that it calculates, the government explains that in this case it "recognizes that the Guidelines range of 235 to 293 months, which is largely driven by the substantial amounts of money laundered, overstates the defendant's conduct." (Sentencing Letter at 26.) Instead, the government requests that the Court "impose a sentence of at least 144 months' imprisonment." (*Id.* at 2.)

While the defense appreciates the government's concession, it does not go far enough. Although the government objects to Mr. Mizrahi's request for a departure under *United States v. Lauersen,* 348 F.3d 329 (2d Cir. 2003), that is essentially what the government has done in recommending that the Court impose a sentence of at least 144 months instead of a sentence in the 235–293-month range under its Guideline calculation. *Lauersen* provides for a downward departure when the Guidelines are accurately calculated, but overlapping enhancements create a sentencing recommendation that overstates the seriousness of the offense. In requesting this sort of departure, the government does not offer any meaningful explanation as to why it considers 144 months appropriate.

The most fundamental flaw in the government's 144-month proposal is that the government has not appropriately calculated Mr. Mizrahi's Sentencing Guideline score in the first place. As Mr. Mizrahi explains in his Sentencing Memorandum, the government improperly piles on enhancement after enhancement that should not be included. It should come as no surprise that the government's math yields a sentencing calculation result that it cannot defend, because it

1

improperly inflated Mr. Mizrahi's Guideline calculation by adding in sentencing enhancements that do not apply. Bad inputs yield flawed outputs. It is only by overstating Mr. Mizrahi's Guideline score as recommending a 235–293-month sentence that its new recommendation for as little as 144 months appears generous. Using a more reliable Sentencing Guideline calculation that strips out these unwarranted enhancements, a 144-month sentence is way too high and could very well mean that Mr. Mizrahi will spend the rest of his life in prison.

**No Laundering Of Drug Proceeds Was Proven**

As Mr. Mizrahi explains in his Sentencing Memorandum, the bulk of these enhancements have to do with the government's unproven claim that Mr. Mizrahi laundered the proceeds of unlawful drug sales for a cartel, but there is no meaningful evidence that occurred. The government's only evidence comes from Mr. Zubaid, who admittedly had no first-hand knowledge that the money belonged to a cartel and were the proceeds of drug sales. It was what he assumed or claims to have been told by others in hearsay upon hearsay. The government claims that Mr. Goran corroborated Mr. Zubaid's claim, but Mr. Goran acknowledged that his testimony was based only on what Mr. Zubaid told him. (Tr. 1031.)

Next, the government claims that it has text messages between Mr. Zubaid and a "cartel representative" named "Negra," who Mr. Mizrahi never met or had any contact with, but there is no proof that she had anything to do with a cartel or drug money. (Sentencing Letter at 14, 18.) Only Mr. Zubaid claims she was a cartel representative, but he only identifies Negra as "his client" in his messages to Mr. Mizrahi. Nor does Negra appear to be a scary cartel enforcer from her communications with Mr. Zubaid where they refer to each other affectionately as "Hon" or "Honey."

> **From:** +19095570577 Joel Zubaid (owner)
> **To:** +16266275466 Negra-Claudia
>
> Please my Hun.  Go inside and cozy up
>
> | Participant | Delivered | Read | Played |
> |---|---|---|---|
> | +16266275466 Negra-Claudia | 6/5/2021 3:28:34 PM(UTC+0) | | |
>
> **Status:** Sent
>
> 6/5/2021 3:28:33 PM(UTC+0)

Source Info:
00008110-00166D1211B9801E_files_full.zip/private/var/mobile/Library/SMS/sms.db :
0xB89FF49 (Table: message, handle; Size: 425308160 bytes)
00008110-00166D1211B9801E_files_full.zip/private/var/mobile/Library/SMS/sms.db-wal :
0x25EDAE (Table: chat; Size: 2793392 bytes)

> **From:** 16266275466@s.whatsapp.net Negra-Claudia
>
> Good morning honey
> ETA
>
> **Status:** Read
> **Platform:** Mobile
>
> 9/28/2021 2:52:38 PM(UTC+0)

Source Info:
00008110-00166D1211B9801E_files_full.zip/private/var/mobile/Containers/Shared/AppGroup/4A8CDF22-726F-49C5-B1AC-10A9E02B1D2C/ChatStorage.sqlite : 0x2B71E49 (Table: ZWAMESSAGE; Size: 69267456 bytes)
00008110-00166D1211B9801E_files_full.zip/private/var/mobile/Containers/Shared/AppGroup/4A8CDF22-726F-49C5-B1AC-10A9E02B1D2C/ContactsV2.sqlite : 0xD237F (Table: ZWAADDRESSBOOKCONTACT; Size: 1048576 bytes)

> **From:** 19095570577@s.whatsapp.net Joel Zubaid (owner)
> **To:** 16266275466@s.whatsapp.net Negra-Claudia
>
> Good morning sorry for the delay hun At 11 you'll have your BTC
>
> | Participant | Delivered | Read | Played |
> |---|---|---|---|
> | 16266275466@s.whatsapp.net Negra-Claudia | 9/28/2021 4:08:55 PM(UTC+0) | | |
>
> **Status:** Delivered
> **Platform:** Mobile
>
> 9/28/2021 3:06:15 PM(UTC+0)

Source Info:
00008110-00166D1211B9801E_files_full.zip/private/var/mobile/Containers/Shared/AppGroup/4A8CDF22-726F-49C5-B1AC-10A9E02B1D2C/ChatStorage.sqlite : 0x2B715D4 (Table: ZWAMESSAGE; Size: 69267456 bytes)
00008110-00166D1211B9801E_files_full.zip/private/var/mobile/Containers/Shared/AppGroup/4A8CDF22-726F-49C5-B1AC-10A9E02B1D2C/Library/Preferences/group.net.whatsapp.WhatsApp.shared.plist : 0x189E (Size: 18702 bytes)
00008110-00166D1211B9801E_files_full.zip/private/var/mobile/Containers/Shared/AppGroup/4A8CDF22-726F-49C5-B1AC-10A9E02B1D2C/ContactsV2.sqlite : 0xD237F (Table: ZWAADDRESSBOOKCONTACT; Size: 1048576 bytes)

And if the government has evidence that Negra is the bigger fish in this alleged scheme who worked for the cartel, why has she not been arrested and charged too? It would not be difficult to find her, especially with Mr. Zubaid's assistance, and she does not hide. She has an extensive social media presence.





The government also claims that the sort of money laundering that occurred here is consistent with the laundering of drug money, as Agent Hernandez testified, but that is hardly corroboration. It may be true that cartels often attempt to convert bulk cash in substantial quantities into Bitcoin, but that is hardly unique. Section 1956(c)(7) makes the money laundering statute applicable to "specified unlawful activity," which includes dozens upon dozens of criminal offenses in addition to drug-related crimes. Converting cash into a different currency, like Bitcoin, is a common method of laundering money in every instance. Given the vast number of crimes that generate money that criminals may seek to launder, there is nothing in the facts here that make the conversion of large quantities of cash into Bitcoin some sort of distinct signature of a drug related offense. Nor are the supposed threats of violence unique to money laundering from the drug trade, as the money laundering offense covers a host of violent crimes, including "murder, kidnapping, robbery" and even a more general "crime of violence." 18 U.S.C. § 1956(c)(7). The government

has not proven that it was drug sales proceeds here that were laundered as opposed to proceeds from some other crime.[1]

The holes in Mr. Zubaid's testimony and the government's case are massive. Even with the cooperation of Mr. Zubaid and Mr. Goran, the government has not charged "Negra" or anyone involved with the supposed cartel. The government has not even identified which cartel the money supposedly belonged to. Nor has the government identified even a single drug transaction or what drug was sold, by whom or to whom, with respect to any of this money. Such evidence is commonplace in the typical drug-related money laundering case, but all such evidence is absent here. All the government has is Mr. Zubaid's self-serving claim that it was cartel money. The government has failed to prove that it was drug money in particular that was laundered, and that is the government's burden.

### There Is No Evidence That Mr. Mizrahi Engaged In Violence Or Threatened Violence

The government's persistent claim that Mr. Mizrahi engaged in violence or threatened to do so remains empty. Again, this should not be hard for the government to prove if it happened. The government claims Mr. Mizrahi threatened Andrew Demaio and Anthony Anderson, but the government offered no statement from either man that it happened. Neither purported victim claims Mr. Mizrahi threatened him. Mr. Demaio claimed it was Mr. Zubaid who threatened him, and he did not even know Mr. Mizrahi's name. (DE162 at 20.) Mr. Mizrahi denied threatening Mr. Demaio or Mr. Anderson, and testified that he called Mr. Anderson's girlfriend, explained that

---

[1] The government claims actual violence was used against Mr. Knight, who Mr. Mizrahi never met, based on screen shots that Mr. Knight sent Mr. Zubaid on February 19, 2022. These photographs depict Mr. Knight covered in blood (perhaps a substance, such as paint, made to look like blood), and they were sent seven months *after* Mr. Mizrahi's involvement in the alleged conspiracy ended in June 2021. Even assuming Mr. Knight was attacked, there is no indication it was a Mexican cartel who attacked him or that the attack had anything to do with any activity that involved Mr. Mizrahi.

Mr. Anderson stole some money, and she asked him to return it. No threats were made, and the government did not call Mr. Anderson's girlfriend as a witness either. (*Id.*) Mr. Zubaid's claim about the threats or violence that he claims to believe happened does not reflect the reality of either situation, and it is doubtful that Mr. Zubaid even believes his own testimony.

### New Allegations Of Fraud

The government now claims for the first time that Mr. Mizrahi engaged in an unrelated incident of fraud in *Cheetah Wireless Technologies, Inc. v. Lasvegasnet, LLC*, 2023 WL 6878455 (D. Nev. Aug. 14, 2023), but these allegations are irrelevant to his sentencing hearing here. Although Mr. Mizrahi was found liable by the trial court in that civil case, Mr. Mizrahi has appealed the decision, contesting the trial court's factual findings.[2] Thus, it would be inappropriate for this Court to view that case as having established any facts that should be relied upon now at Mr. Mizrahi's sentencing.

Moreover, the case itself is far afield from the sort of allegations at issue in this case. *Cheetah Wireless* is a typical commercial dispute involving an alleged breach of contract with a business partner. That sort of commonplace commercial dispute hardly establishes that Mr. Mizrahi has a vast history of engaging in fraud.

The government also claims Mr. Mizrahi made misrepresentations concerning Core Scientific being a company he helped found, when the government claims that it was merely a client of LV.Net. The documents show that is not true.

---

[2] The government misstates that Mr. "Mizrahi was found liable for approximately $1.5 million in compensatory and punitive damages." (Sentencing Letter at 28.) As the judgment in that case reflects, the roughly $1.25 million compensatory damages award is against LV.Net "only" and Mr. Mizrahi and LV.Net were found jointly and severally liable for the remaining $250,000 in punitive damages. *See Cheetah Wireless*, Judgment at 49 (Aug. 14, 2023).

| | |
|---|---|
| **From:** | Marty Mizrahi <marty@lv.net> |
| **Sent:** | Saturday, December 16, 2017 3:28 AM |
| **To:** | DF |
| **Subject:** | Re: Address |

We have to discuss. 10 million is nothing. I can do that on my own. I already did that I need 100,000 million.

On Dec 16, 2017, at 2:04 AM, DF <df@blackstarlv.com> wrote:

> No. MineCo. We going public man. Can't have any confusion. I'm going to make you 10m+. All our investors are coming to this building. I did it as presentation center. Come to vegas see this spot. We need all your systems though
>
> Sent from my iPhone
>
> On Dec 16, 2017, at 1:49 AM, Marty Mizrahi <marty@lv.net> wrote:
>
>> Great
>> Can we put LV.Net and your Name on the outside of the building?
>>
>> From: Darin Feinstein [mailto:df@blackstarlv.com]
>> Sent: Friday, December 15, 2017 10:25 PM

| | |
|---|---|
| **From:** | DF <df@blackstarlv.com> |
| **Sent:** | Friday, March 9, 2018 3:55 PM |
| **To:** | Bryce Johnson; marty@lv.net; ronc@lv.net; Aber Whitcomb; matt minnis; Jim Benedetto |
| **Cc:** | Nick Phillips; Russell Cann Ypo |
| **Subject:** | Roll up 2 |

We are rolling Marty up for 1m shares he has about 600-700 machines as well as hosting contracts for about 25-40k month in 200-300 machines. We are taking over those contracts and he is coming on the team with russel to roll up more companies. He is full time Mineco and ready to go. The revenue from mining and hosting should come over by the mid next week because he is putting everything he owns on a truck this wknd let's get this started. Jim please have jaque work wirh Marty and nick to get done.

Sent from my iPhone

**The Cosmopolitan Hotel Attack**

There is no question that Mr. Mizrahi was attacked at the Cosmopolitan Hotel and that he suffered great psychological injury, as is reflected in the fact that he sought therapy at the time, and he has provided the Court with his medical records to prove it. (DE162 at 28.) Nevertheless, the government suggests that Mr. Mizrahi is some sort of egg-shell victim because his attack was

8

not so bad. (Sentencing Letter at 20.) While the government seeks to demonize Mr. Mizrahi for threats of violence it claims—without any meaningful foundation—that he committed against Mr. Demaio and Mr. Anderson, the government completely trivializes Mr. Mizrahi's abuse from an actual violent encounter by four men who attacked him.

The government claims the video surveillance shows that Mr. Mizrahi was not being choked as Mr. Mizrahi claims, and it characteries his claim as "a gross exaggeration," but the government is wrong. (*Id.* at 28.) The still frames below reflect Mr. Mizrahi getting choked and not being able to breath for some time. Also, the Cosmo admits that they lost all the other angles of the video footage and over 10 minutes of the video footage. The government conveniently leaves that out.









Additionally, Mr. Mizrahi has suffered injuries that have required medical treatment, and it now appears that he may require surgery on his shoulder to address these injuries. (*See* Dr. Kim Ltr. (Ex. A).)

**The Government's Attacks On Dr. Romanoff Are Unfounded**

The government's attacks on Dr. Romanoff's credibility are unwarranted and simply insulting. Dr. Romanoff has forty years of experience and has provided evaluations of over 3,000 defendants over the course of his career. (DE162 at 3.) Virtually nothing the government says about his diagnosis is factually accurate.

The government claims he "did not review any of the trial proceedings or evidence" (Sentencing Letter at 30), but he did. Dr. Romanoff conducted his review of Mr. Mizrahi post-trial, and he reviewed the allegations in the superseding indictment, the expert disclosures and the PSR, among other materials. (DE162-4 at 2-3.) Additionally, Dr. Romanoff spent 14.5 hours

11

conducting evaluations of Mr. Mizrahi, as well as one-hour sessions with each of three people close to him, and he reviewed 116 letters from friends and family that were submitted to this Court. (DE162-4 at 5).

It is insulting to Dr. Romanoff and each of these individuals that the government claims Dr. Romanoff's report "should be viewed with skepticism," claiming, "[t]he report is not corroborated by any pre-trial evaluations or pre-trial interviews with family members, friends, or other third parties." (Sentencing Letter at 30.) More than 100 individuals submitted post-trial letters to the Court relaying their knowledge of Mr. Mizrahi pre-trial, often going back to his childhood, where people took advantage of him due to his gullibility and they witnessed him suffering under his disability. The government's "skepticism" is a transparent suggestion that each of these people are lying post-trial and that Dr. Romanoff is not reliable.

Additionally, Dr. Banafsheian's report identifying Mr. Mizrahi's learning disabilities and the trauma that he suffered following the Cosmopolitan Hotel attack also predates Mr. Mizrahi's indictment. Her report informed Dr. Romanoff's ASD diagnosis, which is within his wheelhouse. Dr. Banafsheian's role was not to diagnose Mr. Mizrahi with ASD, which is not her expertise, but to provide therapy to help in overcoming his PTSD following a violent attack.[3]

The fact that Mr. Mizrahi was not diagnosed with ASD sooner should come as no surprise, as the recognition of ASD itself is fairly new. Plainly though, the early warning signs were there with his parents seeking help for him in addressing learning disabilities as a child and the numerous stories by friends and family of how easily Mr. Mizrahi would be conned by nefarious people

---

[3] Given the acute presentation of Mr. Mizrahi's PTSD and his urgent need for therapy to address his suffering, it would have been difficult to diagnose an underlying ASD. In essence, the PTSD would likely mask any other conditions that Mr. Mizrahi would have.

throughout his life.  This is not some story fabricated by Dr. Romanoff and more than 100 members of Mr. Mizrahi's friends and family.  Mr. Mizrahi's counsel sought Dr. Romanoff's evaluation precisely because it became apparent to them post-trial that something was not right with him, and defense counsel certainly wish they had made this discovery pre-trial.

The point for the Court in sentencing Mr. Mizrahi is that the conduct that he engaged in occurred while he was suffering from PTSD and ASD, and professional conmen—Mr. Zubaid and Mr. Goran—were seeking to exploit him.[4]  The Court certainly can take that into account as a mitigating factor or extenuating circumstances, as even the government acknowledges. (Sentencing Letter at 30 ("The Government does not dispute that a defendant's mental health or developmental disabilities, such as ASD, may be appropriately considered as a mitigating factor.")) That is all we are asking the Court to do in tailoring its sentence to the particular individual as the law requires.

September 6, 2024                                          Respectfully submitted,

Richard A. Portale                                         *s/ Richard Weber*
Chad Mair                                                  Richard Weber
PORTALE RANDAZZO LLP                                       WINSTON & STRAWN LLP
245 Main Street, Suite 605                                 200 Park Avenue
White Plains, N.Y. 10601                                   New York, N.Y. 10166
rportale@portalerandazzo.com                               rweber@winston.com

---

[4] The fraud counts particularly illustrate this exploitation.  Mr. Zubaid and Mr. Goran sought Mr. Mizrahi's ability to charge credit cards through his business to obtain money.  Such a scheme could only benefit them, if they took the money and ran.  As soon as credit card holders got their bills, they would surely contest the charges and there would be charge-backs to Mr. Mizrahi's company, LV.Net, which was a large, well-established company that was not going anywhere.  Mr. Mizrahi had no ability to take the money and run.  The charge-backs would cost him, and damage his already lucrative legitimate company.  No one in their right mind would join this supposed conspiracy in the role that the government alleges Mr. Mizrahi played because there is no conceivable way for him not to get caught and have to pay all the money back, which is precisely what happened.

cmair@portalerandazzo.com  (212) 294-1718
(914) 359-2400

Christopher D. Man (*pro hac vice*)
W<small>INSTON</small> & S<small>TRAWN</small> LLP
1901 L Street, N.W.
Washington, D.C. 20036
(202) 282-5622
cman@winston.com

*Counsel for Martin Mizrahi*

14